Exhibit 2

Deposition of Steven Lenes
May 11, 2012

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

ELISABETH LENES and STEVEN        )  CIVIL ACTION NO.:
LENES,                            )  2:10-CV-316-CWH
                                  )
          Plaintiffs,             )
                                  )
vs.                               )
                                  )
LORAL LANGEMEIER,                 )
                                  )
          Defendant.              )

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


VIDEOTAPED
DEPOSITION OF:        STEVEN LENES
DATE TAKEN:           Friday, May 11, 2012
TIME:                 9:00 a.m.
PLACE:                1017 Chuck Dawley Blvd.
                      Mt. Pleasant, SC  29464

REPORTED BY:          TERI L. SAMPSON, RPR,
                      Notary Public and Certified
                      Live Note Reporter


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


POST OFFICE BOX 21784
CHARLESTON, SOUTH CAROLINA 29413-1784

STEVEN LENES - MAY 11, 2012

---

### 2

```
 1        A P P E A R A N C E S
 2   REPRESENTING THE PLAINTIFFS:
 3        JAMES C. BRADLEY, ESQUIRE
          CHRISTINE C. ORMAND, ESQUIRE
 4   Richardson Patrick Westbrook & Brickman, LLC
     1017 Chuck Dawley Blvd.
 5   Mt. Pleasant, SC  29464
     (843) 727-6603
 6   email: jbradley@rpwb.com
          cormand@rpwb.com
 7
          GUY M. BURNS, ESQUIRE
 8   Johnson, Pope, Bokor,
     Ruppel & Burns, LLP
 9   403 East Madison Street
     Suite 400
10   Tampa, FL  33602
     (813) 225-2500
11   email: guyb@jpfirm.com
12   REPRESENTING THE DEFENDANT:
13        J. MITCHELL LITTLE, ESQUIRE
     Sceef & Stone, LLP
14   2601 Network Blvd.
     Suite 102
15   Frisco, Texas  75034
     (214) 472-2100
16   email: mitch.little@solidcounsel.com
17   ALSO PRESENT:
18        Clearview Legal Video
          Doug White
19        1257 Fort Dr.
          Hanahan, SC 29410
20        843-557-7138
          info@clearviewlegalvideo.com
21        www.clearviewlegalvideo.com
22        DR. STUART BROWN
          ELISABETH LENES
23
24
25
```

### 4

```
 1   MT. PLEASANT, SOUTH CAROLINA, FRIDAY, MAY 11, 2012
 2        9:06 A.M.
 3   P R O C E E D I N G S
 4        - - - - -
 5        VIDEOGRAPHER:  The date today is May 11th,
 6   2012.  The time is 9:06.  This is the video
 7   deposition of Dr. Steven Lenes in the matter of
 8   Elisabeth Lenes and Steven Lenes versus Loral
 9   Langemeier in the United States District Court for
10   the District of South Carolina, Charleston
11   Division, Civil Action No. 2:10-CV-316-CWH.
12        This deposition is being held at Richardson
13   Patrick Westbrook & Brickman located at 1017 Chuck
14   Dawley Boulevard in Mt. Pleasant, South Carolina.
15        Will counsel please introduce themselves and
16   the parties they represent after which our court
17   reporter will swear in the witness.
18        MR. LITTLE:  Mitch Little representing Loral
19   Langemeier.
20        MR. BRADLEY:  Jim Bradley representing the
21   plaintiffs.
22        MS. ORMAND:  Christine Ormand representing
23   the plaintiffs.
24        MR. BURNS:  Guy Burns for the plaintiff.
25        MR. BRADLEY:  And with us here today is
```

### 3

```
 1        I N D E X
 2
     WITNESS:  STEVEN LENES
 3
     Examination                   Page
 4
     BY MR. LITTLE. . . . . . . . . . . . . . .  5
 5
     REPORTER'S CERTIFICATE . . . . . . . . . . . 268
 6   ERRATA SHEET . . . . . . . . . . . . . . . . 269
 7
          - - - - -
 8
 9
          EXHIBITS:
10
          (No exhibits were offered or marked for
11        identification.)
12
13        - - - - -
14
15        S T I P U L A T I O N S
16        It is hereby stipulated and agreed by and
17   between the parties hereto, through their respective
18   counsel, that the reading and signing of the
19   transcript is reserved by the Deponent.
20
21
22
23
24
25
```

### 5

```
 1        Stuart Brown.
 2   WHEREUPON,
 3            STEVEN LENES,
 4   being first duly sworn, testified as follows:
 5            EXAMINATION
 6   BY MR. LITTLE:
 7        Q   Dr. Lenes, have you ever had your deposition
 8   taken before?
 9        A   This is the first time.
10        Q   Okay.  Well, as you know, my name is Mitch
11   Little and I represent a lady named Loral Langemeier
12   that you and your wife have sued.  You understand that,
13   right?
14        A   Yes.
15        Q   Okay.  And we have some local rules here in
16   South Carolina regarding a certain instruction I'm
17   supposed to give you.  If you don't understand a
18   question that I ask you, would you agree to just ask --
19   or let me know so I can try to rephrase the question?
20        A   Yes.
21        Q   Okay.  And I'll do my darnedest to not talk
22   over you when you're giving your answer, as well.
23   Never having had your deposition taken before, are you
24   familiar with the process, having sat through your
25   wife's deposition?
```

STEVEN LENES - MAY 11, 2012

## 6

1    A   I -- I think I am.
2    Q   Somewhat?
3    A   Yes.
4    Q   Okay.  Would you just tell the ladies and
5  gentlemen of the jury what your educational background
6  is?
7    A   Yes.  So I'm a physician, family practice,
8  and after -- high school, do you want -- do you want
9  back as far as high school?
10   Q   Yeah, where did you go to high school?
11   A   I went to high school in Florida, Satellite
12 Beach, Florida, and then I did a year of Bible school
13 in Oak Park, Illinois.  And then I went to the
14 University of Florida for four years and then I did
15 some graduate work in Boston.
16       Then I became an operating room technician
17 and then -- that was at Essex Agricultural and
18 Technical Institute in -- in Massachusetts.  And then I
19 went to physician assistant school at Emory in Atlanta
20 and then back to medical school at Emory University in
21 Atlanta and did my training in family medicine here in
22 Charleston.  So it's way too much school.
23   Q   When did you graduate from medical school?
24   A   I didn't hear you.  I'm sorry.
25   Q   When did you graduate from medical school?

## 7

1    A   In -- in 1986.
2    Q   And physician's assistant school?
3    A   That was in 1981.
4    Q   And what kind of graduate work did you do in
5  Boston?
6    A   It was health science.
7    Q   And when did you graduate from there?
8    A   That was just one year that I did that, so I
9  did not get a --
10   Q   When did you graduate from the University of
11 Florida?
12   A   1976.
13   Q   And what was your degree in?
14   A   Zoology.
15   Q   And what Bible school did you attend in Oak
16 Park, Illinois?
17   A   It's called Emmaus Bible School.  It's
18 actually Bible College now, and they've moved to
19 Dubuque, Iowa, so they're no longer in Oak Park.
20   Q   Were you considering entering the ministry at
21 that time?
22   A   Nope.  It was -- I -- I had applied to the
23 Naval Academy and was going to go there and I was
24 disqualified for physical reasons, and so that's the
25 only school I applied to.

## 8

1    Q   For what --
2    A   So --
3    Q   -- for what physical reasons did you end up
4  getting disqualified?
5    A   So I have a heart murmur.
6    Q   Okay.
7    A   And so they -- they wouldn't take me for
8  that.
9    Q   So where did you receive -- where did you
10 receive your training in family medicine?
11   A   Here in Charleston at the Medical University
12 of South Carolina.
13   Q   And if you would, take me through your kind
14 of professional background beginning after you leave
15 college.  So you did some emergency room tech work?
16   A   No.
17   Q   Do I have that correct?
18   A   No.  So as my summer jobs in college, I
19 worked in -- well, I painted houses and did janitor
20 work, but I also worked in hospitals as an attendant.
21 And so the -- the operating room technician was a
22 nine-month course just to be able to work in -- in the
23 operating room and assist surgeons.  And I actually
24 went to school for that, but didn't do that.  I got
25 into P.A. school after I finished that program, so I

## 9

1  went on to -- to become a physician assistant.
2    Q   And how long did you work as a physician's
3  assistant?
4    A   For about eight months, and then I went to
5  medical school.
6    Q   What kind of doctor were you assisting?
7    A   A cardiologist.
8    Q   And after you got out of medical school, take
9  me through kind of your professional history, if you
10 would.
11   A   So residency is three years and --
12   Q   Where did you do that?
13   A   Here at the Medical University of South
14 Carolina.  And then through the course of that, I
15 worked in emergency rooms moonlighting, so that's the
16 emergency room part.  After finishing residency, I
17 worked for the Indian Health Service in New Mexico for
18 a year.
19       Then I came back to -- we came back to
20 Charleston and I worked for -- at the Navy Hospital in
21 their emergency room and ambulatory care clinic.  And
22 at the same time, I also worked at the VA hospital in
23 their alcohol and drug treatment program.  I did that
24 for about, I don't know, a year and a half, two years,
25 somewhere around there.

STEVEN LENES - MAY 11, 2012

## 10

1  And then I started working for a community
2  health center, which is Franklin C. Fetter here in
3  Charleston. And I did that for eight years. And I
4  continued to do emergency room kind of moonlighting
5  through that whole time.
6  Then I worked for two years for -- contracted
7  with a company that contracted with South Carolina to
8  provide medical care at prisons. So I worked at Lieber
9  prison and MacDougall, which are here in -- just north
10 of Charleston.
11 And then at the end of two years, I came to
12 where I currently work, which is the Coastal Center.
13 It's part of the South Carolina Department of
14 Disabilities and Special Needs. And so I take care of
15 people with developmental disabilities and I've been
16 doing that for the last 12 years.
17 Q    What years did you work at the VA and Navy
18 hospitals?
19 A    That would have been, let's see, probably '90
20 to '92, middle of '92, end of '92, somewhere around
21 there.
22 Q    And during the course of your work at the
23 Navy Hospital or the VA or anything else in your
24 professional career, have you had occasion to treat
25 people who have severe mental illness?

## 11

1  A    I do a lot of that now, so people with
2  developmental disabilities also have mental illness.
3  Q    And I -- I imagine that that's right. What
4  kinds of mental illnesses are you talking about?
5  A    The -- the same as everybody else. I mean,
6  they're really not any different than all the rest of
7  us.
8  Q    Okay. Do you treat people with dissociative
9  disorders?
10 A    You know, I don't -- I'm not sure what you're
11 meaning when you say "dissociative disorders"
12 Q    Okay.
13 A    So I don't...
14 Q    Do you know what a dissociative disorder is?
15 A    Not exactly, no.
16 Q    Okay. When you were working at the Navy
17 Hospital or the VA, did you treat people with post
18 traumatic stress?
19 A    Some. It's more -- I did the medical
20 consulting and the -- on the -- for the alcohol and
21 drug treatment, so I took care of their medical
22 problems and the psychiatrist did most of the rest of
23 that.
24 Q    Did you do psychiatric or psychological
25 rounds when you were in medical school?

## 12

1  A    Right.
2  Q    How long did you do that for?
3  A    Probably -- I think we had two months of
4  psychiatry rotations.
5  Q    What types of mental illnesses do you treat
6  now or have you treated for the last 12 years?
7  A    So bipolar disorder, schizophrenia,
8  schizoaffective disorder, depression, autism, fragile X
9  has a mental component to it, some personality
10 disorders.
11 Q    Any others that you can think of?
12 A    Well, the -- the thing that's difficult about
13 people with developmental disabilities is it -- it's
14 very hard to really say what's going on with them. And
15 so you also treat symptoms and so when they have
16 self-injury or they're aggressive, you know, you -- you
17 tend to treat a -- a symptom, but you don't really
18 necessarily always have a diagnosis to go with it.
19 Q    Because they can't tell you what's going on
20 with them?
21 A    Correct.
22 Q    Is that --
23 A    Correct.
24 Q    -- am I understanding you correctly?
25 A    Yes.

## 13

1  Q    Okay. One of the issues that came up in your
2  wife's deposition was she said that she had been
3  brainwashed. Do you recall that?
4  A    I do.
5  Q    All right. At some point during your
6  marriage, did you identify that that was something that
7  was going on?
8  A    You know what, that's -- that is not correct.
9  My wife --
10 Q    Okay.
11 A    -- my wife, English is her fourth language.
12 Q    Okay.
13 A    And so when she -- there's sometimes she uses
14 words that she doesn't get all the nuances of them.
15 And I remember when we were first married, she -- she
16 was working for the Bank of Nova Scotia in Atlanta and
17 she -- she was new to this country, I called her up to
18 ask her -- you know, to talk to her and she was
19 talking, and she used some language that I knew did
20 not know what that meant.
21 And -- and she -- it was -- the place she
22 worked, people just spoke very, you know, crudely
23 there. And so she used that language and I thought,
24 oh, my gosh, and I -- I was quiet for a minute and I
25 thought through it and I said, "Dear, please don't use

STEVEN LENES - MAY 11, 2012

## 14

1  any words that you don't know exactly what they mean
2  until you check with me."
3       So she -- she has -- she has a very -- she's
4  great with English, but there are certain things that
5  she just still doesn't get.  And the children and I, I
6  mean, we have things that we just laugh about at home
7  because she'll use a word a particular way.
8       So if you're -- if you're trying to imply
9  that there's psychological disturbance or anything like
10 that, that is not true.
11     Q.  Okay.  Well, what I'm asking you is, did you
12 observe your wife having been brainwashed by Loral
13 Langemeier?
14     A.  No.
15     Q.  Okay.  And you didn't suggest that she get
16 treatment for -- for any kind of psychological
17 ramifications of her experiences --
18     A.  So --
19     Q.  -- with Loral Langemeier, did you?
20     A.  -- what -- what my wife used was a word that
21 she did not completely understand the meaning of it and
22 the way that you're understanding it.
23     Q.  Okay.
24     A.  And so that's all that that has to do with,
25 that -- she was not trying to imply that any -- I don't

## 15

1  even know where you're going with all that, but she's
2  not trying to imply that there's mental illness or any
3  of those kind of things that -- that just -- that is
4  just...
5       Q.   My question was a little bit different,
6  Dr. Lenes.  My question was, did you suggest that she
7  get treatment for any kind of disorder dealing with the
8  ramifications of her experiences with Miss Langemeier?
9       A.   So there -- there's really nothing to suggest
10 treatment for.  So when you say did I suggest
11 treatment, you're -- you're saying that -- really, I
12 mean, I don't even know exactly how to answer that.
13 She's -- there's -- there's -- there's nothing, she
14 used a word that was -- that -- she just used a word
15 that didn't have any of those meanings that you're
16 trying to attribute to it.
17     Q.  I -- I think I understand your answer.  So it
18 goes without saying that you didn't suggest she get
19 treatment?
20     MR. BRADLEY:  Look, you know, I'm -- I'm
21     going to -- I'm going to object here.  He has
22     explained the situation.  You're getting to a
23     point where you are being harassing.  This is
24     offensive, inappropriate, I'm not going to let
25     this go on, I mean.

## 16

1       MR. LITTLE:  Jim --
2       A.  (Continuing)  Really, it does --
3       Q.  Hold on a second, hold on a second, Dr.
4  Lenes.
5       MR. LITTLE:  Jim, that's not a legal
6  objection.  I just want to make sure that I
7  understand that there wasn't any treatment of
8  Mrs. -- of Mrs. Lenes and --
9       MR. BRADLEY:  It -- it is a legal objection.
10 You're not allowed to harass the witness.
11     MR. LITTLE:  Okay.
12 BY MR. LITTLE:
13     Q.  I'm not trying to harass you, Dr. Lenes.  I'm
14 just making sure I -- everybody here understands that
15 Mrs. Lenes didn't receive any treatment for
16 brainwashing, right?
17     MR. BRADLEY:  I object to the question.
18     I'm --
19     A.  (Continuing)  I need to sit for just a minute
20 and compose myself, so if you'll forgive me.
21     Q.  Okay.
22     A.  This is...
23     I mean, really, I'm very disturbed by the
24 question because there's -- I think I've explained it.
25 It has nothing to do with any mental illness.

## 17

1       Q.  Right.
2       A.  It has nothing to do with any of that.
3  It's -- it -- it's irrelevant, in my opinion, to the
4  case.
5       Q.  Okay.
6       A.  And you -- it -- it's just a bizarre
7  question.
8       Q.  Okay.  And as I understand your answer, you
9  don't believe she was brainwashed, you just believe
10 that she didn't understand the word, correct?
11     A.  That is correct.
12     Q.  Okay.  And you certainly weren't brainwashed
13 by Loral Langemeier, were you?
14     A.  So I understand the word and -- and I would
15 say that we were not brainwashed by Loral Langemeier.
16 But the -- the interesting thing is, is that we did
17 have a trust in her.  We -- we revealed a lot of
18 personal, private information and we felt that, you
19 know, we were in the Live Out Loud community, we
20 revealed that to her.  And so we trusted her and we --
21 she said that she would help us to accomplish the goals
22 that we felt were important, and so we had a trust
23 relationship with her and -- and so, you know, we feel
24 that she abused that trust relationship.
25     MR. LITTLE:  Object, nonresponsive.

STEVEN LENES - MAY 11, 2012

18

1    BY MR. LITTLE:
2        Q    And -- and we'll get to all of that
3    certainly. I just want to make sure, I mean, when
4    the -- when you borrowed money from the bank -- well,
5    let's back up.
6            You borrowed some money from banks against
7    real estate that you and your wife owned, right?
8        A    That's correct.
9        Q    And no one forced you to do that, did they?
10       A    So Loral Langemeier, when we had our meetings
11   and everything, instructed us on how to do those
12   things. And so she said that if we wanted to be
13   involved in this program, we needed to do the things
14   that she asked us to do, and so we did what we were
15   told to do.
16           MR. LITTLE: Object, nonresponsive.
17   BY MR. LITTLE:
18       Q    No one forced you to go and borrow money from
19   any banks, did they?
20       A    We -- I mean, we really were following what
21   she asked us to do.
22       Q    I see. But you weren't forced to, correct?
23       A    You know, did she tell us that she'd do most
24   us, I mean, no, she didn't say she'd do any of that,
25   but she instructed us, she said that unless we -- you

19

1    know, if we weren't going to play the game, then we
2    might as well get out. So it's -- it's what we were
3    instructed to do, what we felt we should do, and to
4    be -- you know, to -- to work with her and to
5    accomplish what the long-term goals were and to help
6    her do, you know, for us what she said she would do.
7        Q    And, Dr. Lenes, what properties did you
8    borrow against to make investments?
9        A    So we borrowed against our primary home.
10       Q    And where is that located?
11       A    At 109 Ponsbury Road here in Mt. Pleasant.
12       Q    And I -- I hate interrupting, so let's just
13   go one by one and ask a series of questions. So 109
14   Ponsbury, how much did you borrow against that home?
15       A    We borrowed just about $700,000.
16       Q    And when did you do that?
17       A    Let's see. That would have been sometime
18   after the first table, I think in -- so it would have
19   been 2006 and it would have been -- you know, I
20   can't -- I can't exactly remember how long it took for
21   the whole process. I think we got the money in July.
22   So it would have been --
23       Q    That's okay. And I think --
24       A    Yeah.
25       Q    -- you've produced the documents, so I'm just

20

1    trying to get a timeline here as best you remember. It
2    was after the first table, sometime around July of '06?
3        A    Well, that's when we got the money, so I
4    think it takes some period of time to do all the
5    paperwork, so...
6        Q    You'll fill out a loan agreement, they'll do
7    an appraisal, and then you have a closing?
8        A    Correct.
9        Q    Right. What other -- what other properties
10   did you borrow against?
11       A    So we have two rental properties -- or we had
12   two rental properties also here in Mt. Pleasant, and so
13   we borrowed --
14       Q    And where were those located?
15       A    In the Belle Hall subdivision, and one is 345
16   Rice Bay and the other is 532 Pritchard, if I remember
17   right.
18       Q    And how much did you borrow against those
19   properties?
20       A    So we got a -- we refinanced both of those
21   properties and we also got a second mortgage on both of
22   those properties. And it's somewhere -- again, I mean,
23   we -- just kind of dredging the exact numbers off the
24   top of my head is a little --
25       Q    That's okay.

21

1        A    -- difficult.
2        Q    As best --
3        A    Yeah.
4        Q    -- best you remember.
5        A    So, I mean, we were careful when we did
6    the -- the -- your -- the response to you. But it's,
7    off the top of my head, somewhere around maybe $240,000
8    or something like that --
9        Q    Combined?
10       A    -- for each property. For each property.
11       Q    Okay, 240 out of each?
12       A    Uh-huh (affirmative).
13       Q    At the time that you borrowed against those
14   properties, were they cash flowing?
15       A    Small amount, yes. Before -- before we
16   borrowed, they were.
17       Q    Right.
18       A    Not after.
19       Q    Right. So you borrowed 240 from each of
20   those. What other properties did you borrow against?
21       A    So we had half interest in a commercial
22   building and so we refinanced that. And --
23       Q    Where was that located?
24       A    That's -- I can't actually remember the
25   address of that. That's in I'On, in the I'On

STEVEN LENES - MAY 11, 2012

22

1     subdivision.  I've just forgotten the address of that.
2         Q    And how much did you borrow against it?
3         A    And that number is a little -- because we
4     split it in half, it's a little hard to recall exactly.
5     It seems to me two to $300,000 for that one.  It was
6     just kind of an odd number, so I just don't remember
7     the exact --
8         Q    Was this a shared office building, or was it
9     mixed use, office, retail, what was it?
10        A    Yes, mixed use, office, retail.
11        Q    And it had tenants in it?
12        A    Yes.
13        Q    Was it cash flowing?
14        A    Yes.
15        Q    And what was the entity through which you
16    owned the interest -- half interest in the building?
17        A    L & M -- I can't --
18        Q    L & M Enterprises, LLC?
19        A    Yes, yeah.  Thank you.
20        Q    Is that a real estate investment entity?
21        A    No.  It's just a -- an entity to hold that
22    building --
23        Q    Are the --
24        A    -- with our friends.
25        Q    Are you, the Leneses, the "L" of the L & M?

23

1         A    Yes.
2         Q    Okay.  Who is -- who's the "M"?
3         A    The -- the Mostellers.
4         Q    And when did you-all originally buy that
5     office building?
6         A    That would have been -- you know, the -- the
7     further along you get, the further back that gets, and
8     it would have been in the early '90s, I think, early to
9     mid '90s, somewhere around there.  I -- I'm -- I
10    actually don't -- I don't recall that very clearly.
11        Q    When you originally acquired it, you-all
12    borrowed a lot of money, right?
13        A    You know, I guess I'm not sure what a lot of
14    money is, number one, and number two, I'm not -- I -- I
15    don't recall the original purchase price of the
16    building.  We have the paperwork for that and I think
17    we probably disclosed that to you.  I don't know.
18        Q    Yes, sir.  I saw a closing statement for that
19    property to L & M Enterprises that looked like L & M
20    borrowed almost a million dollars.  Does that sound
21    possible?
22        A    That would have been the refinancing, I
23    think, right, for the building?
24        Q    I don't think so.
25        A    Was it from the '90s?  Yeah.

24

1         Q    I don't think so.  I'm -- I'm asking you,
2     though, because you're the person who engaged in the
3     transaction.
4         A    Right.
5         Q    How much do you recall having borrowed to buy
6     the building?
7         A    We -- we -- gosh.  Maybe, you know, with --
8     with the other couple, you know, eight or $900,000,
9     maybe, yeah.
10        Q    Sounds -- sounds about right from --
11        A    Yeah.
12        Q    -- what I saw in the settlement statement.
13    The total acquisition price was a little over a
14    million.
15        A    Yeah.
16        Q    Sound right?  So you had some equity in it?
17        A    Yes.
18             MR. BRADLEY:  Do you have the document with
19    you?
20        A    (Continuing)  I mean, I just --
21             MR. LITTLE:  I don't.
22        A    (Continuing)  Yeah, I -- I'm sorry.  I
23    just --
24        Q    That's okay.
25        A    -- it's hard to remember.  That -- that was

25

1     really a long time ago and I -- I just don't really
2     recall it.
3         Q    I see.  And at some point -- well, you're
4     familiar with the term "leverage," right?
5         A    Yes.
6         Q    Did you understand that when you and Rick and
7     Cyndi Mosteller -- it is Rick and Cyndi, isn't it?
8         A    Uh-huh (affirmative).
9         Q    When you bought that building, you were
10    taking a big risk, and when you borrowed that much
11    money, that, you know, ultimately you're going to have
12    to pay it at some point in time, right?
13        A    So we -- we -- right, when you take a loan,
14    you pay it back.
15        Q    Sure.
16        A    And so that's part of what a loan is.  And
17    when you have a property, you know, there are some
18    tangible -- there's -- you know, there's a building
19    there, there's land and everything, and so it's -- it
20    has -- if something were to happen, you can sell the
21    property and repay the loan.
22        Q    Certainly.
23        A    Uh-huh (affirmative).
24        Q    Certainly.  Now, with respect to this office
25    building, at some point, you wanted to borrow -- you

STEVEN LENES - MAY 11, 2012

---

26

1  wanted to take out your equity in order to make other
2  investments?
3      A   Well, that -- I mean, really, that wasn't so
4  much our original plan until --
5      Q   Oh, no.
6      A   -- Loral, yeah.
7      Q   And I -- I don't mean your original plan, but
8  at some point, you did a refinance to take your equity
9  out?
10     A   So our -- right. So our original plan is --
11 you know, was always to pay off all our loans and have
12 cash flow from it. And then when we met Loral, she
13 taught us how to make our lazy assets work. And so she
14 said, "When there's money sitting in equity in a
15 building, that that's money that's a lazy asset and
16 it's not doing anything." And so she said, "You could
17 refinance that, take that money out, and use that for
18 other investments, and so you're making that money work
19 for you."
20     Q   I see. And my question was a little bit
21 different. At some point, you refinanced and got
22 equity out of this office building, correct?
23     A   Right.
24     Q   Did you tell Rick and Cyndi, "Hey, we're
25 going to do this," or did they agree to let you do that

---

27

1      A   Do -- to refinance the building?
2      Q   Yeah.
3      A   So we -- I mean, right, we're partners, so we
4  all agreed to do it together, so --
5      Q   Well, did they take their equity out, too?
6      A   They did.
7      Q   What did they do with it, do you know?
8      A   You know what, I don't.
9      Q   Okay.
10     A   I -- I didn't ask them.
11     Q   How much money did you take out?
12     A   That's what I think I said earlier, you know,
13 I -- I couldn't exactly remember the -- because it --
14 it's not a round number, so it was somewhere between
15 two and $300,000.
16     Q   Okay.
17     A   So that was --
18     Q   My mistake.
19     A   -- our half, yeah. Sorry.
20     Q   What other properties did you borrow against?
21     A   So we also had a lot that we hoped to build
22 on in Mt. Pleasant, as well. That's the on the harbor
23 lot.
24     Q   I saw that. And how much money did you
25 borrow against that?

---

28

1      A   We borrowed $500,000 from that.
2      Q   I see. And did you borrow against any other
3  property?
4      A   I think --
5          MR. BRADLEY: You mean just real property?
6          MR. LITTLE: Yes.
7      A   (Continuing) So -- so like we -- we've done
8  our home --
9      Q   Home, two rental properties --
10     A   -- the two rental properties --
11     Q   -- I'On --
12     A   -- the commercial building, and the lot. And
13 I think that's all we had.
14     Q   Okay. So roughly, I'm adding up 700,000
15 plus -- call it 500,000, a million two, a million four,
16 you borrowed somewhere between a million seven --
17 somewhere around a million seven, I guess, is that
18 fair?
19     A   Well, if that's what you added up, I mean --
20     Q   Against the real property. I mean, does that
21 sound right to you?
22     A   Yeah, in -- in -- you know, just roughly. I
23 mean, we -- we gave you more specific numbers in the
24 responses.
25     Q   Certainly. And with respect to the rest of

---

29

1  the money that you came up with to make investments in
2  things like Z Restaurant Group and Renaissance Laser,
3  where did that money come from?
4      A   So the rest of the money, we did essentially
5  what Loral instructed us to do with that, too. So
6  she -- she said we had cash value in our life insurance
7  policies and so we could borrow out of our life
8  insurance policies.
9      Q   What else?
10     A   Then she said that we had -- you know, we
11 had -- my mother had died and had left us some General
12 Electric stock, and so she said, you know, that, you
13 know, that money was available, that why would we --
14 why would we trust -- she called those kind of assets,
15 she called them park and pray, you know, and so you
16 just put them there and hope that they'll do well.
17 And -- and so she said you didn't need to use park and
18 pray assets, you didn't want to leave that, those are
19 like lazy assets, too. So we used that money.
20         And then we had some money just in savings,
21 as well, that we'd saved up.
22     Q   Did you liquidate anything else?
23     A   I mean, we also -- our retirement account, I
24 mean, does that count as -- is that a different --
25     Q   Certainly. Your IRA?

---

STEVEN LENES - MAY 11, 2012

---

## 30

1     A  Right, uh-huh (affirmative).

2     Q  Okay.

3     A  And so we sold, you know, our mutual funds

4  and those things out of the retirement account.

5     Q  I see.  Did Loral Langemeier sit down with

6  you one on one and tell you to borrow against 109

7  Ponsbury?

8     A  She -- she -- the way it worked was she had

9  us in a big room and then we had, you know, those big

10  white papers that are like on tripods, you know, the

11  big --

12     Q  An easel?

13     A  Easel paper, right.  Do you know what those

14  are, those big --

15     Q  Yes.

16     A  So we'd write -- you probably do.  You're an

17  attorney.

18     Q  That's okay.  That's okay.

19     A  So we would write on those what all our

20  assets were, and then she would ask us to help us think

21  about what else we had, you know, that were assets.

22  And so we wrote all those -- all those down and

23  everybody, you know, in the room did that, you know.

24  They -- and they called it Live Out Loud and we were

25  going to live out loud, we were going to say exactly

## 31

1  what all we had.

2      And -- and so then when she went -- after we

3  did that, then she would go through individually with

4  each of us and talk about what we could do with those

5  assets.  And so I think, you know, she -- she -- she

6  did tell us what -- you know, what we could do with the

7  assets that we had, you know, how we could liquidate

8  them and use them for different things.

9     Q  Okay.  So what I want you to tell me is, you

10  had your own easel and a list of all your real estate

11  assets and your retirement account and your life

12  insurance policies and your savings --

13     A  Uh-huh (affirmative).

14     Q  -- you had written.  Who wrote those on the

15  easel, you or Mrs. Lenes?

16     A  So I -- well, probably -- well, who knows, I

17  mean, I can't remember that far back.  It's probably me

18  because usually I do -- I'm kind of -- you know, I like

19  to have neat and in a certain way.  It's just kind

20  of --

21     Q  Certainly.

22     A  -- that's the way I like it.  So probably I'm

23  the one who wrote them.  But I actually don't recall

24  who did.

25     Q  And did Mrs. Langemeier come -- and did

## 32

1  Miss Langemeier come over to your easel and tell you

2  what to do with those assets?

3     A  She -- I mean, it's -- she didn't come over

4  to them.  She had them, you know, at the front of the

5  room.  So we went through -- you know, all 50 people

6  were in the room, and so she would have, you know, like

7  our couple or it was just a single person, whoever it

8  was, she'd have that on the -- on the front of the room

9  and then she'd talk about that in front of everybody,

10  you know, going through everybody in the room.

11     Q  Okay.  And that's what I want to be clear.

12  So you brought your easel up to the front of the room

13  in front of everybody that was there --

14     A  Uh-huh (affirmative).

15     Q  -- that had all your assets?

16     A  Uh-huh (affirmative).

17     Q  And what did Mrs. Langemeier -- and what did

18  Miss Langemeier say when looking at your easel?

19     A  She -- I mean, she talked about how much

20  money we had that we could invest and -- and how you --

21  how you get that money, you know, you can refinance

22  your homes and those sorts of things, and -- and then,

23  you know, that we would have that money available to

24  invest, you know, in things that would have a good rate

25  of return.

## 33

1     Q  Did she tell you anything else?

2     A  At that -- when she's talking to us in the

3  front of the room --

4     Q  Yes, sir.

5     A  -- or later?

6     Q  Yes, sir.

7     A  Yeah, I mean, later, I mean, because --

8     Q  When you're talking at the front of the room,

9  right.

10     A  So at the front -- later she would talk to us

11  about --

12     Q  Let's talk about the front of the room for

13  right now.

14     A  The front of the room.

15      MR. BRADLEY:  Let him answer the question.

16  Don't interrupt him.

17     A  (Continuing)  So -- so at the front of the

18  room, it was just kind of going over everybody's assets

19  and what -- what they would have available to invest

20  and how much -- you know, for example, how much money

21  was in the whole room, you know, that, you know,

22  everybody could invest if they really did those kind of

23  things.

24      And -- and then she told us that we would --

25  we -- sorry, just sort of lost my train of thought a

---

STEVEN LENES - MAY 11, 2012

---

## 34

1  little bit.
2      Q   That's okay.
3      A   That she would have -- she would have -- that
4  we would have this -- this money available to invest.
5  And -- and it was later that she really talked about
6  what all the opportunities are.  I can't -- there's
7  a -- you know, they had a schedule of how they went
8  through everything.  So it's a three-day seminar and
9  you -- and you went through, she did teaching, she did
10  a -- I think she called that a money makeover, is I
11  think what she called it.
12      Q   Okay.
13      A   And so she would talk about what's available
14  and what you could invest in to utilize that money and
15  utilize your lazy assets.
16      Q   And I just want to know, was there anything
17  else she told you when your assets were up at the front
18  of the room on an easel?
19      A   So it's hard, I mean, really, I'm stumbling a
20  little bit mainly because it's -- you know, it was
21  three days and we started at 8:00 in the morning and
22  would go till 6:00, 7:00, 8:00, or 9:00 at night.  And
23  so I -- it's hard to sort out individual chunks of time
24  from those three days.  So at that point in time, it's
25  hard to remember what she said.  I mean, it's -- it's

## 35

1  really a whole general expression of what happened, you
2  know, during the course of that three-day seminar.
3  So --
4      Q   Okay.
5      A   -- at the front -- at the front, she talked
6  about investments.  It's just hard.  I can't remember.
7      Q   If you can't remember --
8      A   Yeah.
9      Q   -- that's okay.
10      A   Okay.
11      Q   That's okay.  I'm just trying to find out if
12  there was anything else that she said to you at the
13  front of the room with your assets on an easel, and you
14  don't remember anything else?
15      A   So I remember a lot a lot of things.  It's
16  very hard to remember --
17      Q   It just happened later?
18      A   Well, it's hard to --
19      MR. BRADLEY:  That mischaracterizes his
20  testimony.
21      A   (Continuing)  It's -- it's hard to remember
22  if happened at the front of the room then or if it
23  happened later, when she was going over all the
24  investments on the back wall, where she would put all
25  her investments on another sheet of paper.  So I -- the

## 36

1  chronology of it is hard to sort out, if she spoke
2  about it at the front, at the back of the room, I --
3  you know, but -- I've lost track of your question
4  again.
5      Q   That's okay, that's okay.  I'll ask a
6  different question.
7      A   All right.
8      Q   Did Loral Langemeier advise -- did she sit
9  down with you and -- or your wife one on one and tell
10  you to borrow $700,000 from your home?
11      A   She -- essentially, we put the papers on the
12  wall and we listed how much equity we had in our home.
13  And she said that's money that's available to -- to
14  borrow and to use for investments.  So -- so the only
15  thing she didn't do is sit down, she was standing up,
16  you know, essentially, when she told us that we could
17  borrow all that money on our home and use that to
18  invest and take advantage of a lazy -- a lazy asset.
19      Q   Something I want to understand, Dr. Lenes,
20  did she sit down with you one on one and instruct you
21  to -- to withdraw money or to withdraw equity from your
22  home?
23      MR. BRADLEY:  Objection, asked and answered.
24      A   (Continuing)  And so she -- she's talking to
25  us, she's just not sitting down, I mean, she's at the

## 37

1  front of the room, she's talking to us.
2      Q   Okay.  And that's -- I wasn't there, so
3  I'm --
4      A   Yeah.
5      Q   -- trying to understand.  Is she doing
6  basically a review of your assets while you're sitting
7  down somewhere, but it is a review of only your assets,
8  and she's standing up at the front?
9      A   She did that for everybody in the whole room.
10  She went through everybody's assets, and when she did
11  your assets, she -- she did our assets.  I mean, we had
12  our piece of paper that we wrote everything down --
13      Q   Okay.
14      A   -- on and explained, you know, where all --
15  what we thought our assets were, and then she said what
16  to do with them.
17      Q   Well, and -- and that's what I want to get
18  at.  So when she was standing up and reviewing your
19  assets, did she say, "Dr. Lenes, you need to borrow
20  $700,000 from your home"?
21      MR. BRADLEY:  Objection, asked and answered.
22      A   (Continuing)  Do you want me to say the same
23  thing I said before?
24      Q   No.  No.  There -- do you see the difference
25  between telling someone that they have money available

STEVEN LENES - MAY 11, 2012

## 38

1  to invest and telling them to borrow it and invest it?
2      A   The --
3      Q   Do you see the difference?
4      A   The -- so the --
5      MR. BRADLEY: Let him answer the question.
6      A   (Continuing)  So when -- when we're -- when
7  we're at the Big Table, I mean, we came -- Loral said
8  that she made millionaires, and when we came to the Big
9  Table to learn how to do that, she said that we should
10 do what she told us to do, that she was the expert and
11 that she was the one who knew how to do it.  And we --
12 we didn't know how to do that.
13      And so when she's at the front of the room
14 reviewing our assets, she's telling us that we have
15 this money available and that we should liquidate that
16 and do our -- do the investments.
17      Q   And I think you answered my question.  I just
18 want to be clear.  Loral Langemeier told you that you
19 should borrow $700,000 from your home, right?
20      MR. BRADLEY: Objection, mischaracterizes the
21 testimony.
22 BY MR. LITTLE:
23      Q   Is that right?
24      A   So she stood at the front of the room and we
25 went over all our assets and she explained where all

## 39

1  the money was and how we could get that money to be
2  able to invest in assets.
3      Q   Did she tell you to liquidate everything?
4      A   She -- she later on definitely did.  At that
5  point in time --
6      Q   Okay.
7      A   -- she said -- it's just hard, again, the
8  chronology of events, it's hard to know exactly when
9  happened when.
10      Q   I understand.  You said that she definitely
11 told you to liquidate everything.  When did she do
12 that?
13      A   So when she talked to Elisabeth at the -- at,
14 I think, the second table and she talked about have
15 we -- have we liquidated, have we got all our lazy
16 assets available and -- and essentially fussed
17 Elisabeth out for not having done that, at the second
18 table.
19      So that's the way we -- we understood, we --
20 we placed a trust in her as a person who is giving us
21 advice and she was saying that this is what we needed
22 to do to be able to fully be involved in the program
23 and to have our best chance at being, you know --
24 reaching our goals, that she helped us figure out what
25 they were and we -- so we did, you know, really what --

## 40

1  what she advised us to do.
2      Q   So at the second Big Table, when Elisabeth
3  was fussed out, as you put it, by Miss Langemeier, you
4  understood that Miss Langemeier was telling you to
5  liquidate all of your assets?
6      A   She -- at that point in time, I mean,
7  that's -- she said that we -- we had not gotten all our
8  lazy assets going.
9      Q   Have you heard Miss Langemeier speak about
10 money rules or asset allocation before?
11      A   Yes.
12      Q   What did -- what did you hear her say about
13 that?
14      A   So for asset allocation, she -- that's one of
15 the lectures that she had.
16      Q   Uh-huh (affirmative).
17      A   And she told you how to -- to -- she had a
18 big circle that she drew on a board and divided it
19 up and said you needed to have assets in oil and gas,
20 you needed to have assets in real estate, you needed to
21 have assets in business.  And -- and she helped us
22 figure out, you know, roughly a percentage of how much
23 should be in each kind of investment.
24      Q   Did you have any equity in any real estate
25 assets after Miss Langemeier instructed you to

## 41

1  liquidate?
2      A   Sir, I'm not sure what you're asking me.
3      Q   Yeah, sure.  What was your asset allocation
4  after Miss Langemeier told you to liquidate everything?
5      A   So like are you asking me did I put it into
6  all those --
7      Q   Yeah.
8      A   -- all those different circles?
9      Q   Sure.  Did you?
10      A   So that was what she taught us to do, so
11 we -- we invested in oil and gas.  We invested in
12 businesses, we did all -- you know, we did those kind
13 of things to -- to develop, you know, you know, how she
14 instructed us that we were to diversify our assets.
15      Q   And you diver-- you feel like you
16 adequately diversified your assets after you liquidated
17 everything, is that -- is that correct?
18      A   So we -- we did what she instructed us to do.
19 I mean, she was the one who told us that that's how you
20 diversify your assets.
21      Q   How much time did you have one on one with
22 Loral Langemeier?
23      A   The --
24      MR. BRADLEY: And -- and let me just
25 interject an objection that it's vague.

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

42

1     MR. LITTLE: What's vague about that, Jim?
2     MR. BRADLEY: Are you talking about the first
3  Big Table seminar, or you mean over the whole
4  course of the relationship?
5     MR. LITTLE: Ever, ever.
6     A  (Continuing) So it -- it is -- I mean, I'm
7  pausing just because it's hard to -- I mean, we had
8  lots of interactions with her, and so to quantify a
9  particular period of time over time, we talked to her a
10 lot, we -- you talk after meetings, you talk, you know,
11 during the meetings, there would be breaks, you know,
12 we'd talk. So I -- I don't know that I can actually
13 quantify it.
14    Q  Did you and your wife -- did you or -- and/or
15 your wife ever sit down in a room alone with Loral
16 Langemeier?
17    A  The -- I'm trying to remember if we had a
18 time, I mean, that first, you know, when she just sat
19 down. It seems to me we had some specific one on one
20 time with her. But the thing that's so difficult is
21 just trying -- these were just really busy times, you
22 know, the -- the three days were just a blur of
23 activities.
24    And so, you know, I remember, you know, a lot
25 of what we talked about, but as far as defining, you

43

1  know what occurred when, it's -- the days were just
2  long days and so they -- they really had a lot of
3  activities. They had a full schedule. They had people
4  lecturing. She lectured, she did the money makeovers.
5  You know, we had times to talk, we even had times
6  scheduled during meals, you'd talk with different
7  people.
8     So it wasn't -- it was a very full time and
9  so I'm -- I'm having a hard time recollecting --
10    Q  Is your answer you don't remember?
11    A  -- anything specific. For if we had a one on
12 one sit down with her?
13    Q  Yes.
14    A  My answer is I think we did during that time.
15    Q  What do you recall about it?
16    A  That -- so the -- during that time, we talked
17 about -- during the whole weekend, we talked about just
18 a lot of things. So to be able to say what happened
19 during that sit down time, you know, she had a
20 particular agenda during that. And so the -- trying to
21 remember what we talked about then versus what we
22 talked about at other times during the weekend is a
23 little unclear to me.
24    Q  I see. So you don't remember?
25    MR. BRADLEY: Objection.

44

1     A  (Continuing) So I remember that we talked --
2     MR. BRADLEY: Mischaracterizes his testimony.
3     A  (Continuing) -- that we talked about a lot
4  of things, and as far as what particular time we talked
5  about those things, that's what I'm not so clear on.
6     Q  What things did you talk about?
7     A  So during the course of the weekend, we
8  talked about asset allocation, we talked about
9  liquidating your lazy assets and getting them to work
10 for you. We talked about -- they had lecturers come in
11 to talk about taxes and accounting and entities.
12    And so there just was a lot of things that
13 occurred during the course of those -- those three
14 days. And then we talked with other people. We talked
15 to -- you know, what kind of things did they invest in.
16 When we listened to the -- when she did -- went through
17 the money makeovers for everybody in the room, you
18 know, we learned about each person.
19    From that time, she made comments about
20 things that they could do. We learned -- you know, we
21 learned from them. So she would tell somebody they
22 could use this particular asset and accomplish, you
23 know, some of their goals. And so we learned, okay,
24 well, that worked for them, would that work for us.
25    And so it was -- it was really just a -- and

45

1  that took -- I mean, that -- that wasn't done in just
2  an hour. I mean, there were 50 people in the room, and
3  so over the course of a morning and an afternoon, she
4  went through all of those.
5     Q  I see.
6     A  And --
7     Q  When you had your assets up on the easel, how
8  much money did you realize that you had to invest?
9     A  The -- so when -- at that point in time, you
10 know, we hadn't figured out all the equity that was in
11 our home and all that, so we put that down. And so
12 then when we saw -- you know, essentially, we never
13 really knew what our net worth was before then.
14    And -- and we saw what we thought was an
15 estimate of what the value of our home was and all of
16 those sort of things. So we weren't -- I mean, it's
17 not like we had a clear -- we hadn't gotten an
18 appraisal on our home. We didn't know exactly what the
19 value of it was.
20    And so when we -- when we saw that, it wasn't
21 a real accurate estimate, but you -- you just did a
22 rough estimate of the money that we borrowed off our
23 home, and so that is essentially those -- Loral defined
24 those as lazy assets and they were just sitting doing
25 nothing in our home, and we could utilize those lazy

STEVEN LENES - MAY 11, 2012

---

### 46

1   assets in investments, you know, that she would make
2   available to us and we'd be able to, you know, be --
3   and she talked -- she had a lot of lingo that she used,
4   she had like a freedom day and those sorts of things.
5        And so we -- or a happy day or something like
6   that.  And so that was a time when you would be able to
7   pursue some of the other goals and things that you had
8   once you had all that money working for you and
9   generating money.
10   Q   Were your rental homes lazy assets?
11   A   Her -- so -- so the rent -- I don't exactly
12   understand that question, I'm sorry.
13   Q   What's a lazy asset?
14   A   So from -- from what I understood was it was
15   when you have money that's just sitting doing nothing.
16   And so -- and so the value of the home is more than
17   what you owed on it, and so there's that -- that much
18   money that was equity in the home and that would be
19   considered a lazy asset because you -- you had money.
20   It was part of your net worth, but it was just sitting
21   there doing nothing.
22        And so if you could take that money and make
23   it work and the thing -- the thing that appealed to us
24   about that was, is that we -- we had just -- I mean,
25   all our whole sort of financial planning, you know,

---

### 47

1   whatever you want to call it, prior to that, our -- our
2   financial goals, the way we did things is we just
3   worked.
4        And so, for example, on the -- for the -- for
5   the homes, our rental homes, you know, we had those,
6   but we didn't -- I mean, we -- we worked and we taught
7   our children to work.  And we would -- when something
8   needed to be repaired, the boys and I repaired it.  And
9   when -- you know, when we landscaped, you know, we had
10   halogen lights out in the yard in the middle of the
11   night planting shrubs and stuff just to try to get it
12   done in between working and everything else.
13        So all -- all the assets that we knew of were
14   ones that we -- it was our sweat, our sweat equity, our
15   hard labor.  And we -- we worked and did those kind of
16   things.  And we had renovated a house in downtown
17   Charleston and we worked and did that, you know.
18        The children, we had -- we had times when we
19   were putting insulation in an attic and I'm holding the
20   hose, the two boys are guiding the hose through the
21   attic and Elisabeth and the girls are feeding
22   insulation into the hopper on the second floor to blow
23   it into the attic.  So -- so the equity that we knew
24   about was that kind of equity.  And --
25   Q   Working hard?

---

### 48

1   A   Working hard.
2   Q   Yeah.
3   A   And so the -- to have somebody tell us that
4   we could have the money work hard, we thought this is a
5   good thing.  And so she said there's equity in those
6   homes and that we can make that money -- she would
7   teach us how to make that money work.  It wouldn't --
8   Leneses, we don't want Leneses to be lazy, and she
9   had -- we had lazy assets that she told us about, and
10   so that money could work and so that people sense to me
11   Q   Wasn't your money already working in the rent
12   homes?
13   A   It -- not the way she explained it to us.  I
14   mean, it was just -- there was money sitting there that
15   was not doing anything.  And so it -- you know, it's
16   money that could be -- you could -- you'd have the
17   rent -- the rental home and you'd still have that, but
18   then you take that money and then that money goes and
19   works.
20   Q   Wasn't your money already working in the
21   office building that you owned a piece of?
22   A   So you have money that's in equity that's --
23   that's money that's -- you know, as she explained it to
24   us, that those are -- those were lazy assets and so
25   there was money that was available there and that money

---

### 49

1   could go then and work, as well.
2   Q   And what did she advise you to do with that
3   money?
4   A   So -- so then during the course of that
5   weekend, she had investment opportunities that she
6   wrote on those same big white sheets of paper and put
7   on the wall around that we could invest in.  So we
8   could take our lazy assets and invest it in the things
9   that she presented to you.
10   Q   Did she tell you to put all of your money in
11   those things?
12   A   She told us that -- how we could take those
13   resources and allocate those and she -- you know, she
14   gave us the circle pie, you know, the pie graph of how
15   to allocate those assets, and that those assets, the
16   ones that she put around the room, you know, they
17   were -- she had oil assets, she had those sorts of
18   things.  And she told us how we could be involved in
19   those -- in those assets.  And she made those things
20   available to us and she taught us about them and she
21   told us, "This is what you need to do."
22   Q   When you say "she told us this is what you
23   need to do," do you mean that she told you to put all
24   of your money into those things?
25   A   It's -- so when we went to -- you know, to

---

STEVEN LENES - MAY 11, 2012

---

### 50

1    Loral Langemeier, she was teaching us how to be
2    millionaires. And so --
3        Q    You were already millionaires, weren't you?
4        A    We -- I think we were. You know, we
5    didn't --
6        Q    Three times over, right?
7        A    Yes. So we didn't -- we didn't actually know
8    that until we got there. And -- and so we went to have
9    her teach us. The thing -- you know, the thing about
10   that was, is that she was teaching us more than just
11   even being a millionaire. So our freedom day was when
12   we had income from our -- our investments that would
13   equal the income that I earn from work. And so
14   then that would give us the flexibility to do other
15   things that we felt were important to do.
16            And so -- so she -- she told us how to do
17   that, you know. She was a millionaire maker, I mean,
18   that's the title of her book, that's what got us
19   interested in -- in coming to see her in the first
20   place.
21       Q    And, Dr. Lenes, my question was a little bit
22   different. I just want to go back to this -- this
23   question and see if I can get you to answer, okay? My
24   question was, when you said "that's what she told us to
25   do," did she tell you to put all of your money in those

### 51

1    assets -- in those investments?
2        A    So that's really what we understood her to
3    say.
4        Q    Is that what she said or what you understood
5    her to say?
6        A    That's what we understood her to say, she was
7    in the -- we went to this seminar, she was teaching us
8    how to do it. She was presenting the opportunity. She
9    said that we had the opportunity to do these things
10   there, we should put our money into those kind of
11   things and that it would -- that's -- that's how you
12   make passive income, that's how -- you know, the
13   businesses will earn 20, 25 even, 30 percent returns
14   and that's money that would help us towards our -- our
15   freedom day.
16       Q    Dr. Lenes, did Mrs. Langemeier give you an
17   amount to invest or did she recommend an amount to
18   invest in Z Restaurant Group?
19       A    She -- when we did Z Restaurant, she said
20   that we had -- well, I guess -- I guess what she said
21   was -- she helped us divide it up by percentages, and
22   so we had a certain amount of money. We had the -- we
23   had the pie, we had a percentage that was supposed to
24   go in oil and gas and all of those. So she helped us
25   figure out the percentages that we should put into each

### 52

1    investment.
2        Q    Did she write that down with you?
3        A    She wrote it down on the -- on the paper.
4        Q    On the easel --
5        A    The --
6        Q    -- at the front of the room?
7        A    The -- the percentages were -- I'm trying --
8    I mean, I'm not exactly recalling the percentages, the
9    exact percentages of each thing. And so when she had
10   us write all those, when she wrote that, I think she
11   wrote the, you know, percentages in the general
12   lectures and then divided and told us about, you know,
13   what percentages would be good for us. I don't recall
14   if she wrote them on the -- on the board or -- on the
15   easel or not.
16       Q    What percentage of your assets did she
17   recommend that you put into Z Restaurant Group?
18       A    So that -- that would fall under promissory
19   notes and I -- I don't recall the percentages, the
20   division of the percentages of everything. When --
21   when we did Z Restaurant, she -- we had the money
22   available, and so I think Elisabeth talked to her about
23   we have this -- this much money available, what -- you
24   know, what can we do as far as promissory notes.
25            And so she told us about David Zebny and Z

### 53

1    Restaurant Group. And I think she gave maybe two
2    other -- two other examples, as well, and so she gave
3    us three places to invest it in.
4        Q    Did you invest it in all three places?
5        A    We did, I think we did mainly with Z
6    Restaurant.
7        Q    Did you understand that you were taking a
8    huge risk when you invested that money?
9        A    The -- when she -- when she described all
10   those kind of things, you know, she -- she never really
11   mentioned things about risk.
12       Q    Okay.
13       A    And so we did not -- we did not think that
14   there was any risk. We -- we thought when -- when she
15   presented investments, those kind of investments, she
16   essentially had said she has been in the game, she was
17   a like investor, she had investigated these, she was
18   monitoring them, and that there was really -- she never
19   really talked about risk.
20       Q    Was any of that false?
21       A    Is any of what false?
22       Q    What you just told me that she told you about
23   Z Restaurant Group.
24       A    Do you -- I'm not sure that you're asking.
25   Are you asking me -- are you asking me did she tell us

---

STEVEN LENES - MAY 11, 2012

---

54

1  the truth or --
2    Q  Yeah.
3    A  -- what are you asking?
4    Q  Yeah, did she tell you the truth?
5    A  About Z Restaurant!
6    Q  Z Restaurant Group.
7    A  And as far as -- I'm sorry.  You just have to
8  be a little -- I'm not --
9    Q  I'll slow down.
10   A  -- I'm not understanding --
11   Q  That's okay.
12   A  -- the question.
13   Q  That's okay.  I'll ask a different question.
14  Was Loral Langemeier a like investor in Z Restaurant
15  Group?
16   A  That's what we understood from her when she
17  would talk in the -- in the presentations and present
18  the investments.
19   Q  Was that true?
20   A  We -- we really understood that to be true at
21  the time, you know, when she was there.
22   Q  Now, do you understand it to be true?
23   A  That she was a like investor?
24   Q  Yes.
25   A  So when she had -- when she was in Z

---

55

1  Restaurant, we -- we don't understand that to be true
2  at this time, that she was a like investor, that she
3  had -- she invested money in it, but she had some other
4  arrangements with them.
5    Q  Okay.  What are those arrangements?
6    A  Those arrangements were, excuse me, that she
7  had -- you know, the exact specifics of that, I'm
8  not -- I'm just not recalling right off the top of my
9  head, but that she had some additional shares of
10  control or involvement.
11   Q  And what do you know about that?
12   A  Mainly --
13      MR. BURNS:  Jim -- Jim, could we -- could we
14  take a -- a break for a minute to discuss a
15  privilege issue we're having?
16      MR. BRADLEY:  Okay.
17   A  (Continuing)  Are you --
18   Q  Yeah, we're going to take a break.
19   A  Okay.  I might go to the bathroom, if that's
20  all right.
21      VIDEOGRAPHER:  Off the record at 10:06, Tape
22  No. 1.
23   (Recess taken.)
24      VIDEOGRAPHER:  This is Tape No. 2 in the
25  deposition of Dr. Steven Lenes.  We're on the

---

56

1  record at 10:15.
2      MR. BRADLEY:  And -- and just for the record,
3  we took a break to discuss a potential privilege
4  issue.  Your question was what he may know now
5  about what Miss Langemeier had previously said
6  that he knows now to be false.  And -- and some of
7  that, to the extent that -- excuse me.
8      To the extent that he has independent
9  knowledge of what may be false, that's fine, but
10  to the extent that that knowledge is based on
11  communications with counsel, I'm going to instruct
12  him not to answer that.
13      MR. LITTLE:  Okay.  Let me ask a different
14  question.
15  BY MR. LITTLE:
16   Q  Dr. Lenes, other than things that you've
17  talked about with your lawyer or learned from talking
18  with your lawyer, are you aware of any facts or
19  evidence that suggests that Loral Langemeier was not a
20  like investor?
21   A  So we -- we believed that she was a like
22  investor and that she taught us -- she recommended
23  different investments and that we would trust -- you
24  know, we trusted her for those and that she -- she had
25  skin in the game, was an expression that she used a

---

57

1  lot.
2      And so we -- that's what we believed when we
3  made the investments, you know, that she recommended
4  and that -- and that she was just like us.  And so, in
5  the process of that, we didn't have an understanding of
6  what all the other things that she was involved in.
7    Q  But, Dr. Lenes, Miss Langemeier was an
8  investor in these programs, too, wasn't she?
9    A  That's what she told us when she recommended
10  the investments.
11   Q  And that was true, right?
12   A  That she was an investor in -- in each of
13  these things?
14   Q  Yes.
15   A  She --
16   Q  That was true, wasn't it?
17   A  So she was an investor in each of those,
18  whether or not she was exactly like us, that's --
19  that's different.
20   Q  Okay.  You understand you've sued
21  Mrs. Langemeier for fraud and alleged that she was --
22  she did not have skin in the game, that when she told
23  you that, that was a lie?
24   A  So --
25   Q  Do you understand that?

---

STEVEN LENES - MAY 11, 2012

---

58

1    MR. BRADLEY: And, again, I'm going to
2  instruct the witness to the extent he understands
3  that from conversations with counsel, you don't
4  have to reveal that, but to the extent you have an
5  independent knowledge of that, then go ahead and
6  answer.
7    A  (Continuing) Okay, so would you ask me the
8  question again?
9    Q  Yeah, sure. Why don't you open this book in
10  front of you, there's a tab in the back, Tab A. This
11  is a copy of a summons and complaint that you filed
12  against Miss Langemeier.
13    MR. BRADLEY: Are you -- are you going to
14  make this an exhibit to the deposition?
15    MR. LITTLE: Not yet.
16  BY MR. LITTLE:
17    Q  Would you turn to page 6, if you will.
18    A  Which 6 are you talking about?
19    Q  Six at the bottom in the middle.
20    MR. BRADLEY: Page 6 of the actual
21  complaint --
22    MR. LITTLE: Yeah.
23    MR. BRADLEY: -- not page 6 of the Tab A?
24    MR. LITTLE: Correct.
25    A  (Continuing) All right.

---

59

1    Q  Are you with me? Beginning paragraph 36,
2  your lawsuit reads, "Langemeier's primary motivation in
3  selecting and promoting investments to the plaintiffs
4  was her own financial gain." What do you know about
5  that other than what your lawyers told you?
6    A  So are -- you're asking specific details
7  about that?
8    Q  Yeah. Do you know any specific details about
9  that other than what your lawyers told you?
10    A  The -- the things that we know are the things
11  that I think we referenced, you know, as we've talked
12  with people, that there came up that she had other
13  returns that we were unaware of and -- at the time, and
14  so she had -- she had received -- she had received
15  favorable treatment or, you know, --
16    Q  Who told you that?
17    A  So when we talked with David Zebny and we
18  talked with the Poindexters, and then I think Elisabeth
19  talked with another person, you know --
20    Q  Who are the Poindexters? I'm sorry.
21    A  The Poindexters, Dax and Theresa Poindexter.
22    Q  And how do you know that?
23    A  So they were fellow table participants.
24    Q  And what did they tell you about
25  Miss Langemeier's interest in these firms?

---

60

1    A  So they had wanted to present an investment
2  opportunity to the table and that she had asked for
3  a -- a percentage, you know, some -- some additional
4  percentage of that.
5    Q  Did that ultimately happen?
6    A  That -- at -- at that time, they told us, you
7  know, they weren't going to do that because they -- you
8  know, they didn't want to pay her that amount of money.
9    Q  Did Dax or Theresa Poindexter tell you
10  anything about percentages or commissions or facts that
11  Miss Langemeier got in any of the programs in which you
12  invested?
13    A  They told us about their experience, and so
14  they didn't tell us about the other -- other ones.
15  They told us their experience.
16    Q  Right. And you would agree with me that
17  David Zebny is a liar, right?
18    A  So, you know, that's -- that's kind of an out
19  there kind of a question. And so --
20    Q  Let me -- let me withdraw and I'll ask you a
21  different one, different question. Did David Zebny lie
22  to you about things?
23    A  That -- that's something that is -- I
24  don't -- you know, we're still just trying to figure
25  out all of that. So I don't -- I don't actually know.

---

61

1  You know, you can be upset about things and -- and
2  say -- but as far as, you know, what -- what -- you
3  know, if he lied or what he specifically lied about,
4  that -- I don't know that I can answer that directly.
5    Q  You know Mr. Zebny was running a Ponzi
6  scheme, don't you?
7    A  So, again, that -- that is -- that is not
8  what --
9    Q  Your wife testified that David Zebny was
10  running a Ponzi scheme.
11    A  So --
12    Q  So you think she misunderstood what that was?
13    A  So, yeah, I -- she -- she did misunderstand
14  what that was.
15    Q  Oh, okay.
16    A  And so when you asked her the defini- --
17  definition in her deposition, she gave you a -- a
18  definition of a Ponzi scheme that wasn't correct. And
19  so she used, again, a word that she didn't exactly
20  understand what it meant.
21    Q  What's a Ponzi scheme?
22    A  So a -- my understanding of what a Ponzi
23  scheme is, is that when people like Bernie Madoff, I
24  think that was a Ponzi scheme --
25    Q  Yes.

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

### 62

1    A  -- where you take money from investors and
2    then you continue to take money from investors and use
3    the money that you get from later investors to pay the
4    first investors.  And so I think that's a Ponzi scheme.
5    Q    Is that what happened with Z Restaurant
6    Group?
7    A    And so that would -- I'd have to -- that --
8    that's information that I -- I don't have access to.
9    I -- I don't -- I can't really answer that question.
10   Q    Okay.  The next sentence in paragraph 36 in
11   your petition reads, "Contrary to her representations,
12   Langemeier was not a like investor whose interests were
13   aligned with those of the plaintiffs."  That's not
14   true, is it?
15   A    Well -- tell me again what the question is.
16   Q    That sentence isn't true, is it?
17   A    So if we -- if we made this -- this statement
18   in here, then it -- we consider it to be true.
19   Q    Okay.  Tell me what evidence that you're
20   aware of, other than what you learned from talking to
21   your lawyers, suggest that Miss Langemeier's
22   representations about being a like investor weren't
23   true?
24        MR. BRADLEY:  I think you've already answered
25        that question.  I'm going to object.  Asked and

### 63

1    answered.
2    A    (Continuing)  And so I can repeat what I said
3    before.
4    Q    Okay.  You believe this sentence is true,
5    "Contrary to her representations, Langemeier was not a
6    like investor whose interests were aligned with those
7    of the plaintiffs," do you believe that's true?
8    A    That's why we wrote it.
9    Q    Okay.  But Loral Langemeier did invest money
10   is Z Restaurant Group, didn't she?
11   A    She invested -- you know, it's -- those kind
12   of -- that information, that is what we understood when
13   she would be at the -- at the Big Table meetings and
14   she would tell us about the investment, she said she
15   had skin in the game.
16   Q    And that was true, right?
17   A    And we understood that to mean that she was a
18   like investor, that she invested in those things.  And
19   so the skin in the game, she said that, and so we
20   trusted her because she was making these
21   recommendations to us.
22   Q    Did she have skin in the game?
23   A    When we were at the Big Table meetings,
24   that's what she told us.
25   Q    As you sit here today, do you -- did you --

### 64

1    do you understand Loral Langemeier to have had skin in
2    the game?
3    A    So when we talk about the -- so I'm not
4    sure -- I mean, I -- I don't know how to answer that
5    question, because I know there's things that I know now
6    that we've talked about that -- I don't know how to
7    answer that question.
8    Q    Did Loral Langemeier invest money in --
9    A    So --
10   Q    -- programs that you invested in?
11        MR. BRADLEY:  To the -- to the extent that
12   you have knowledge to answer his question, as you
13   sit here today, whether you know that or not, you
14   can answer it.  To the extent it came from
15   discussions with counsel --
16   A    (Continuing)  Then -- yeah, okay.  So ask me
17   the question again.
18   Q    Did Loral Langemeier invest in the same
19   programs that you invested in?
20   A    So we were at the Big Table and she told us
21   that she was -- she had skin in the game.  And we
22   understood that she had -- she had -- these were all
23   investments that she was invested in just like we were.
24   Q    And that's true, isn't it?
25   A    That's what we understood when we were at the

### 65

1    table, that she --
2    Q    I'm not talking about at the table.  I'm
3    talking about as you sit in that chair today, for the
4    ladies and gentlemen of the jury, that statement was
5    true when she made it, wasn't it?
6    A    The -- so what we know is what she told us
7    and --
8    Q    You know what she told you is true?
9    A    What we know is what she told us.
10   Q    Do you know anything else?
11   A    And so that's what we know, is the things
12   that she told us.
13   Q    Are you aware of anything, as you sit here
14   today, in front of the ladies and gentlemen of the
15   jury, to suggest that what she told you about that was
16   false?
17        MR. BRADLEY:  And, Judge Gergel, I'm going to
18   object that that question has been asked and
19   answered.
20   A    (Continuing)  And so tell me again.
21   Q    As you sit here today in front of the ladies
22   and gentlemen of the jury, are you aware of any facts
23   to suggest that what Loral Langemeier told you at the
24   seminars was false?
25   A    So we --

STEVEN LENES - MAY 11, 2012

---

66

1          MR. BRADLEY: And I'm going to object. To
2     the extent that that knowledge you have comes from
3     a lawyer, you don't have to reveal it now. Now,
4     if you have independent knowledge, you can share
5     that, but if you don't, then you can state that
6     that's where your knowledge comes from.
7          A    (Continuing) So what -- what we know are the
8     things that we -- we wrote in our document and the rest
9     of that -- of what we know now came from our attorney.
10         Q    Okay. What is Action Real Estate
11    Investments, LLC?
12         A    That was a -- an LLC that we set up to
13    manage -- you know, just to figure out how to manage
14    the investments and things that we did with Loral.
15         Q    When did you set it up?
16         A    Oh, my. You know what, I -- I don't recall
17    the exact date of when we sat that up.
18         Q    Why did you set it up?
19         A    So we set it up -- they -- they talked to us
20    about -- one of the things that they talked about at
21    the Big Table was how to -- how to, you know, protect
22    your investments in things, and they said that you
23    needed to have a limited liability company so that
24    you'd have a separate entity for each thing. And they
25    had a -- a person there, Your Entity Solutions person

---

67

1     that helped you set up entities and -- and so that --
2     that's part of what Loral told us to do, is to set up
3     different entities and put different things in
4     different entities so -- just to protect all of them.
5          Q    Okay. Did -- did it ever do any business?
6          A    Well, what -- what are you asking me as far
7     as business goes?
8          Q    Did it ever do anything, Action Real Estate
9     Investments, LLC?
10         A    So --
11         Q    If so, what did it do?
12         A    Yeah. We -- we set that up and it -- it
13    never really -- it never really did anything. We
14    didn't --
15         Q    Never did anything?
16         A    We just kind of set it up.
17         Q    Okay.
18         A    Yeah.
19         Q    How many years -- well, let me ask you this:
20    Would you agree with me that when you came to Loral's
21    Big Table, the first one, that you and your wife had a
22    three million dollar net worth, roughly?
23         A    That's what, you know, we calculated when we
24    got there.
25         Q    And how did you accumulate that?

---

68

1          A    Over time.
2          Q    Yeah.
3          A    So that's -- I mean, I kind of --
4          Q    Tell me a little bit -- let me ask a
5     different question.
6          MR. BRADLEY: You asked the question.
7          MR. LITTLE: I know.
8          MR. BRADLEY: Let him answer the question.
9          A    (Continuing) So -- so, I mean, we -- we
10    worked very hard over a long period of time to
11    accumulate that and we -- we saved money, we tried to
12    live, you know, frugally. We -- we started learning
13    how to invest in real estate and we got the rental
14    properties.
15              And we -- there was a change in the tax law
16    and -- where you could sell your primary home and not
17    pay taxes on the first portion of money, and so we
18    thought that would be a good way to take advantage of
19    that. And so we started moving to a new home, we moved
20    to a new home and sold our old home. And so we just --
21    we saved and worked hard and -- and tried to do the
22    right thing.
23         Q    What real estate investment -- what was your
24    first real estate investment as a couple, do you
25    remember?

---

69

1          A    Our -- our -- like our first home that we
2     bought.
3          Q    Is that what it was?
4          A    I mean, that's the first piece of real estate
5     we ever owned.
6          Q    Okay. Did you --
7          A    So --
8          Q    -- consider that to be an investment
9     property?
10         A    Well -- bless you.
11         Q    Excuse me. Go ahead.
12         A    The -- you know, you -- a home, you know, is
13    a home, but it's also something that you always want
14    to -- I mean, it's not like you would necessarily stay
15    in the same home. Like our first home was, you know, a
16    small little starter home. And so in the sense that it
17    was an investment, knowing that, you know, our family
18    would grow and we wouldn't stay there forever, we
19    wanted to choose a wise first starter home that would
20    be a good -- that somebody would want to buy later when
21    we needed a bigger house to house our family.
22         Q    I see.
23         A    So -- so I guess that's an investment, right?
24         Q    Sir, I would think so.
25         A    Yeah.

---

STEVEN LENES - MAY 11, 2012

---

**70**

1    Q   But what was your first nonresidential piece
2  of real estate that you bought as an investment or
3  nonprimary residence, we'll call it?
4    A   So the first piece was -- well, the first two
5  were the -- the rental homes.
6    Q   The Rice Bay and Pritchard home?
7    A   Rice Bay and Pritchard, yeah.
8    Q   And when did you buy them?
9    A   So we bought those in -- again, I think we
10 put the dates and all of that stuff down, but I think
11 that that was the early -- the early '90s.
12   Q   Early '90s.
13   A   Yeah.  Early to mid '90s.
14   Q   And you used leverage to acquire those,
15 didn't you?
16   A   So -- I think I can figure out the date.  I
17 think we bought those when I was in the -- working at
18 the prison.  And -- and so we actually, you know,
19 earned enough money to make the downpayments for those.
20 And then are you asking me did we get a loan on the
21 property, is that what you're asking?
22   Q   Do you know what leverage is?
23   A   So leverage is when you -- just using
24 something -- so leverage is like a loan, I mean, you
25 get -- you -- you have property and you --

---

**71**

1    Q   Yeah.
2    A   Yeah, so --
3    Q   You took on debt to buy the rental
4  properties, right?
5    A   That's correct.
6    Q   Okay.  How much debt did you take on in the
7  early '90s to do that?
8    A   So each house was -- the loan was around, I
9  think, 140, $150,000.
10   Q   What was the next piece of investment real
11 estate that you bought after that?
12   A   So we bought -- I can't quite remember the
13 order.  So we either did the --
14   Q   Tell you what, why don't we look at the --
15       MR. BRADLEY:  Go ahead and finish your
16 answer.  And, Judge Gergel, I'd like you to
17 instruct Mr. Little in front of the ladies and
18 gentlemen of the jury to not interrupt the witness
19 when he's answering.
20       MR. LITTLE:  Jim, give me a break.
21       MR. BRADLEY:  Well, I --
22       MR. LITTLE:  I'm trying to -- I'm trying to
23 help --
24       MR. BRADLEY:  I thought we were pretending
25 that the jury is here.

---

**72**

1        MR. LITTLE:  We're not pretending anything,
2  Jim.
3        MR. BRADLEY:  Oh, well, you are.  Okay.  I
4  was playing along, that's all.
5        MR. LITTLE:  Don't embarrass yourself.
6  BY MR. LITTLE:
7    Q   Just -- Dr. Lenes, if you would, take a look
8  at Tab B in the back of the book.  These are some
9  supplemental discovery responses that you served.  I'm
10 going to use this to try to help you with the timeline,
11 if I can.  There are some real estate properties that
12 are listed on there.
13       MR. BRADLEY:  Which tab?
14       MR. LITTLE:  Tab B in the back of your book.
15 BY MR. LITTLE:
16   Q   Does this help refresh your recollection?
17   A   So the High Battery Circle was our home.  The
18 Isle of Hope was a lot that we bought that we wanted
19 to -- that we bought with our friends -- excuse me --
20 that we wanted to build a house on and sell.
21   Q   Who were the friends?
22   A   Rick and Cyndi Mosteller.
23   Q   Did they -- obviously you-all wouldn't all
24 live in the same house together on the lot.  So why
25 would you-all buy the lot together?

---

**73**

1    A   So your question was asking me what
2  investment properties we bought, right?
3    Q   Yes.  But you were going -- yes, it was.
4    A   And so, I mean, if you have buy an investment
5  property, it doesn't mean you're going to all live
6  together, right?
7    Q   Right.  My -- my question is a little bit
8  different.  If this was the property you intended to
9  build a home on, was it going to be your primary
10 residence with Miss Lenes?
11   A   No.  It was -- I mean, it's to build a home
12 to sell.
13   Q   To build a home to sell --
14   A   Right.
15   Q   -- on spec?
16   A   Right.
17   Q   Okay.
18   A   You're -- are you making a distinction
19 between a home and a house?
20   Q   I thought you meant your home.
21   A   Okay.
22   Q   I'm sorry.  So 53 Isle of Hope, that was
23 bought in 2000.  Did you borrow money to do that?
24   A   I don't recall if we borrowed money or we
25 paid cash for that.

---

STEVEN LENES - MAY 11, 2012

---

### 74

1    Q    Was that the next -- this High Battery lot,
2    was that the next piece of investment real estate that
3    you bought after the two rental properties on Rice Bray
4    (sic) -- Rice Bay and Pritchard?
5    A    Which one now, which one are you talking
6    about?
7    Q    The High Battery lot.
8    A    So the High Battery, that -- that -- that was
9    our home.  We lived there.
10   Q    Okay.  I'm sorry.  The Isle of Hope lot, was
11   that the next piece of investment real estate that you
12   bought?
13   A    I think we -- I think 54 Sewell Street was
14   the next one.
15   Q    I see.  Did you borrow money to buy that?
16   A    So that's -- so did we have a loan, is that
17   what you're asking?
18   Q    Yes.  Did you borrow money to buy it?
19   A    Yes, we -- we had a loan and we bought that,
20   as well, with our friends.
21   Q    And you made some money on it when you sold
22   it --
23   A    That --
24   Q    -- correct?
25   A    -- that -- that was a house that we -- we had

---

### 75

1    a friend who was going through a divorce, and so we
2    bought a home, you know, to -- for her to rent to have
3    a place to live until -- until she could get things
4    together.  It was either that --
5    Q    Were Rick and Cyndi Mosteller in on that deal
6    with you?
7    A    On the 54 Sewell, they were.
8    Q    Were they in on the 34 Sewell Street deal
9    with you, too?
10   A    To the best of my recollection, I think we
11   did that one on our own.
12   Q    Did you borrow money to buy that home?
13   A    So we borrowed money to buy that home.
14   Q    And you don't remember whether you borrowed
15   money to buy the Isle of Hope lot, right?
16   A    I don't -- I don't recall if we borrowed
17   money or paid cash for that.
18   Q    And you lost all your money in that deal, is
19   that correct?
20   A    That's not correct.
21   Q    Okay.  It says, "lot reclaimed by developer."
22   Did you --
23   A    So he -- they bought it back at --
24   Q    Oh, they bought it back at what you paid for
25   it?

---

### 76

1    A    Yes.
2    Q    Okay.  So you didn't net anything?
3    A    Well, I mean, we actually lost probably a
4    little bit, just closing fees and those kind of things,
5    but...
6    Q    Sure.  Is it fair to say that prior to ever
7    meeting or hearing of Loral Langemeier, you and your
8    wife had engaged in several uses of leverage in the
9    real estate market as investments?
10   MR. BRADLEY:  As you have now defined it?
11   MR. LITTLE:  As he defined it.
12   A    (Continuing)  So as far as getting loans?
13   Q    Yes.
14   A    So we -- so when we -- when we bought
15   different pieces of property, we got loans to pay for
16   those.
17   Q    Right.
18   A    And so that's, you know, how we paid for
19   them.
20   Q    Have you ever heard of the term flipping with
21   regard to real estate?
22   A    I have recent, you know, and since -- since
23   meeting Loral Langemeier, that's where I learned about
24   flipping.
25   Q    Well, that was what you were doing before you

---

### 77

1    ever met Loral Langemeier, isn't it?
2    A    Actually, from what I understand of the term
3    "flipping," that's not the case.  And so what I
4    under -- what I understood that flipping is, is you buy
5    a house and then you fix it up and then you sell it
6    within, you know, probably a short period of time and
7    hopefully for a profit.  And so our -- our financial
8    plan was to live in homes and then sell them and then,
9    you know, move to another home --
10   Q    I see.
11   A    -- during the course of five years.  So -- so
12   I -- I did not understand what we were doing to be
13   flipping homes.  When we bought these other pieces of
14   real estate, that was, you know, to help care for our
15   friend that needed a place to live.  And so we
16   didn't -- it wasn't that we were trying to just flip a
17   piece of real estate.
18   Q    I see.  Did you -- is it fair to say that all
19   of your prior real estate experience before meeting
20   Loral Langemeier involved leverage?
21   A    So all of our prior, we got loans --
22   Q    Yeah.
23   A    -- for all of our prior real estate except
24   maybe that one lot.  We might have paid cash for it.
25   Q    Besides working hard and making good real

---

STEVEN LENES - MAY 11, 2012

---

**78**

1   estate investments, did you and your wife inherit any
2   money?
3        A   So when my mother died, we -- she left us
4   General Electric stock.
5        Q   How much General Electric stock are we
6   talking about?
7        A   Right around 5,100 shares at the time, it
8   was -- and -- and some mutual funds, a few mutual
9   funds, right -- it was right around $200,000.
10       Q   Did you inherit anything else?
11       A   Uh-uh (negative), that's it.
12       Q   I see.  What property is located at 18
13  Resolute Lane, is that an investment that you and your
14  wife made?
15       A   18 Resolute Lane, I -- I'm not sure of that
16  address.
17       Q   Okay.  There are some documents that were
18  produced related to real estate investments that you
19  made and that was one that came up.  Is that one on
20  which --
21       A   Oh, is that the commercial building, is that
22  18 -- I think --
23       Q   I don't know.
24       A   -- you know, it's -- I think that's probably
25  the -- I never called it by that name, and so I don't

---

**79**

1   have that in my memory, but I think that -- that's
2   probably the commercial building or CM3 or the
3   commercial building or -- we've called it different
4   things.
5        Q   I see.  Which properties --
6        A   So I think that's it, yeah.
7        Q   Which properties did you lose by virtue of
8   defaulting on loans?
9        A   We lost the lot on the harbor and we lost
10  both of the rental homes.  And -- and then that's all
11  the -- you know, the properties that we've lost.  We
12  haven't lost our home yet, but that --
13       Q   Is that becoming increasingly difficult?
14       A   That's -- it's sort of a -- I'm not sure
15  where we are with that.
16       Q   Is it in nonpay status?
17       A   So the second mortgage is in nonpay.
18       Q   And they haven't started any foreclosure
19  proceedings on that second lien?
20       A   Not to my knowledge.
21       Q   They don't want to take it because they'll
22  probably get wiped out, right?
23       A   Well --
24           MR. BRADLEY:  Objection.  Asking the witness
25  to speculate.

---

**80**

1           MR. LITTLE:  I'm asking if he knows.
2        A   (Continuing)  I do not know.
3        Q   Okay.  Have they told you anything about why
4   they haven't started any kind of foreclosure
5   proceeding?
6        A   It -- it's with Bank of America.  It's --
7   trying to find out anything from them is almost
8   impossible.
9        Q   I understand.  What's the debt service on the
10  house?
11       A   The first loan is two -- about $266,000,
12  somewhere around there, and the second loan is right
13  now around 680, 690.
14       Q   What do you estimate the value of your home
15  to be?
16       A   Somewhere around 800 to 850,000.
17       Q   All right.  Let's take a look at this Tab B
18  in front of you here.  There were some investments that
19  you made in something called Delmas Towers and 5th
20  Street Tower in San Jose?
21       A   Uh-huh (affirmative).
22       Q   That was about $600,000 that you and your
23  wife invested, is that right?
24       A   Uh-huh (affirmative).
25       Q   Did Loral Langemeier instruct you to make

---

**81**

1   those investments?
2        A   So when she talked to us on how to allocate
3   our assets --
4           (Cellular telephone interruption.)
5        A   (Continuing)  Sorry about that, I thought I'd
6   turned that off.  I apologize.
7        Q   That's okay.
8        A   I'll just turn it off, if you'll forgive me.
9   Sorry.  There's a way to do that.  Sorry.  I apologize.
10  I really thought I had done that.
11       Q   That's okay.
12       A   Tell -- ask me the question again.
13       Q   Did Loral Langemeier instruct you or advise
14  you to make these investments at Delmas Towers and 5th
15  Street Tower in California?
16       A   So when we -- when we went to the Big Table,
17  she talked about how to allocate your assets, and so
18  the principal was real estate, there -- a certain
19  amount of your assets are in real estate and some was
20  in promissory notes and some was in oil, some was in
21  business.
22           And so -- so she did not teach us about
23  Delmas Towers.  What she recommended to us was that we
24  invest in -- in real estate and promissory notes.  And
25  so those -- those two investments we learned from her,

---

STEVEN LENES - MAY 11, 2012

---

82

1    but she did not recommend those.
2        Q   She didn't recommend these.  So she didn't
3    sell you these investments, correct?
4            MR. BRADLEY:  Referring -- referring to
5    Delmas Towers and 5th Street Tower?
6            MR. LITTLE:  Yes, I think we all know what
7    we're talking about.
8        A   (Continuing)  So these two investments, she
9    did not recommend those.
10       Q   Right.
11       A   Yeah.
12       Q   Why did you do those deals?
13       A   The -- the portion of our -- our asset
14   allocation that was for real estate, we -- we wanted to
15   figure out what kind of real estate to put in those.
16   Loral recommended that we have a portion in real
17   estate, and so we had done single family homes, you
18   know, we had our rental properties, and we spent a lot
19   of time working on them.  And we were not wanting to do
20   a whole lot of labor on individual rental properties,
21   and so we thought this was a viable alternative to
22   that.
23       Q   Were these condos or office, or what were
24   they?
25       A   So these were -- so these -- those were two

---

83

1    loans for two condo projects.
2        Q   Did Loral Langemeier talk to you at all about
3    investing in condos in California?
4        A   She talked about a number of real estate
5    investments.  She talked about condos in Georgia and
6    real estate investments in Georgia and she talked about
7    them in Ohio and she talked about them in Missouri.
8    And at our table, she talked about developing in
9    California.  And so as far as condos in California
10   specifically, she talked about real estate development
11   in a number of different areas.
12       Q   Were you suitable to make those investments?
13       A   So when he --
14       Q   In Delmas Towers and 5th Street Tower?
15       A   So when you ask were we suitable, what are
16   you asking me?
17       Q   Let me -- let me unpack that a little bit.
18   When you made these investments in Delmas Towers and
19   5th Street Tower in California where you lost all your
20   money, were you capable of understanding and evaluating
21   the merits and risks of those investments?
22       A   We -- we went to Loral, who taught us how you
23   can become, you know, wise investors.  And -- and so
24   she had a course about, you know, how you -- how you
25   can manage those things and she taught us how to do it.

---

84

1    So at the time, we felt we were appropriate investors.
2        Q   Dr. Lenes --
3            MR. LITTLE:  Object, nonresponsive.
4    BY MR. LITTLE:
5        Q   -- my -- my question is a little bit
6    different, okay?  Were you suitable for these
7    investments, were you capable of evaluating the risks
8    and merits of investing in Delmas Towers and 5th Street
9    Tower?
10       A   We --
11       Q   You can answer.
12           MR. BRADLEY:  Object to the form of the
13   question.  It's a compound question.
14       A   (Continuing)  Okay.  So at that -- at that
15   time, we understood that we could make those
16   investments.
17       Q   Did you know the deal was risky, Delmas
18   Towers and 5th Street Tower?
19       A   The -- here's -- here's what -- here's what
20   we knew, we knew that Loral had said you have these,
21   you divide up your investments between real estate and
22   oil and gas and all that and that she would -- that --
23   that if you had -- there's land associated with this,
24   so we -- we did not understand it to be risky at the
25   time.

---

85

1        Q   Okay.
2            MR. LITTLE:  Object, nonresponsive.
3    BY MR. LITTLE:
4        Q   I think I understood your answer to be that
5    you did not understand Delmas Towers and 5th Street
6    Tower to be risky at the time you made those
7    investments.  Is that correct?
8        A   We were -- we were taught, you know, how to
9    manage those kind of things, and we did not
10   understand them to be risky at the time.
11       Q   What about Metra Mezzanine I, LP, and 1800
12   Primrose Limited Partnership, did you understand those
13   to be risky?
14       A   Those were -- those are apartment buildings
15   in Texas and those are -- they're still operational.
16       Q   Have they made you any money?
17       A   Those have not made us any money.
18       Q   What's happening to those investments?
19       A   So they're -- right now they're -- they're
20   operating apartment complexes and --
21       Q   Are they operating at a loss?
22       A   They are, to the best of my knowledge,
23   operating at a small loss right now.
24       Q   Did you understand those to be risky?
25       A   Those were part of the real estate

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

86

1    investments, as well.
2              MR. LITTLE:  Object, nonresponsive.
3      A   (Continuing)  And so they -- well --
4              MR. BRADLEY:  He's answering your question.
5    Let him finish this -- his answer.
6      A   (Continuing)  I just want to finish.  And
7    it's -- it's a little hard to keep my train of thought
8    when you do that, so -- I mean, if you want to do
9    that --
10     Q   No, go ahead.
11     A   If you wouldn't mind just waiting a little
12   bit until I finish, that would be good.
13     Q   I will.
14     A   So when -- so when we made those
15   investments -- you want to ask me the question again.
16     Q   Yes.  Did you understand the -- your
17   investments in Metra Mezzanine I, LP and 1800 Primrose
18   Limited Partnership to be risky?
19     A   So from what we had learned from the
20   recommendations and things that Loral made, we did not
21   consider those to be risky.
22     Q   All right.  I'm going to ask you the same
23   question about the other investments on this page, on
24   this -- in this document.  And --
25     A   Do you want me to --

---

87

1      Q   Just one second.  I'll ask you a question.
2    Did you understand your investments in Z Restaurant
3    Group to be risky?
4      A   So we -- we -- here's what we understood.
5    Loral was the person who made millionaires, she's the
6    one who taught how to do these things, she recommended
7    the Z Restaurant Group.  She recommended that we be
8    involved in that, that she was involved in it.  And so
9    she -- she taught that when you have a good team, you
10   have a -- you know, you just -- you'll -- you'll
11   succeed.
12         And she -- David Zebny, she described him as
13   a -- as a person who had a master's in business from
14   Harvard, that had managed a large sum of money for
15   Fidelity in their real estate investment arm, that he
16   successfully operated a restaurant just like that in
17   California, and that there was no risk, you know, in
18   being involved in the Z Restaurant Group.
19     Q   All right.  Was Renaissance Laser LP a risky
20   investment?
21     A   So when we became involved with that, she
22   described the -- Scott and Mike, who were doing that,
23   and she said that they didn't even really need our
24   money, that they were doing this as a favor to her, and
25   that she was -- that this was an established company

---

88

1    that was already making money and had, you know,
2    positive cash flow and that this was a -- there were
3    plans to expand it and produce more.  And so she -- she
4    never mentioned that there was any risk associated with
5    that.
6      Q   Did you understand it to be risky,
7    Renaissance Laser?
8      A   So she -- she was teaching us, we -- she
9    would have told us if it was risky.
10     Q   Did you understand Coastal Serenade to be a
11   risky investment?
12     A   So Loral told us that Debbie Murray, who is
13   the principal in that group, was an expert at turning
14   around companies.  She told us that it was an already
15   established business that was making money, but that
16   the owners were just ready to, you know, move on and do
17   something else, that Debbie Murray was excellent at
18   turning around businesses and that she was the poster
19   child of business plans and turning around businesses.
20   And so we did not -- she never told us about any risk
21   associated with that.
22     Q   Did you understand --
23     A   So --
24     Q   -- Coastal Serenade to be a risky investment?
25     A   So when she never told us about risk and she

---

89

1    was involved, and she recommended it, then there
2    wouldn't be risk associated with that.
3      Q   Did you understand STG Investors, LLC to be a
4    risky investment?
5      A   So when she told us about investing in
6    Supplements To Go, she told us about the principals and
7    that they already were successfully managing World
8    Class Nutrition and that they would be able to combine
9    the Supplements To Go, a lot of the shipping and those
10   kind of things so that the overhead and some of the
11   expenses associated with the business would not be
12   high, that they had experts involved in doing Internet
13   searches and optimization and, you know, having
14   customers come to their Web site to buy their products,
15   that they were experts in that field, that there was a
16   company that had just sold for a large amount of money
17   just like that, that we would keep this and sell it and
18   that we would make a very large, you know, return on
19   the money that we invested and that -- that she was
20   invested in it and that there was -- you know, that she
21   had skin in the game, there was not -- she never -- she
22   never told us about any risk associated with that.
23     Q   Did you understand it to be risky when you
24   made the investment?
25     A   So when she told us all those things about

---

STEVEN LENES - MAY 11, 2012

---

90

1  the company and that she was invested in it, then we --
2  we would not -- I mean, we did not think that that was
3  a risky investment.
4      Q   At the time you invested in BioNovix, did you
5  understand that to be a risky investment, sir?
6      A   So when she told us about BioNovix, she again
7  talked about that the person -- so that was a compound
8  called Xanthohumol that were -- that they had developed
9  and that the scientist who developed that was at
10 Vanderbilt, there were published papers on it, that it
11 was -- he had developed previous compounds and they had
12 marketed those and done very well with them, that he
13 had a good relationship with her and with the
14 principals of that company, and that they were working
15 together, that she brought together a large number of,
16 you know, experts and they were going to do a
17 multi-level marketing approach for that.  And so they
18 had people that were well-known in that field who were
19 developing the program so that it would -- it would be
20 exactly right.
21          She told us that that company, within five
22 years, would go to 600 million dollars.  She told us
23 that it -- that she would essentially make 12 -- 12
24 times return on that from what we invested and that she
25 never -- she never mentioned risk associated with that.

---

91

1      Q   So you didn't -- at the time you made your
2  BioNovix investment, you did not understand there to be
3  risk associated with that investment, is that correct?
4      A   So she told us that you -- you have experts
5  that are involved, you have a good team, you have a
6  good product, you know, those sorts of things.  And
7  so --
8      Q   Yeah.
9      A   -- when you have all of that, you have a
10 successful business.
11     Q   And, Dr. Lenes, I just want to be clear,
12 based on what Loral Langemeier told you, you thought
13 you were going to get a 12 times return on your money
14 for zero risk, is that what I understand?
15     A   So we felt that we were going to get a 12
16 times return on our money, and she never really talked
17 about risk.  And so it's -- it's not something that
18 came into the picture so much.  So it's not a correct
19 characterization to say that we thought for zero risk,
20 we would get a 12 turn -- she -- she really told us
21 that there was -- there was -- she never mentioned risk
22 about that and --
23     Q   What level of risk did you understand there
24 to be in BioNovix, if any?
25     A   So we understood that she was getting

---

92

1  together an excellent team, that she was involved, that
2  this was a good molecule, that it was -- she talked
3  about how it was manufactured in Germany, and that it
4  was going to take five years to really develop the
5  company to where we could sell it.
6      Q   Was there any risk in BioNovix?
7      A   So Loral Langemeier never talked about risk
8  associated with that.
9      Q   Did you learn about risk anywhere else?
10     A   We learned about risk after the company
11 failed.
12     Q   After the company failed, okay.
13     A   That's when we learned about risk.
14     Q   Was there any kind of risk in
15 IRR-Residential, LLC?
16     A   So when Loral recommended that to us, she
17 said that one of the principals involved with IRR was a
18 former Federal Reserve regional bank person.  I'm
19 sorry.  I've just forgotten the nomenclature for that,
20 the -- the Federal Reserve.  So he was involved in
21 that, that -- that IRR-Residential was an established
22 company, that essentially they were franchising it and
23 building -- building kind of like a network so that
24 they could pull at large national accounts and funnel
25 them out through their network, that the company had

---

93

1  already been in existence and was already making money
2  and this was the way to grow that investment, and that
3  she never -- she never mentioned any risk associated
4  with that.
5      Q   So what -- what return on your money did you
6  expect in IRR-Residential?
7      A   So, over the course of the next several
8  years, we -- we thought that there would be probably --
9  in the -- in the papers, it said specifically, and so
10 I'm -- I'm trying to -- we've really talked about a lot
11 of -- a lot of investments, and so I'm trying -- some,
12 you know, are more clear than others.  And so I think
13 this one was either a, you know, triple return or
14 doubling our money, something --
15     Q   Somebody told --
16     A   -- something along --
17     Q   -- somebody told you you would make two or
18 three times your money for no risk, right?
19     A   So not somebody --
20         MR. BRADLEY:  Objection.  Mischaracterizes
21 the testimony.
22     A   (Continuing)  Not somebody told us.  So Loral
23 told us, and in the -- in the documents, there's --
24 there's essentially what the pattern of -- when they
25 would -- when they'd write out a business plan, they'd

---

STEVEN LENES - MAY 11, 2012

---

## 94

1  say this is what you'll make, you know, over a
2  particular period of time.
3      Q   A pro forma projection?
4      A   Yes.  I think that's what that's called.
5      Sure.  So you expected you were going to make
6  two to three times your money for zero risk based on
7  what Loral told you, is that right?
8          MR. BRADLEY:  Objection.  Mischaracterizes
9      the testimony.
10 BY MR. LITTLE:
11     Q   Is that right?
12     A   Again, what we -- what we said was that we
13 didn't -- Loral never mentioned risk.  She focused on
14 what the returns would be and how good the investment
15 was and the urgency of investing in the investment and
16 the -- how you would get to -- get to your freedom day
17 or happy day or whatever it's called.  And so those are
18 the things that she focused on when she recommended the
19 investments to us.
20     Q   Was -- were you aware of any risk in the Oil2
21 Holdings investments?
22     A   So with Oil2, we had never really thought
23 about investing in oil before and -- until we went to
24 the Big Table and she recommended that as part of our
25 asset allocation and as -- she told us that the

---

## 95

1  way -- when you -- when you invest in oil wells, the
2  old way of doing it was you put a bunch of money in one
3  well, and if that well were a dry hole, then you would
4  have lost all your money.
5          And so the way that they did it was they
6  developed a -- where you would buy small portions of a
7  bunch of wells.  And it started out you'd have 20, 20
8  or 25 wells in a particular month, like they'd package
9  together 20 wells for the April '06 oil, gas -- oil and
10 gas fund, whatever the nomenclature they called it.
11     Q   Okay.
12     A   And so out of those 20 wells, eight -- eight
13 out of 10, 16 out of 20 would produce a return and the
14 four -- two or three or four that didn't, you know, was
15 more than offset by the 16 that did.  And so she -- she
16 said there -- she never mentioned any risk.  She -- she
17 said that that's how you make sure that you get a
18 return on -- on oil and gas investments.
19         And this, she said was a proprietary system,
20 that they'd figured out how to do that, and that the
21 FCC approved it, and that it was a way, you know, you
22 invest -- you invest money as you go along in oil and
23 gas and then you get -- she told us, too, that you
24 get -- that there are incentives built into oil and gas
25 investing where you get to deduct from your taxes what

---

## 96

1  the -- there's costs associated with drilling a well,
2  and because the government, you know, at least used to
3  want you to drill wells, and so to encourage that, they
4  gave you tax incentives.
5          And so you -- they knew how to set it up that
6  you could get those tax advantages.  So you -- you save
7  money on your taxes and then you had a guaranteed
8  return on your investment over time.
9      Q   You understood the Oil2 programs to be
10 guaranteed returns on your investment over time?
11     A   We understood that -- that -- she --
12     Q   Is that right?
13     A   -- she told us that we would --
14         MR. BRADLEY:  Let him answer your question.
15     A   (Continuing) She -- she told us that we
16 would -- as we invested this much money, you would get
17 this -- this much return.  And so they had a way of
18 calculating roughly, you know, what -- from their --
19 from their history of how much they'd always paid, then
20 you would put this money in and you would get paid, you
21 know, this much over the life of all of these wells,
22 and that -- you know, that an oil well had a particular
23 lifespan, you know, it didn't pump forever and ever.
24 And so you just kept going with the investments all
25 along so that you always had a stream of income, you

---

## 97

1  know, coming from those wells and that you would
2  replace, you know, the investment that you had in that
3  well and then you continued to make, you know, money
4  past that.
5      Q   What was the risk level of that investment in
6  Oil2 Holdings?
7      A   I -- I don't understand what you're asking.
8      Q   Was there any risk in your investments in
9  Oil2 Holdings that you were aware of?
10     A   So she never described any risk and, in fact,
11 said that because you did it this way, there -- there
12 wasn't risk associated with it.
13     Q   Oh, I see.  She affirmatively told you that
14 there wasn't risk associated with it?
15     A   Because you're -- she -- what she said was,
16 is that you get -- you know, you'll have a guaranteed
17 return associated with these oil wells.
18     Q   Was there any risk in the Vetrazzo
19 investment?
20     A   So Vetrazzo, what she told us when she
21 recommended it was that Jim Sheppard, James Sheppard,
22 who -- and there's another woman who is involved with
23 him in Vetrazzo, that they were graduates of an earlier
24 Big Table and that she essentially taught them how
25 to -- how to do this business, how to do business and

---

STEVEN LENES - MAY 11, 2012

---

## 98

1  how to make good investments.
2       And she recommended that we be involved in
3  this because they were a good team and they had found a
4  business that -- so Vetrazzo was a -- used recycled
5  glass to make countertops. And -- and so it was --
6  it's a green -- it was a green product. And so it
7  was -- as -- as our country has gone more towards green
8  things, it was the up and coming kind of a product.
9       And so there was going to -- there's a great
10 market for it, especially in California, which is where
11 the company was based, that they had -- knew how to
12 access a lot of California grant money to develop the
13 business, so there was -- there was resources available
14 for them to make the company and to grow it, that it
15 was a green product, so there was a big market for it,
16 that the team involved knew how to do this, that the
17 person that they bought the company from that, you
18 know, knew the process and everything was going to be
19 involved with them to, you know, just make a good
20 transition and make the company.
21      And so she said that this was a good
22 investment, she recommended it to us, it fit into our
23 schema. And so she never -- she never mentioned risk
24 associated with that when she made that investment.
25      Q   I see. Well, in your fourth supplemental

---

## 99

1  responses and objections to our discovery requests,
2  you've got a long list here of different investments
3  that you and your wife made over the last five years,
4  is that right?
5       A   Where, where are you?
6       Q   In Tab B.
7       A   Tab B.
8       Q   Same place you are.
9       A   Like these pages here?
10      Q   Yes, sir. Tell the ladies and gentlemen of
11 the jury which of these investments contained any risk.
12      A   So when we -- when we -- when Loral
13 recommended Z Restaurant Group, we did not understand
14 that there is risk associated with that.
15      Q   Okay.
16      A   When Loral recommended Renaissance Laser, we
17 did not -- she never mentioned risk. When Loral
18 recommended Coastal Serenade, on down through the whole
19 list.
20      Q   Through the entire list, there's no risk on
21 any of these investments, right?
22      MR. BRADLEY: Mischaracterizes testimony.
23      A   (Continuing) So -- so you're -- what I'm
24 saying is -- is that -- do you want me to repeat it?
25 What I'm saying is -- is that when Loral recommended

---

## 100

1  these investments to us, she never disclosed that there
2  was risk to us.
3       Q   My question was different, Dr. Lenes, and
4  I'll -- I'll try to clarify for you. At the time that
5  you and your wife put money into the investments that
6  are disclosed in your fourth supplemental responses to
7  our discovery requests, which of them did you
8  understand to contain a risk, any of them?
9       A   So -- so when Loral recommended these, she
10 said -- she did not mention risk and she said that this
11 is -- these are the things that we're doing to make
12 sure that these businesses are successful. And she
13 said that you'll have such and such a return on this
14 business. And she said that, you know, over this
15 period of time, you'll make this much money and -- and
16 we'd be that much closer to the day when we would be
17 independent, you know, that we would reach our -- our
18 freedom day, that we'd be able to, you know, go do some
19 of the things that we had hoped to do.
20      Q   At the time that you and your wife put money
21 into the investments that are disclosed here in your
22 fourth supplemental discovery responses, is it fair to
23 say that you did not understand any of them to have
24 risk?
25      A   It's -- we -- we -- we went to Loral to -- to be

---

## 101

1  exposed to investments, you know, with a good return.
2  And we -- we did -- she -- she never -- she never
3  mentioned risk. And -- and so it's -- she's the one --
4  so we -- we -- we gave her money. Because we did that,
5  she -- she made investments available to us, she
6  recommended those investments.
7       We disclosed to her, you know, all of our
8  resources, and we felt that she was -- she had a -- she
9  knew all about us, she knew our resources. She knew
10 that -- where we were coming from, she knew what our
11 goals were, what we hoped to do, and that she -- we
12 trusted her and felt that she had an obligation, you
13 know, to steer us in the right direction.
14      Q   And because you trusted her, you didn't think
15 any of these investments had risk, is that right?
16      A   Because we trusted her, we felt that she
17 would not recommend an investment that was not
18 appropriate for us.
19      MR. LITTLE: Object, nonresponsive. And he's
20 going to need to change the tape in a second, so
21 why don't we take a short break.
22      A   (Continuing) Take a short break, can we do
23 that, and I can -- thank you.
24      MR. BRADLEY: Yeah.
25      VIDEOGRAPHER: Off the record at 11:17, Tape

---

STEVEN LENES - MAY 11, 2012

---

102

1  No. 2.
2      (Recess taken.)
3      VIDEOGRAPHER:  This is Tape No. 3 of the
4  deposition of Dr. Steven Lenes.  We're on the
5  record at 11:25.
6  BY MR. LITTLE:
7      Q   Dr. Lenes, did anyone ever tell you anything
8  about risk with respect to the investments contained in
9  your fourth supplemental discovery responses?
10     A   The -- when -- when Loral recommended these
11 investments to us, we talked about the returns, we
12 talked about why they were good investments, the team,
13 we talked about all those things.  We really -- we just
14 did not talk about risk, and so she -- she did not
15 mention, you know, risk associated with that.
16     Q   Dr. Lenes, that wasn't my question, okay?
17 And let's leave Loral Langemeier aside for a second.
18 Did anyone besides Loral Langemeier ever tell you
19 anything about risk with respect to the investments
20 identified in your fourth supplemental discovery
21 responses?
22     A   So are you asking me did any of her team talk
23 about risk --
24     Q   Did anyone?
25     A   -- or --

---

103

1      Q   Anyone at all.
2      A   So what -- what we all talked about, you
3  know, the other people at the table, we talked about
4  the returns, you know, that the investments would
5  return.  And we talked about really how -- I mean,
6  Loral -- Loral -- you can't just lay aside Loral.  We
7  were just very thankful that she would bring these --
8  these investments to us and recommended them.
9          And so we talked about, you know, the -- the
10 return of the investments.  I mean, those are the kind
11 of things we -- we just had not seen returns like those
12 kind of things before.
13     Q   Did --
14     A   So we -- we -- really, we didn't -- we were
15 thinking about the returns and the investments and
16 those sorts of things, you know.  We didn't think about
17 risk.  She didn't -- she didn't talk about risk.  It's
18 a -- we were thinking that -- what she talked about
19 was, you know, our freedom day.
20         And so we're thinking, gosh, you know, part
21 of what my -- my hope was, I am a physician, and I -- I
22 was really hoping that I would be able to support
23 myself and go overseas and work in -- in hospitals and,
24 you know, relieve missionary -- longstanding missionary
25 physicians.  They have a big conference in Kenya every

---

104

1  year for missionary doctors.  I wanted to go fill in
2  for somebody so they could go to that conference.  And
3  then I would be able to support myself in doing that.
4          I mean, those are the kind of things I
5  thought about, and she -- she said we would get these
6  kind of returns.  And so I thought, okay, I'm -- I'm
7  going to be able to do this.
8      Q   Did you ever see or hear anything from anyone
9  prior to making your investments that you complain
10 about in this lawsuit about risk?
11     A   Loral didn't mention risk.
12         MR. LITTLE:  Object, nonresponsive.
13     A   (Continuing)  We talked about return.  We --
14 we -- I guess I didn't finish answering yet.  And so
15 when you -- when you do that, you get me a little off
16 track, so -- so when -- do you want to ask me the
17 question again?
18     Q   Yeah.  Did anyone ever tell you anything
19 about the risk involved in the investments that you
20 identify in your fourth supplemental discovery
21 responses?
22     A   Okay.  So when we -- when we made these
23 investments, we talked about the return.  We talked
24 about all the aspects of it.  We talked about
25 allocating our resources and -- and we didn't -- we

---

105

1  didn't talk about risk.
2      Q   Did you ever hear anything about risk related
3  to your investments prior to making them?
4      A   We -- to the best of my recollection, we did
5  not -- we did not know about risk.
6      Q   Thank you.  What did you pay Miss --
7      A   What we -- what we -- what we did expect was
8  that we would have -- that we would be presented
9  with -- with recommendations that would be appropriate
10 for us.
11     Q   What did you pay Loral Langemeier for those
12 recommendations, directly or indirectly?
13     A   So in coming to the Big Table, we were -- we
14 were told that that's how you had access to these
15 investments that she recommends and that that was -- we
16 got that -- got that information in there, you know,
17 somewhere -- somewhere around 18, 12, $18,000.
18     Q   Okay.  Turn to Exhibit 1 in the book in front
19 of you, if you would.  Is this the money that you paid
20 Loral Langemeier for her recommendations, sir?
21     A   We did pay that, and what I don't -- what I
22 don't recall, you know, from that is if we paid another
23 amount for -- for me to come to that, so I just -- just
24 don't recall that.
25     Q   And in conjunction with paying the money

---

STEVEN LENES - MAY 11, 2012

## 106

1  that's identified by the invoice in Exhibit 1, did you
2  sign the contract that's identified as Exhibit 2?
3     A   The coaching resource performance contract?
4     Q   Yes.
5     A   Yeah.
6     Q   Loral's Big Table agreement?
7     A   Yeah.  That's -- that's my signature.
8     Q   Did you understand that you were going to be
9  getting investment advice after you signed this
10  contract?
11     A   What we understood was that we would --
12         MR. BRADLEY:  And -- and I'm going to -- I'm
13  sorry, hold on.  I'm going to object to the extent
14  that calls for a legal conclusion.
15     A   (Continuing)  So -- so let me -- I'm just
16  going back to one question, I just see this right here,
17  the 17,990 double tuition, includes course materials, I
18  think that's what I'm thinking of, so that's why I'm a
19  little confused by this invoice.  But there -- so I'm
20  not sure if there's another invoice or what exactly is
21  going on.  So that's where that -- where I'm thinking
22  18,000.
23     Q   I see.
24     A   So now would you ask me your question again?
25     Q   Yes.  Did you understand this contract

## 107

1  entitled you to -- entitled you to investment advice
2  from Loral Langemeier?
3         MR. BRADLEY:  Objection.  Calls for a legal
4  conclusion.
5     A   (Continuing)  So this -- what we understood
6  was -- is what Loral's agent, Robert, told us, is that
7  Loral has increased her net worth, she became -- she
8  became a millionaire, she knows how to do that, that
9  she could make us that way, and that she has
10  investments that she recommends that are only available
11  to people in the -- on the Big Table.
12       And part of what was difficult for us and why
13  this appealed to us is that we -- we -- we've already
14  gone over how -- the work that we've done, the sweat
15  hours that we put in to develop, to get to the point
16  that we had gotten to.  And we saw, you know, people
17  that we knew in the Charleston community that would
18  invest in different other opportunities where -- you
19  know, a bank or something, that they would get a --
20  they would have -- they would actually have a good
21  return from all of that and they weren't working all
22  the time on it.
23       And so we never could figure out how to do
24  those sorts of things in our community here, and so
25  Robert said that there's these investment opportunities

## 108

1  that are only available through Loral.  And so when we
2  said that we were coming, what we understood was -- is
3  that Loral would be making those investments available
4  to us.  She'd recommend, she'd figure out how -- you
5  know, what we should do and we'd be able to be involved
6  in -- in investments that would -- you know, where
7  essentially our money would work and we wouldn't have
8  to work so hard.
9         MR. LITTLE:  And I'm going to have to object
10  as being nonresponsive because my question was a
11  little bit different.
12  BY MR. LITTLE:
13     Q   Did you understand that when you --
14     A   Oh, by the way -- oh, I just interrupted you.
15  I'm sorry.  Go ahead.
16     Q   That's okay.  By the way what?
17     A   I was going to say thank you for waiting till
18  the end to object.
19     Q   I'm trying.
20     A   Yeah.
21     Q   Did you understand that this contract was
22  going to entitle you to investment advice from Loral?
23         MR. BRADLEY:  Objection, asked and answered.
24  Objection, calls for a legal conclusion.
25     A   (Continuing)  And so what I understood was

## 109

1  that when we came to the Big Table, that she would make
2  those kind of opportunities available for us, she would
3  recommend what, you know, would be good for us, and
4  that we would have opportunity to make our money work.
5     Q   Is there anything in this agreement that
6  suggests that to you, sir?
7     A   What -- what -- where we rented that was,
8  you know, from Robert.
9     Q   Robert Owings?
10     A   I don't know Robert's last name.  I think
11  that's what it is.
12     Q   Who does he work for, do you know?
13     A   So he was Loral's person, you know, when --
14  when Elisabeth called, so I -- I was not involved in
15  that conversation.  And so I don't have -- I don't have
16  a direct understanding of that, but that's what -- you
17  know, what we understood.
18     Q   And you contend that the money that you paid
19  to attend this conference is the compensation that you
20  paid her for her recommendations, is that correct?
21         MR. BRADLEY:  Objection.  Calls for a legal
22  conclusion.
23     A   (Continuing)  So what we understood was
24  that -- this is what we understood, that we would come
25  and that she would help us, you know, she would have

STEVEN LENES - MAY 11, 2012

### 110

1  these opportunities avail -- she would have investment
2  opportunities available for us that she would
3  recommend, that she would teach us about how you -- you
4  could -- could make money so I could do the things I
5  wanted to do.
6        So when -- when we came -- when we came to
7  this, really, Elisabeth did, you know, a lot of the
8  initial foot work and everything.  And so as we -- as
9  we came, I -- I mean, I read the book, you know, on the
10  plane coming, so I just had a very rudimentary
11  understanding of what she was going to supply, but we
12  understood that Loral would have investment
13  opportunities that she would recommend to us.
14    Q   I see.  And the check that you wrote to pay
15  to come to the conference, that was to Choice
16  Performance, is that right, or how did you pay for it?
17    A   You know, I would -- I really -- I just don't
18  remember if we wrote a check or we did a credit card or
19  whatever.  I don't -- I don't recall.
20    Q   Did you or your wife ever pay Loral
21  Langemeier anything?
22    A   So --
23        MR. BRADLEY:  Objection.  Calls for a legal
24  conclusion.
25        MR. LITTLE:  What's -- in what regard, Jim?

### 111

1        MR. BRADLEY:  You're -- you're -- you're --
2  you're trying to set up a -- you know, a
3  contractual issue, first of all, which is -- you
4  know, the judge -- you lost your motion, I don't
5  know if you're aware, that came out yesterday, but
6  -- but the fact of the matter is you're trying to
7  draw legal distinctions.
8        You know, you want me to get in a -- a
9  debate, I made my objection and I'm happy to
10  explain.  Just because the -- the check goes to
11  Choice Performance doesn't mean that that wasn't
12  ultimately compensation that Langemeier received.
13        The other issue with the question, since you
14  ask, is that, you know, the compensation you
15  receive as an investment advisor doesn't have to
16  come directly from the client.  It's compensation
17  related to it.  So, you know, that's a source of
18  my objection, but go ahead, you can answer --
19  BY MR. LITTLE:
20    Q   Dr. Lenes --
21        MR. BRADLEY:  -- if you know.
22  BY MR. LITTLE:
23    Q   -- did you ever pay me -- did you ever pay
24  anything to Loral Langemeier?
25    A   So when we -- when we made the payment, I --

### 112

1  I don't make a distinction between -- you know, Loral
2  Langemeier is -- is the -- she was the person.  So
3  it -- we felt we were paying Loral Langemeier.
4    Q   I understand.  Turn to Exhibit 3, if you
5  would.  Have you seen Exhibit 3 before?
6    A   Yes.
7    Q   Did you provide information to complete this
8  document?
9    A   I would think I did because it has our
10  address and our phone number and our cell numbers.  And
11  I -- I actually have a -- I think maybe some of it is
12  missing or there's -- like I have a blank page here.
13        MR. BRADLEY:  And -- and, Mitch, so far
14  you've not made any of these exhibits to the
15  deposition.  Do you intend to do that?
16        MR. LITTLE:  This is -- this is already an
17  exhibit to Mrs. Lenes's deposition.
18        MR. BRADLEY:  Okay.  Is it -- is it marked --
19        MR. LITTLE:  I have not marked his yet.  I'm
20  going to mark them at a break, okay.
21        MR. BRADLEY:  All right.  Just so we're
22  clear, I mean, I'm not agreeing that this whole
23  book is an exhibit to the deposition.  If you
24  want --
25        MR. LITTLE:  No, Jim.

### 113

1    A   (Continuing)  So are you asking me --
2    Q   I'm going to ask you to take a look at Tab 3,
3  if you would.
4    A   Tab 3, okay.
5    Q   So have you seen the contents of this
6  document before?
7    A   Yes.
8    Q   Did you provide information that went into
9  the preparation of this document, to the best of your
10  knowledge?
11    A   We -- I think we filled this out in the
12  process of the tables.  So I think -- I think we had
13  help with this as we -- you know, filling it out when
14  we were at the first table.
15    Q   Who helped you?
16    A   So I think this is -- so this is a GAAP
17  analysis and we had help, I know Loral helped us with
18  some of it and I -- I think -- I'm trying to remember
19  if we had a meeting with somebody else.  I don't think
20  we did.  I think it was us and I think Loral helped us,
21  like some of the things where -- when she would talk
22  about what our goals were --
23    Q   Yes.
24    A   -- she would help us figure those things out.
25    Q   Did anyone else help you?

STEVEN LENES - MAY 11, 2012

---

### 114

1     A  It's -- I don't know if we had help, if
2 somebody typed it up. I don't really recall if
3 somebody typed it for us or anything like that.
4     Q  That's okay. Have you seen Exhibit 4 before?
5     A  Yes.
6     Q  Is that your handwriting on the first page?
7     A  It is.
8     Q  What is that phone number?
9     A  That's our home phone number.
10     Q  I see. Why did you write that on the front
11 page?
12     A  Because that's what I do.
13     Q  Just to make sure?
14     A  I don't know why I do it. I -- it's -- I
15 don't know. It's just a funny habit.
16     Q  Turn to the third page, if you would. It
17 says, "Congratulations, you are here." Do you see
18 that?
19     A  "You are here," yes.
20     Q  There's -- it says, "Your table private
21 password is turbo." Do you see that?
22     A  Yes.
23     Q  Is that your handwriting?
24     A  It -- I don't think it is.
25     Q  Okay. How did you come by these documents?

---

### 115

1     A  So these probably would have been what was
2 handed to us when we arrived for the conference.
3     Q  Did you read it?
4     A  Do --
5     Q  Exhibit 4?
6     A  So there was -- I don't -- I don't have a --
7 I read a lot of it. There's -- we started out -- so
8 there is a lot of information about calls and
9 mastermind calls and all those sorts of things. So as
10 we went through, we had a lot of things to fill out.
11 So -- and then we started -- she really started
12 lecturing right away, so it was just a busy time. I
13 don't --
14     Q  Do you recall having read it, Exhibit 4?
15     A  I recall having read -- I recall having read
16 a lot of it.
17     Q  Turn to the fourth page of Exhibit 4, if you
18 would. It's right there.
19     A  Okay.
20     Q  Do you see the -- the bold header there that
21 you, "Notice of disclaimer regarding investment
22 opportunities"?
23     A  Yes.
24     Q  Did you read this page?
25     A  The -- you know, I -- I don't have a -- I

---

### 116

1 don't have a recollection of -- of reading this page.
2     Q  Do you understand that one of your
3 allegations in this lawsuit is that Loral Langemeier
4 didn't tell you and your wife that she was not
5 registered to do securities business?
6     A  Tell me again.
7     Q  Do you understand that one of your
8 allegations in this lawsuit is that Loral Langemeier
9 did not tell you that she was not registered to do
10 securities business?
11     A  I understand that.
12     Q  The first -- the top sentence here says,
13 "Below is a disclaimer to notify you that Live Out
14 Loud, Loral's Big Table and Wealth Diva are not
15 endorsing any investments and we are not a licensed
16 security firm." Do you see that?
17     A  Yes.
18     Q  Did you read that? You don't remember?
19     MR. BRADLEY: Objection. Asked and answered.
20     A  (Continuing) So I -- again, I just --
21     Q  You just don't remember?
22     A  -- don't recall. I just don't remember.
23     Q  Yeah.
24     A  Yeah.
25     Q  But you did get the documents because you

---

### 117

1 produced them in this lawsuit?
2     A  Correct.
3     Q  So you didn't read paragraph -- you don't
4 recall having read the paragraph below it either, is
5 that fair?
6     A  That's fair.
7     Q  Okay. I'm going to ask you to turn to
8 Exhibit 12, if you would, in that book in front of you.
9     A  Here's -- here's one thing, though, about
10 that, is that, you know, if it's something that
11 important --
12     Q  Do you remember something about it now?
13     A  -- then I would have -- I would have thought
14 that it should have been talked about in the course of
15 the -- in the course of the seminars.
16     MR. LITTLE: Object, nonresponsive.
17 BY MR. LITTLE:
18     Q  Let's take a look at Exhibit 12.
19     MR. BRADLEY: Okay, and I'm -- I'm going to
20 also object to your interjecting your sidebar
21 comments on there and I'm going to ask that that
22 be stricken.
23 BY MR. LITTLE:
24     Q  Let's take a look at Exhibit 12, please.
25     A  All right.

---

STEVEN LENES - MAY 11, 2012

---

### 118

1     Q   Does your signature appear on Exhibit 12?
2     A   Yes.
3     Q   This is a declaration of nonsolicitation for
4   Z Harvard Square LLC. Do you recall having seen this
5   document before?
6     A   Yes.
7     Q   Do you understand that this was a declaration
8   by you and your wife?
9     A   Here's what I understand about this, is that
10   when we were at the table, Loral made a number of
11   recommendations and presented different investments and
12   that when she -- when she made -- she made comment when
13   she presented these, you know, we -- we didn't -- we
14   didn't talk about what -- what all this was. Sorry, I
15   lost track of the -- do you want to ask the question
16   again?
17     Q   Sure. Do you understand that this is a
18   declaration by you and your wife?
19     A   So a declaration meaning that we signed it,
20   is that correct?
21     Q   It says, Declaration of Non-Solicitation," it
22   has a series of paragraphs, and it says, "I, the
23   undersigned person, do hereby declare." Do you see
24   that?
25     A   Uh-huh (affirmative).

---

### 119

1     Q   Was this document true when you signed it?
2     A   So what I understood at the time was that
3   we -- that Loral had investment opportunities for us
4   when we went to the Big Table and that some of these
5   things, you know, were just, you know, things that
6   had -- you know, you did to sort of satisfy lawyers and
7   that you signed those and that's how you got the
8   information for the -- to -- to invest in the
9   investments.
10     Q   This was something that you did to satisfy
11   lawyers, is that what I understand?
12     A   This is something that we did so that Loral
13   would give us, you know, then the rest of the
14   information on the -- on the investments.
15     Q   Did Loral send you this document?
16     A   She -- you know, I -- I don't really know who
17   sent this document to us.
18     Q   Right. Was it -- and my original question,
19   Dr. Lenes, was, was this document true when you signed
20   it, was it true?
21     A   So -- so what -- I'm not exactly sure what
22   you're asking. What I'm --
23     Q   There are a bunch of statements --
24     A   -- what I understand --
25     Q   Okay, go ahead.

---

### 120

1     A   What I understand is -- is that at the time
2   that Loral recommended investments, we signed the paper
3   and then she gave us the information on the
4   investments.
5     Q   I'll try to unpack my question a little bit
6   for you, Dr. Lenes. There are four paragraphs
7   beginning with the word, "I," "I," "I," and "If," do
8   you see those above your signature?
9     A   Uh-huh (affirmative).
10     Q   Were those paragraphs true at the time that
11   you signed this document?
12      MR. BRADLEY: You can read each one and
13   comment on them.
14     A   (Continuing) Okay. So I understood that I
15   was an accredited investor. And -- and so the -- you
16   know, the information was for my personal use. And I
17   -- I looked at -- Loral gave us, you know, a number of
18   different recommendations, you know, that we could
19   choose from. And so I understood that that's a -- you
20   know, that I was choosing from those recommendations.
21   And -- and so that's -- that's what I understood from
22   that.
23     Q   Dr. Lenes --
24      MR. LITTLE: First of all, objection,
25   nonresponsive.

---

### 121

1   BY MR. LITTLE:
2     Q   Let me ask a different question and see if
3   you can answer this one. Is there anything false in
4   your declaration that we find in Exhibit 12?
5     A   As I -- as I understood this, I understood
6   that Loral was giving us choices. That's really what I
7   understood.
8     Q   I don't understand your response, Dr. Lenes,
9   and -- and perhaps you could explain it further. My
10   question was, is there anything false in Exhibit 12, in
11   your declaration? Did you sign your name to anything
12   that's not true?
13     A   Well, what's -- what's hard, you know, for me
14   to sort out is that I -- when I -- when -- when these
15   were presented to us, it was -- it just really, I
16   guess -- maybe I don't completely understand what
17   you're asking me, but, so she --
18     Q   All right. Here we go. Let's start --
19      MR. BRADLEY: Let him -- he's in the middle
20   of answering.
21      MR. LITTLE: Object, nonresponsive.
22   BY MR. LITTLE:
23     Q   Dr. Lenes --
24      MR. BRADLEY: He is in the middle of saying
25   something.

---

STEVEN LENES - MAY 11, 2012

## 122

1    A    (Continuing) She -- she gave us -- she gave
2    us a number of choices, and so I figured that if she's
3    giving us a number of choices, it's not like she's
4    saying do -- you know, you must do A and B and C.  I
5    mean, you can do A, you can do B, I mean, you -- it's
6    a -- so --
7        Q    What does that have to do with my question,
8    Dr. Lenes?
9        A    Well, it has to do with the question in that,
10   you know, we asked for the information and so she --
11   she gave us choices.  I mean, I think of -- I just
12   think of, you know, solicitation or promotion in a
13   different way.  I mean, I look at it as she gave us --
14   she gave us a number of choices, and so we could choose
15   from any of those.
16       Q    Dr. Lenes, let's go sentence by sentence.
17   Were you an accredited investor according to the U.S.
18   Securities Act of 1933?
19       A    We --
20       MR. BRADLEY:  Objection -- Objection.  Asks
21   for a legal conclusion.
22       A    (Continuing)  And so we felt the -- that --
23   you know, we understood that we -- that we were.
24       Q    And that's why you signed this, right?
25   That's one of the reasons you signed this, because that

## 123

1    first sentence is true, right?
2        A    That's --
3        MR. BRADLEY:  Objection.  Mischaracterizes
4    prior testimony.
5    BY MR. LITTLE:
6        Q    You requested information pertaining to a
7    capital investment in Z Harvard Square, LLC, didn't
8    you?
9        A    We felt that in order to -- to invest in it,
10   you know, you -- that's -- those are the steps that you
11   take.  So she -- she presented the investments, she
12   recommended that we do a certain amount in each area,
13   and so she said, "You fill out this paper and we give
14   you the information on it."
15       MR. LITTLE:  Object, nonresponsive.
16   BY MR. LITTLE:
17       Q    Did you request information pertaining to a
18   capital investment in Z Harvard Square, yes or no?
19       MR. BRADLEY:  He can explain his answer.
20       A    (Continuing)  So when -- when these
21   investments were presented to us, then you filled out
22   the paper to get the information.
23       Q    The next sentence reads, "I have not
24   requested this information as a result of any public
25   solicitation, offering, or promotion and have requested

## 124

1    this data for my own personal use."  Is that true?
2        A    So we didn't look -- try and get any
3    information for anybody else, it was for us.
4        Q    The next sentence reads, "I was referred to
5    you by a private party."  Is that true?
6        A    So -- I don't really understand that.  I'm --
7    I'm not sure what a private party is, but Loral -- you
8    know, Robert said, you know, "Come to the Big Table,"
9    and we came to the Big Table and that's -- these were
10   presented at the Big Table.
11       Q    The next paragraph reads, "I realize that the
12   requested information is for private use and is not
13   available to the public and that the purpose of this
14   information is not to solicit me to invest in
15   anything."  Was that true?
16       A    So --
17       Q    Did you understand that?
18       A    -- we -- you know, we knew it was for private
19   use.  She said, you know, these are for -- for the
20   community and that these opportunities were only
21   available to invest if we were involved in a -- in a
22   Big Table community.  And so, you know, we weren't
23   supposed to go talk about it everywhere.  And so it was
24   private, it was private information.
25       Q    Anything false in that paragraph that you --

## 125

1    that you're aware of?
2        MR. BRADLEY:  And I'm going to object to the
3    extent it calls for a legal conclusion.
4        A    (Continuing)  And so, I mean, we -- we
5    were -- it was for our private use.
6        MR. LITTLE:  Object, nonresponsive.
7    BY MR. LITTLE:
8        Q    Is there anything false in that paragraph
9    that you're aware of, sir?
10       A    So --
11       MR. BRADLEY:  Object to the extent it calls
12   for a legal conclusion.
13       A    (Continuing)  And so we -- it was for our
14   private use, you know, it's not -- I mean, it's not
15   available to the public.
16       Q    All right.  Next paragraph reads, "If I
17   choose to participate in any capital investment
18   opportunities or private placement opportunities
19   referred to in the requested information" provide to
20   me -- "provided to me, it will be of my own free will
21   and accord and not through solicitation or coercion by
22   any agents, affiliates, or non-affiliated entities
23   related to you directly or indirectly."  Was that true
24   when you signed this?
25       A    When -- when we were at the table, we -- we

STEVEN LENES - MAY 11, 2012

---

126

1  knew that we needed to come to the table to be able to
2  be involved in -- and -- in the investments that Loral
3  had available. And so we chose to come to the Big
4  Table and Loral presented these, recommended what we
5  should -- you know, what would fit into our general
6  portfolio, and that she said that there was a very good
7  return, we'd be able to, you know, do the things that
8  we felt we were called to do.
9      Q   Did you ever discuss Exhibit 12 with Loral
10  Langemeier?
11     A   This, we -- I don't believe we did.
12     Q   Did you ever show it to her?
13     A   She -- she's -- I -- really, I don't recall
14  so much where it came from. I mean, I assumed it came
15  from her and she was involved in it.
16     Q   You assumed?
17     A   And when -- when she is in -- at the table,
18  you know, she is the one who -- she said we needed to
19  follow her lead.
20     Q   Where did you get Exhibit 12?
21         MR. BRADLEY: Objection. Asked and answered.
22     A   (Continuing) So the -- it was part of the
23  paperwork that we filled out through Loral Langemeier
24  to be involved in the investment.
25     Q   Loral Langemeier sent you Exhibit 12?

---

127

1      A   So -- so somebody in her organization got us
2  that information. So I -- you know, I don't know who
3  stuffs her envelopes, you know. It's a -- I don't know
4  who does that --
5      Q   Where did you get --
6      A   -- or if she does it herself.
7      Q   -- Exhibit 13?
8      A   So this would have been some of the
9  information, I think, that we would fill out to -- as
10  part of getting the paperwork for -- for investing in
11  the -- in the investment.
12     Q   In Z Restaurant -- Z Harvard Square?
13     A   Z Harvard Square, right.
14     Q   David Zebny sent you this document, didn't
15  he?
16         MR. BRADLEY: Objection, asked and answered.
17     A   (Continuing) So, you know, I don't remember
18  who mailed it to me. I mean, I -- I don't know about
19  that.
20     Q   The document, the first paragraph reads, "The
21  purpose of this questionnaire is to solicit certain
22  information regarding your financial status to
23  determine whether you are an accredited investor as
24  defined under applicable U.S. Securities Act of 1933
25  and States securities laws and otherwise meet the

---

128

1  suitability criteria established by the company for
2  investing in the shares of the company." Do you see
3  that?
4      A   Yes.
5      Q   And you answered all of those questions,
6  right?
7      A   Yes.
8      Q   And there's Section F that says, "Consistent
9  investment strategy, is this investment consistent with
10  your overall investment strategy?" And you marked --
11  or actually, either you or your wife marked "Yes,"
12  correct?
13     A   So what -- what we understood was -- is that
14  Loral was helping us navigate, you know, all these
15  investments and that she -- she would make
16  recommendations to us that was consistent with what
17  would be the right thing for us.
18         And she had gotten that information at the
19  first table, I mean, she knew what our goals were. I
20  mean, we had actually told her all of our financial
21  assets, and actually, in front of 50 people, we -- we
22  revealed all of that information. And she -- she knew
23  what we wanted to do, we talked about all those, she
24  helped us set goals and figure out where we wanted to
25  be. And so she was directing our, you know, investment

---

129

1  strategy.
2      Q   Did you send this document to Loral
3  Langemeier?
4      A   So she recommended -- and, again, I don't
5  know who -- who -- that was, I don't know how many
6  years ago, I don't recall who we mailed it back to.
7      Q   Did you ever discuss Exhibit 13 with Loral
8  Langemeier?
9      A   Is this Exhibit 13?
10     Q   Yes.
11     A   So, what -- what we did do was, I mean, the
12  people that are involved with her, you know, that help
13  her make all the -- you know, run her organization and
14  everything, those -- you know, those are the people
15  that we send this to. I mean, I don't -- you know, you
16  don't necessarily talk to the president of the United
17  States if you need to get the bathroom cleaned at, you
18  know, where you work. I mean, that's just -- there are
19  certain things that are kind of administrative tasks,
20  and so you take care of those by, you know, the
21  administrative people that are assigned to those tasks.
22     Q   Did you send Exhibit 13 to anyone at Live Out
23  Loud or anyone associated with Loral Langemeier?
24     A   So we did send -- I mean, whoever -- whoever
25  we sent it to is associated with Loral Langemeier.

---

STEVEN LENES - MAY 11, 2012

---

### 130

1    Q    David Zebny is associated with Loral
2    Langemeier?
3    A    So -- so David has been evaluated by Loral.
4    I mean, she's part of the rec -- he's part of the
5    recommendations, the recommendations that she made.
6    And so there's -- you know, there's some kind of a
7    relationship between them.
8    Q    But you don't recall having discussed Exhibit
9    13 with Loral Langemeier, do you?
10   A    So this -- you know, this is a piece of paper
11   that we needed to sign and fill out, and we felt that
12   Loral knew our investment strategy and made
13   recommendations.  So did we discuss this piece of paper
14   with Loral, we didn't, but what we did discuss was what
15   our hopes and goals and aspirations were, what our
16   financial resources were, what we hoped to accomplish.
17   Those are the things that we discussed with her.  And
18   so it seems to me that that's the person who helps you
19   do your overall financial strategy.
20   Q    Did you discuss Exhibit 20 with Loral
21   Langemeier, sir?
22   A    So Exhibit 20 was the private placement
23   memorandum, and when -- when Loral presented this --
24   this company, she used -- she used the -- she
25   referenced the Z Restaurant Group as one of her really

---

### 131

1    good companies.  And so she talked about ultimately
2    they had like 150 employees, David Zebny was -- had a
3    master's in business from Harvard.  She talked about
4    how it was a -- you know, what the returns would be,
5    those sorts of things.
6         And so they -- she talked about, you know,
7    they send you a private placement memorandum.  And so
8    she sent it, I mean, she told us all about the company,
9    so --
10   Q    Did she send you the private placement
11   memorandum?
12   A    So, again, I don't recall exactly who sent
13   it.  She -- let me just clarify that she -- however,
14   the -- you know, she talked about private placement
15   memorandums, you know, that that's how you -- how you
16   learned about investing in companies.
17   Q    What did she teach you about private
18   placement memorandums, sir?
19   A    So that -- that was a while ago and I don't
20   have a real -- I don't have a good recollection of
21   what -- what she specifically taught and what other
22   people said at the seminars on how that exactly works.
23   Q    I'm going to ask you to take a look at the
24   four pages of risk factors contained in this
25   memorandum, Exhibit 20.  They're pages 7 through 10.

---

### 132

1    A    Seven through 10, like the bottom number?
2    Q    Yes.
3         MR. BRADLEY:  Go ahead and read it.
4         MR. LITTLE:  I haven't asked him a question
5    yet.
6    BY MR. LITTLE:
7    Q    Dr. Lenes, did you review these four pages of
8    risk factors before you put your money into Z Harvard
9    Square?
10   A    The -- so here's -- here's what I remember.
11   When we talked about the Z Restaurant Group, Loral said
12   that this was a -- a company that was -- that already
13   had a track record, that it had a successful operation
14   in California, that it was operated by an M.B.A. from
15   Harvard, that one of the consultants was a man who had
16   helped Mrs. Fields take her cookies nationwide, and
17   that all of -- that this was a company that was going
18   to return a good return and -- and that it was a -- you
19   know, going to be a great -- a great investment.
20   Q    Sir --
21        MR. LITTLE:  Objection, nonresponsive.
22   BY MR. LITTLE:
23   Q    -- my question was so different.  My question
24   was, did you read pages 7 through 10?
25   A    So --

---

### 133

1    Q    Did you read it?
2    A    So when I -- I usually read through the PPMs,
3    and so I'm -- I'm anticipating that I read it, but what
4    I do know is that the concerns, any of the concerns
5    that were mentioned here, what we really talked about
6    with Loral was that those things, you know, were
7    already taken care of, that she had an investment that
8    had -- that already had a track operating record, you
9    know, that it -- the restaurant in California had done
10   well, that they knew how to do the business, that they
11   had a good team in place, and that they would -- that
12   there would be an excellent return in this restaurant.
13        And it was really -- she -- she recommended
14   us -- to us so well that we -- we had our children
15   invest money in it.  So our daughter invested her
16   money, and then the other three, actually, you know,
17   took some money that they had earned and some money out
18   of one of their insurance policies and invested it in
19   it, as well.
20   Q    Did you show your kids the PPM and tell them
21   how risky this was?
22   A    They -- so when -- when we made this
23   investment, Loral -- you know the answer.  Loral
24   presented it --
25   Q    Just tell me the answer.  Of course, you

---

STEVEN LENES - MAY 11, 2012

---

134

1   didn't, of course, you didn't show --
2       MR. BRADLEY: Objection. Let him finish.
3       A   (Continuing) Loral addressed all these
4   things when she made the presentation. She talked
5   about how it's -- it's -- she didn't talk about risk.
6   She talked there's a team in place, there's people who
7   know what they're doing, it's a -- it's a proven
8   investment, it's -- there's already a restaurant that's
9   operating. She talked about how -- you know, what the
10  income per seat was in the California restaurant, you
11  know, however that works.
12      And there's -- all that information is what
13  she presented when she presented the -- the information
14  on Z Square Harvard (sic).
15      Q   You got the PPM after Loral Langemeier talked
16  to you, correct?
17      A   At the -- at the table, and then you sign up
18  to get the information and then they send it to you.
19      Q   Right. Timeline, you talk -- you go to the
20  seminar, you listen to Loral Langemeier, you sign up
21  for some information, they send it to you, correct?
22      A   That's correct.
23      Q   And you got this and because of what Loral
24  Langemeier said, you ignored the risk factor section,
25  right?

---

135

1       A   That's not exactly right. So when -- when
2   she gave the information she answered this. So she --
3   she knew -- she knew what our -- what our strategies
4   were, I mean, she -- not our strategies. She knew what
5   our goals were, she knew what we had, she knew that we
6   were looking for something different. She presented
7   this, she presented it, you know, as a -- as a good
8   investment. And -- and so she answered the questions
9   about risk.
10      Q   Did she tell you things that contradicted the
11  PPM in Exhibit 20?
12      A   She told us that this was -- you know, that
13  there was a good model, you know, that the restaurant
14  in California had -- had been making money and did very
15  well. She had eaten at it multiple times and that she
16  had invested in that restaurant and, you know, and was
17  so impressed with David, asked him to be, you know,
18  part of the -- the offerings. And so she told us
19  information that I felt answered, you know, these kind
20  of questions.
21      Q   Take a look at page 9 of the PPM, if you
22  would. There's Risk Factor No. 7, "capital and
23  third-party loan financing requirements," do you see
24  that?
25      A   Yes, sir.

---

136

1       Q   And this has to do with disclosing the risks
2   related to the debt that the company, Z Harvard Square,
3   took on, yes?
4       A   Uh-huh (affirmative), uh-huh (affirmative).
5       Q   And the last two sentences read, "A breach of
6   the terms of the loan documents will constitute a
7   default. Any uncured default will allow the lender to
8   exercise its rights against the company and may result"
9   in your loss of -- "in a loss of your investment in the
10  company." Do you see that?
11      A   Uh-huh (affirmative).
12      Q   That's exactly what happened, isn't it?
13      A   You know, I don't know exactly what happened
14  with the company. And so it was -- it was a very nice
15  restaurant. It had delicious food. It was in a very
16  good location. Loral was keeping an eye on it. She
17  had told us all the things I've already mentioned, you
18  know, that there was an M.B.A. managing it, model that
19  was proven in California. David Zebny is from Boston,
20  I mean, he knew the market, he went to Harvard. And --
21  and so it -- so I don't know why it failed. In my
22  mind, it shouldn't have failed.
23      Q   I see. If you'll look at the subscription
24  agreement toward the back of the PPM, there's a blank
25  one.

---

137

1       MR. BRADLEY: Have you got a page?
2       MR. LITTLE: Yeah.
3   BY MR. LITTLE:
4       Q   If you'll look at the bottom right corner,
5   it's Lenes Comp Files 000701.
6       A   Seven zero -- this one (indicating)?
7       Q   Yes. You ultimately signed the subscription
8   agreement, didn't you? We see your -- we actually see
9   your signature page in Exhibit 21, I believe.
10      A   Okay. All right.
11      Q   You signed it, didn't you?
12      A   That's my signature.
13      Q   Right. Look at -- if you'd turn -- turn to
14  page Lenes Comp Files 000702, there are some
15  representations and warranties by you in there.
16      A   Okay.
17      Q   If you'll look at Section 2.1, it says, "By
18  subscriber, the undersigned hereby represents and
19  warrants to and agrees with the company as follows,"
20  and you'll look at 2.1B, "Disclosures," do you see
21  that?
22      A   Disclosures, okay. Do you want me to read
23  that?
24      Q   I want you to read it real quick, yeah.
25      A   All right.

---

STEVEN LENES - MAY 11, 2012

---

138

1    Q   Do you understand that you warranted to Z
2  Harvard Square that no oral or written representations
3  had been made or oral or written information furnished
4  to you or your advisors, if any, in connection with the
5  offering of the units which were in any way
6  inconsistent with the private placement memorandum, do
7  you understand that you represented and warranted that?
8    A   So what I understood was that -- that they
9  were -- what was represented to me by Loral Langemeier
10 was that those concerns had -- you know, she had
11 answered, and so, you know, that there wasn't -- there
12 wasn't really a cause for concern.
13   Q   Do you understand that you warranted to Z
14 Harvard Square, LLC by your signature in the
15 subscription agreement that no one told you anything
16 inconsistent with the memorandum?
17       MR. BRADLEY:  Objection.  Calls for a legal
18 conclusion.
19   A   (Continuing)  And so what I understood was
20 that the things that Loral told us were not
21 inconsistent with the memorandum.
22   Q   Okay.
23   A   You know, she -- she related that there was
24 a -- a model that worked, there was good experts to
25 make sure the business was successful, that it was a

---

139

1  good location, that it had a good menu, they had --
2  they had good recipes, they had a proven model.
3    Q   All important things?
4    A   Yeah, all the important things, you know,
5  that -- that go into making a successful restaurant.
6    Q   Do you see that you represented -- I'm sorry.
7  Excuse me.
8    A   And she -- you know, she didn't -- she talked
9  about the returns and just what a great investment it
10 was.
11   Q   Do you see that you represented in Section
12 2.1D that you recognize that the company has only
13 recently been organized, it has no financial or
14 operating history, and that investment in the company
15 involves substantial risks and that you've taken full
16 cognizance of and understand all the risk factors
17 related to the purchase of the units?
18   A   So what I understand from that is -- is that,
19 you know, Loral made recommendations to us based on
20 understanding what our concerns were, what our goals
21 were, that our -- what our assets were, and, you know,
22 what we understood, that she was teaching us, you know,
23 those things, that she -- you know, we trusted her that
24 what she said was correct and that she was -- had our
25 best interests at heart and that -- that, you know --

---

140

1  that this was going to be a successful venture with a
2  good return.  That's what you understood at the time that
3    Q   That's what you understood at the time that
4  you made that representation, correct?
5    A   That's what I understood.
6    Q   And you signed that document and we find your
7  signature page in Exhibit 21, right?
8    A   The -- so what I understood was that she --
9  she made -- she was looking out for our best interest,
10 and so I felt that she had answered all those concerns
11 and that those were correct.
12   Q   And if you'll turn to Exhibit 22, please.
13       (Witness complied with request of counsel.)
14   Q   This is a -- a fax letter from you, correct?
15   A   Uh-huh (affirmative).
16   Q   And your daughter Felicity is a nonaccredited
17 investor and you invested $5,000 on her behalf,
18 correct?
19   A   Correct.
20   Q   Turn to the page marked Lenes Hard Copy
21 000370, if you would.
22   A   Three seven zero?
23   Q   Yes.
24   A   Is that in that section?
25   Q   Yes.

---

141

1    A   Yes.
2    Q   Do you see the -- the bold, all caps
3  paragraph at the bottom beginning, "This offering
4  involves a high degree of risk"?
5    A   I see it.
6    Q   Did you understand that to be true at the
7  time that you helped your daughter invest in this?
8    A   What we understood at the time was that we
9  felt that Loral would make recommendations to us that
10 were appropriate for us and that this -- this
11 investment was a good investment, it would have a good
12 return and that we -- we would have -- our daughter
13 would have an opportunity to -- when she went to school
14 to have a check come to her to help support her while
15 she's in college, while she's in graduate school, and
16 that this would be an excellent investment.  And that's
17 really what we understood.
18       And when she talked to us, when Loral told us
19 all this information, she went through and, you know,
20 we went through this, she explained why each investment
21 was a good investment.  And she knew what we had and
22 she knew what we wanted to do and she -- you know,
23 we -- and we thought she had an -- an obligation to --
24 you know, to look out for our best interests.  And why
25 would somebody, if they were looking out for your best

---

STEVEN LENES - MAY 11, 2012

---

## 142

1  interests, put you in an investment that was not a good
2  investment?
3      Q   Turn to Exhibit 26, please.  Is this an email
4  that you wrote?
5      A   Yes.
6      Q   Did you ever tell this information to Loral
7  Langemeier?
8      A   Okay.  I need to read it to see what's all in
9  it.
10     Q   Sure.
11     A   Okay.  What are you asking now again?
12     Q   Did you ever tell this information to Loral
13 Langemeier?
14     A   So we would have talked about this to -- at
15 some level at the table.  I -- I don't know what level.
16 And we also -- this -- so this was my group --
17 mastermind group, you know, that I was responding to.
18 And so they -- you know, so this was to let them know
19 all the things that we were assigned to do, you know,
20 how we were coming with all of those.
21         And -- and they -- Loral had wanted to know
22 how those were going, so whether -- you know, how much
23 of this information she knew, I don't know.  We would
24 have talked about bits of it at various times when we
25 were in her presence.  I don't have a recollection of

## 143

1  exactly how that would have occurred.
2      Q   Turn to Exhibit 32, please.
3      A   I would say, too, though that, I mean, really
4  this -- this is the things that -- sort of the work
5  list that we generated from our -- from our -- you
6  know, all the things that she advised us to do when we
7  were in a -- in table, so -- I mean, in a -- at our
8  first table.
9          And so she -- you know, liquidating the --
10 getting the -- for example, getting the GE stock where
11 we could get to it.  My mother had died not that much
12 before that, and so trying to get -- you know, this --
13 this was some documentation of we were doing the things
14 that she -- she told us to do.
15     Q   I understand.
16         MR. LITTLE:  We're out of tape, so why don't
17 we take a lunch break.
18         VIDEOGRAPHER:  Off the record at 12:27, Tape
19 No. 3.
20 (Guys Burns, Esquire and Dr. Stuart Brown have
21 left the deposition.)
22 (Lunch recess taken.)
23         VIDEOGRAPHER:  This is Tape No. 4 in the
24 deposition of Dr. Steven Lenes.  We're on the
25 record at 1:32.

## 144

1  BY MR. LITTLE:
2      Q   Dr. Lenes, as we were leaving, we were --
3  leaving for lunch, we were looking for -- looking at
4  Exhibit 32, and your -- your signature appears on
5  Exhibit 32, correct?
6      A   Yes, sir.
7      Q   To whom did you send Exhibit 32?
8      A   Again, I -- you know, I don't -- I don't
9  recall who we mailed these to.
10     Q   Is the information that you provided in
11 Exhibit 32 accurate?
12     A   So the -- so, again, I'd have the same
13 concern, is this investment consistent with your
14 overall investment strategy, and to -- so to the extent
15 that we understood that Loral made recommendations to
16 us on, you know, what would be good investments, then,
17 yes.
18     Q   You thought this was -- this investment in
19 Coastal Serenade was consistent with your overall
20 investment strategy?
21     A   So from what we understood, yes.
22     Q   Did you have knowledge and experience in
23 financial and business matters to enable you to
24 evaluate the merits and risks of the Coastal Serenade
25 investment?

## 145

1      A   The -- are you reading something?
2      Q   Yes.
3      A   Where are you reading?
4      Q   If you'd like, you can look at Section F of
5  Exhibit 32.
6      A   That's, "Is this consistent with your
7  overall" -- is that what you're asking?
8      Q   No.  What I asked was, did you consider
9  yourself to have such knowledge and experience in
10 financial and business matters to enable you to
11 evaluate the merits and risks of the Coastal Serenade
12 investment?
13     A   So what -- what we understood was that we had
14 gone to Loral, gone to the Big Table that we had
15 presented the information that -- on our -- our assets,
16 our -- the investments that we had prior to that, and
17 that she understood what our goals and aspirations
18 were, she understood that -- you know, all those things
19 related to advising as to investments, and that she had
20 prepared us to be able to do that and we trusted that
21 she would make -- help us make the right decision in
22 our best interests.
23         MR. LITTLE:  Object, nonresponsive.
24 BY MR. LITTLE:
25     Q   With respect to this Coastal Serenade

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

## 146

1  investment, did you have enough knowledge and
2  experience to evaluate the risks and merits of it?
3      A   At the time --
4      Q   Yes.
5      A   -- we felt that -- so not a -- that's my --
6  so at the time, we felt that Loral had taught us what
7  we needed to know, that she had recommended investments
8  that were consistent with our -- with what our overall
9  financial strategy was, that she had our best interests
10  at heart, and that we felt that we -- you know, we knew
11  what we should do and that she recommended it and it
12  was a good thing to do.
13      Q   Were you able to bear the economic risk of a
14  total loss of the Coastal Serenade investment?
15      A   The -- the thing that's difficult about that
16  is that, you know, if -- if it had been one investment
17  that had gone bad, then, you know, we would have been
18  very sad and we would have wondered, you know, why that
19  happened, but, you know, we -- we would have had -- I
20  think we would have been able to bear that risk.
21      But when, you know, almost every single
22  investment went bad and we ended up going into
23  foreclosure on our rental homes and losing the property
24  that, you know, we had hoped to build, you know, a home
25  on and able to have people in and do things, you know,

## 147

1  share that with other people, when -- when all -- you
2  know, we didn't -- we never thought all that would
3  happen.
4      And -- and so I think there's a difference
5  when you say can you -- you know, one -- one investment
6  that was $50,000, can you bear the risk of losing that,
7  but when you -- when you make investments in everything
8  and every one of them is bad, then that's -- that's
9  really -- you know, we -- we -- we explained all of
10  this to Loral, we laid out what we had and the
11  resources.
12      She didn't -- we didn't hold anything back
13  from her, you know.  This was Live Out Loud, you know,
14  we were -- that's what you're supposed to do, you --
15  you -- you reveal, you know, you share all your
16  information.  And so we did that and she knew that and
17  there was everything.  I mean, there was everything
18  that we told her.
19      And so, then, when she makes recommendation
20  is, you know, wouldn't she take that into account?  So
21  that's -- you know, that was my understanding of, you
22  know, what's involved in -- in somebody who, you know,
23  is helping you to accomplish your goals, somebody who
24  you paid to help lead you down, you know, your way
25  to -- you know, to your freedom day.

## 148

1      MR. LITTLE:  Object, nonresponsive.
2  BY MR. LITTLE:
3      Q   My question was different and I'll try to ask
4  it a different way, okay?  Could you have afforded to
5  lose the money that you invested in the Coastal
6  Serenade investment?
7      MR. BRADLEY:  Objection, asked and answered.
8      A   (Continuing)  So -- so I thought what -- what
9  I -- what I said was that this -- this was one
10  investment.  If you -- if you could -- you know, if we
11  were to lose one investment, it would be hurtful to us,
12  but it wouldn't have destroyed us.
13      Q   I see.
14      A   And so -- but what really happened was not
15  just one investment.  So it's -- it's hard to say.
16  This is a part of a whole context, a whole bigger
17  picture, that not only did we lose the investment in
18  Coastal Serenade, but we lost so many other
19  investments.
20      Q   I understand.  I'm --
21      A   And so we -- we -- we -- we answered that
22  question.  I mean, it's one little bit, when you take a
23  thing in isolation, you know, it's one -- one bit.
24      Q   I understand.  I'm just asking about this
25  one.  I think you answered my question.

## 149

1      Below there, you indicate the nature and
2  frequency of your prior investments.  Did you type this
3  information in, sir?
4      A   Sorry, where -- where are you now?
5      Q   Right below that, it says, "Please indicate
6  the nature and frequency of your prior investments."
7  Did you type in that information?
8      A   I am assuming I did since I signed it, it
9  kind of looks like my "X."
10      Q   It says, "Real estate - commercial and
11  rental, sales and flips."  Were you and your wife
12  engaged in flips?
13      A   So -- so we talked about that before.  I came
14  to understand flips in a different way with Loral, and
15  so we had -- we didn't do, you know, the -- the -- the,
16  you know, buy inexpensive property and renovate it and
17  sell it right away.  So we did have the real estate
18  that we bought for our friends and sold that.
19      Q   Would you consider that a flip?
20      A   That's what I think was a flip.
21      Q   Okay.  Who's the real estate professional in
22  your household?
23      A   So Elisabeth would be the real estate
24  professional.
25      Q   In what regard is she a real estate

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

150

1    professional?
2        A    So from what I understand what a real estate
3    professional is, is somebody -- you know what,
4    there's -- there's a definition that we would give our
5    accountant, like how many hours you spent in it and
6    those sorts of things, and so that's what a real estate
7    professional is.  She -- she managed the rental
8    properties, she did -- she did, you know, real estate
9    sales, she's a real estate agent.
10       Q    Was she an agent at the time you completed
11   this?
12       A    She was.
13       Q    Okay.  It says, "evaluations several times a
14   year."  What does that mean?
15       A    You know what, I no longer remember what that
16   means.  I'm not sure what's related to.
17       Q    Isn't it true that somebody evaluated your
18   investments several times a year?
19       A    You know, I don't know that that has that
20   meaning.  That -- I'm sorry, just -- I mean, it's kind
21   of in shorthand there, and so I -- I should have
22   written it more completely, but I don't know that --
23   what I actually meant by that when I wrote it, just
24   look -- you know, trying to remember back that many
25   years.

---

151

1        Q    Below that, it says, "stocks evaluations
2    frequently."  What does that mean?
3        A    So when we would -- prior to -- prior to
4    coming to Loral, you know, we tried different things to
5    see how we would -- how we could invest money and have
6    some income apart from having to work so hard.  And so
7    one way was to see -- in the stock market and to see
8    how that worked.
9            And so there -- you know, you -- you look at
10   different stocks and try and figure out if -- if it's a
11   good -- good company to buy stock in and those -- those
12   sorts of things.  So just doing those stock
13   evaluations, that's what we did prior to coming --
14   prior to coming to Loral.
15       Q    Who evaluated your stock portfolio?
16       A    So we didn't have a very big portfolio, and
17   so that's what -- I mean, what we did.  We looked at
18   it.
19       Q    Did you have an investment advisor?
20       A    For our stock portfolio?
21       Q    Yes.
22       A    We -- we did not.
23       Q    Did you have a stockbroker?
24       A    We had an account through Fidelity, and so
25   you can buy -- you know, buy and sell stocks online

---

152

1    through that.
2        Q    Did you do it on your own, or did you have a
3    broker?
4        A    So we did it on our own, yeah.
5        Q    So who were the people evaluating your
6    stocks, was that you?
7        A    I'm assuming that's what I meant by that,
8    "stock evaluations frequently" would be me.
9        Q    And the next question is, "Do you make your
10   own decisions with respect to such investments?"  And
11   did you mark "always"?
12       A    I think I did.
13       Q    Is that true?
14       A    So we -- so we -- we evaluate, do the
15   evaluations and make decisions, you know, if we're
16   going to buy it.  And so we make those decisions based
17   on information that we're given.  And so we make it
18   on -- in Loral's case, we made those decisions based on
19   the recommendations that she made to us when she
20   understood what our financial status was, what our
21   goals were, and what we hoped to accomplish.
22       Q    I see.  And you were asked to provide any
23   additional information that you think may be helpful in
24   enabling the company to determine whether you have
25   sufficient knowledge and experience in financial and

---

153

1    business matters.
2        A    Uh-huh (affirmative).
3        Q    And you write, "team consisting of contract
4    and real estate attorney."  Who's that person?
5        A    So we have a friend who does real estate and
6    he did the closings for us, and so he's -- he's an
7    attorney in town, Jeffrey Vinzani.
8        Q    How do you spell that?
9        A    Oh, gosh.  V-i-n-z-a -- sorry, I'm looking at
10   my wife to see if she can help me spell it.  I never --
11   I mean, I can do medical words pretty well, but a lot
12   of the other spelling is not -- Vinzani,
13   V-i-n-z-a-n-n-i (sic), I think.  I'm not sure.
14       Q    Who were the other investors that you
15   reference there?
16       A    So -- so Loral, when she was at the table,
17   talked about a team and you needed to get a team in
18   place.  And so part of the team was, I think, the
19   mastermind group.  And so I don't actually recall at
20   this point in time who the other investors, and really,
21   when I read this, it -- it's a -- it's not very good
22   English.
23           And so -- so I think probably it's related to
24   Loral as part of the team and -- and some of the group,
25   some of the mastermind group that's involved in -- at

---

STEVEN LENES - MAY 11, 2012

---

154

1  the Big Table.
2      Q   The other investors you --
3      A   -- and another --
4      Q   The other investors you're talking about
5  include Loral?
6      A   So that's -- I mean, she's -- she was the --
7  kind of like the leader of our team, you know, she was
8  the one who knew what was going on.
9      Q   I see.  And you signed this in May of 2006,
10  correct?
11     A   May 24th, it looks like.
12     Q   All right, turn to Exhibit 33, please.  Was
13  Exhibit 33 true when you signed this document?
14     A   So this is Coastal Serenade, is that right?
15     Q   Yes.
16     A   So to the extent that we understood all of
17  this, we -- let me just read again to make sure.  So
18  here's what -- what we understood at the time was that
19  Loral made a recommendation to us at the tables and
20  that she took into account our situation, and she
21  presented Coastal Serenade and that she gave us, you
22  know, different investments to choose from and that we
23  could be involved in those and that this -- you know,
24  from what we understood, you know, this was true at the
25  time that we made all those investments.

---

155

1      Q   Okay.  Turn to Exhibit 34.  Did you sign
2  Exhibit 34?
3      A   Yes, that is my signature.
4      Q   If you'll turn to page Lenes Hard Copy
5  001916.
6      A   Okay.
7      Q   Did you represent and warranty to Coastal
8  Serenade that you understood that that company would be
9  subject to all the risks inherent in the operation of a
10  business and the risks that are described in Section M?
11         MR. BRADLEY:  Objection.  Calls for a legal
12  conclusion.
13     A   (Continuing)  Sir, which section did you say?
14     Q   Section M on page Lenes Hard Copy  1916.
15     A   M, M as in --
16     Q   M as in Mitch.
17     A   Mitch, thank you.  Okay.  So ask me your
18  question again.
19     Q   Did you understand that the company was
20  subject to the risks specified in Section M?
21     A   So when -- when we talked about all these
22  investments, Loral -- that Loral recommended to us, she
23  talked about Debbie Murray, she talked about her
24  experience in business, in turnaround business, that
25  she's a poster child in business plans and turnarounds,

---

156

1  that she -- that Loral and she had investigated this.
2  It's in the Red River -- Russian -- Russian River
3  Valley in California, it's a resort area, that this was
4  a -- a -- a place where they would actually let pets
5  come, as well, that she had talked with -- that Debbie
6  had talked with the Chamber of Commerce, she had
7  already made business contacts, that that was a good
8  investment and it would have a good return.
9          When Elisabeth told Loral that she had --
10  that we had invested in this, she said, "You just
11  doubled your money," and high-fived her.  And so we
12  understood that, you know, these kind of things, you
13  know, are just things that are sort of boilerplate,
14  things that you write in there that don't really have
15  much meaning because Loral said that this was a very
16  good opportunity.  And they just do this just to -- you
17  know, to do that, that they're required to, and that
18  what really mattered was that this was a good
19  opportunity and there was going to be a very good
20  return.
21     Q   Mr. Lenes -- or Dr. Lenes, excuse me, is it
22  your sworn testimony that Loral Langemeier told you
23  that the text of Section M in Exhibit 34 was
24  boilerplate and that she didn't -- that you didn't need
25  to worry about that?

---

157

1      A   She -- so I'm not able to give an exact
2  quote, but what we understood from the discussions were
3  that these -- these are things that the lawyers do and
4  that really what mattered was that you had a good team,
5  that you had -- that the team was good, that they'd
6  done their research, that they -- it was a proven
7  business model, you know, all the things that we
8  discussed.
9          And so these sorts of things, she -- she
10  answered those questions and so I -- I understood that
11  this was a business that was going to succeed and have
12  a good return on our -- on our income.
13     Q   Did -- did Loral Langemeier explain to you
14  that Section M was just boilerplate language?
15         MR. BRADLEY:  Objection, asked and answered.
16     A   (Continuing)  So -- so what she explained was
17  -- she didn't say Section M was boilerplate language.
18  What she explained was that, you know, there are things
19  that the lawyers just have in -- in documents, but what
20  really mattered was that this was a good team, that
21  she's -- she has, you know -- she's -- she's inspected,
22  she -- I'm trying to think of the right word.
23          She -- these are recommendations that she's
24  made, that she has skin in the game, and that
25  they're -- they -- they've been very careful about

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

## 158

1  all -- all the things that could go wrong and that this
2  was a good investment that was going to make a good
3  return.
4      Q  How old a man are you, sir?
5      A  I am 58. I will be 59 next Tuesday.
6      Q  Have you had occasion to sign a variety of
7  contracts in your life?
8      A  Not -- you know, not so many. I mean --
9      Q  Not so many?
10     A  -- we've done a -- I don't know -- "a variety
11 of contracts," I don't know exactly what that means,
12 but --
13     Q  Well, let's take --
14     A  -- you know, we -- we've signed loan papers.
15     Q  Sure. When you signed loan papers with the
16 bank to borrow money against equity that you have in
17 real estate, did you think that you wouldn't really be
18 held to what -- the documents that you signed?
19         MR. BRADLEY: Objection. Calls for a legal
20 conclusion.
21     A  (Continuing) So the -- when you -- when you
22 sign documents, there's -- there's really -- it's
23 not -- this is a different -- it's a different issue.
24     Q  Why?
25     A  And so -- well, I'm getting ready to tell

## 159

1  you. And so this is -- it's not something that you're
2  not held to. This is -- it's been -- it's been
3  answered, so Loral dealt with that. And so when we --
4  when -- there's one thing when you understand a risk
5  and there's another thing when somebody has explained
6  that really those -- those really aren't risks.
7         And so what we understood was that they --
8  you know, they were careful to make sure that it was a
9  good business, they had a -- a very good, you know,
10 plan, the business had been operating already and
11 they'd been making money. And so, you know, these are
12 very general things.
13         I mean, you could write, you know, there's
14 nuclear war, well, guess -- you know, if there's a
15 nuclear war, then the business wouldn't do very well.
16 You know, it's -- it's --
17     Q  And you knew that that was a risk, didn't
18 you?
19     A  And so --
20     Q  If there's a nuclear war, the business
21 wouldn't do very well?
22     A  So -- so that's a silly statement --
23     Q  Why?
24     A  -- and -- because when you have a company
25 that has a -- you know, there's very low probability of

## 160

1  a nuclear war. And so it -- that was an expression to
2  say that there are things that happen in the world, but
3  that they -- they are very careful to make sure those
4  things wouldn't affect the business because it was a --
5  it's a business that was already operational, it was a
6  business that had a good team, it was a business that
7  had a person who's going to be, you know, able to make
8  it very profitable, who's a turnaround specialist.
9         And -- and so those -- those issues are --
10 you know, they were -- they were answered, Loral, you
11 know, said that those things, you know, were, you know,
12 not something we had so much to worry about.
13     Q  I see. Do you think that your
14 representations and warranties in Exhibit 34 have any
15 meaning whatsoever?
16         MR. BRADLEY: Objection, calls for a legal
17 conclusion.
18     A  (Continuing) So -- so we -- to the extent
19 that we understood all these things, we felt that they
20 were answered and appropriate. And we thought we did
21 the right thing and we thought that Loral was doing the
22 right thing and we thought that Loral was acting in our
23 best interest.
24     Q  All right.
25     A  And so we -- we answered those, you know, the

## 161

1  way that we understood them at the time in an -- in an
2  attempt to be as truthful and under -- and accurate as
3  we could.
4      Q  Turn to Exhibit 35, please.
5      A  (Witness complied with request of counsel.)
6      Q  Have you seen Exhibit 35 before?
7      A  You know, that --
8         MR. BRADLEY: I want to make an objection for
9  the -- the record that Exhibit 35 is a piece of a
10 document. I'm not sure where the rest of the
11 document is. To the extent that you're not
12 providing him with the whole document...
13     A  (Continuing) So I was going to say, it's a
14 little -- I mean -- I mean, it says, "Lenes Hard Copy,"
15 so I'm sure it's something that -- does that mean that
16 we provided it?
17     Q  Yes.
18     A  And so there's probably something to go along
19 with it, but it's just -- I mean, it's hard for me to
20 say, only because I don't really know what -- I don't
21 know what this is all connected to.
22     Q  All right, sir. Well, take a look at Exhibit
23 34.
24     A  Okay.
25     Q  Exhibit 34 runs from page Lenes Hard Copy

STEVEN LENES - MAY 11, 2012

---

162

1    1913 to Lenes Hard Copy 1926.
2        A    Uh-huh (affirmative).
3        Q    The next page you produced was the next page,
4    Lenes Hard Copy 1927.  Do you see that?
5        A    Uh-huh (affirmative).
6        Q    I'll represent to you that this is the format
7    in which it came, okay?
8        A    Okay.
9            MR. BRADLEY:  Well, you know what --
10       A    (Continuing)  So the --
11           MR. BRADLEY:  -- and so --
12       A    (Continuing)  -- the thing --
13           MR. BRADLEY:  -- you know, you've got 1927 as
14    Exhibit 35, and then -- and it says, "Page 1 of
15    13."  Exhibit 36 begins with 1935 and it's page 9
16    of 13.  Now, it's possible that they didn't have
17    the whole document.  All I'm saying is I don't
18    know, as I sit here, whether this is a complete
19    document.
20           MR. LITTLE:  Thanks.
21    BY MR. LITTLE:
22       Q    All right.  Dr. Lenes, have you seen the
23    statement regarding securities in Exhibit 35 before?
24       A    This -- this page?
25       Q    Yes, sir.  Have you seen it?

---

163

1        A    So I -- I don't -- I mean, I don't have a
2    context to put it in, so it doesn't jump up that I can
3    remember.
4        Q    I see.  Look at the third paragraph from the
5    bottom.  It reads, "The securities offered hereby are
6    speculative and investment in the securities involves a
7    high degree of risk."  It's in all capitals.  Do you
8    see that?
9        A    Yes.
10       Q    Did you understand that to be true at the
11    time that you made your investment?
12       A    So the entire form is in capital letters, and
13    the -- so what we understood was that we went to Loral
14    Langemeier and she knew -- I mean, it -- it's really
15    the same thing, she knew the resources that we had, she
16    knew what our goals were, she knew what would be good
17    recommendations for us.
18           She talked to us about how good the team was,
19    about Debbie Murray, about the location, about the
20    previous business being still an operational business
21    that they could make work better.  And -- and so we
22    understood that it was a good investment, and so we
23    didn't -- she didn't talk about risk.  She talked about
24    the return, you know, that we could expect and that
25    she -- she told us we had just doubled our money when

---

164

1    we invested in it.
2        Q    So is it fair to say, based upon what Loral
3    told you, you didn't think there was a high degree of
4    risk in Coastal Serenade?
5        A    You know, really, what she told us, we --
6    didn't really think about risk so much.
7        Q    I see.
8        A    We -- we thought that there was a good
9    return, that it was a good business, that it would do
10    well, and that we would be able to, you know, have some
11    income from it.
12       Q    Did you think any of the risk factors
13    expressed in Exhibit 36 applied to your investment in
14    Coastal Serenade at the time you made your investment?
15       A    Do you mean Exhibit 35 or --
16       Q    I mean Exhibit 36.
17       A    So I turn to the next one?
18       Q    Yes, sir.
19       A    Okay.
20           MR. BRADLEY:  Take your time to look through
21    it.
22           MR. LITTLE:  Tell you what, Jim, I'd like to
23    take a restroom break.  Why don't we let him read
24    that during the break --
25           MR. BRADLEY:  Okay.

---

165

1            MR. LITTLE:  -- and come back and ask him
2    questions.
3            VIDEOGRAPHER:  Off the record at 2:03.
4        (Brief recess taken.)
5            VIDEOGRAPHER:  On the record at 2:07.
6    BY MR. LITTLE:
7        Q    Dr. Lenes, have you had an opportunity to
8    review Exhibit 36?
9        A    I'm -- I'm just going to go over -- I'm
10    sorry.  I'll go a little quicker.  Okay.  What is your
11    question?
12       Q    My question was, at the time you invested in
13    Coastal Serenade, did you understand that the risk
14    factors expressed in Exhibit 36 applied to your
15    investment?
16       A    So what we understood was -- is that when
17    we -- when Loral presented the investment, that
18    there -- she -- she answered a lot of these risk
19    factors.  She said that the -- the company was a
20    company that had already been doing business, that
21    Coastal Serenade would take that over, but it was
22    already doing business.
23           She said that they already had -- you know,
24    there were people booking it, they checked on you
25    booking history and everything.  They -- you know, they

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

166

1  talked about, you know, what they could do to expand
2  the business and to have -- offer more massages and
3  they could offer products -- I'm trying to think what
4  all those things are called, but, you know, the -- the
5  massage products and the oils and the candles and all
6  those sorts of things that they could offer with that,
7  and that that would increase the return.
8      I mean, so each of the -- each of the things
9  that she talks about in the risk factor, she talked
10 about how Debbie Murray did -- you know, just did a
11 great job in making a business plan and projections and
12 all those sorts of things.
13     So -- so there's risks, you know, that are
14 outlined here, but she answered all those risks. And
15 so what we understood was that this was a good
16 investment and it would have a good return and that we
17 would -- we would do well from it.
18     MR. LITTLE: Object, nonresponsive.
19 BY MR. LITTLE:
20     Q   Dr. Lenes, did you understand that the risk
21 factors applied or didn't you?
22     A   So -- what we understood was that these risk
23 factors were taken care of by the plans that Loral had
24 in place, and so that it was -- that it would be a good
25 investment, that there was -- that she had an answer

---

167

1  for, you know, each of the things when they did the
2  presentation at the table.
3      Q   And the presentation that happened at the
4  table happened before you ever saw Exhibit 36, correct?
5      A   I -- I would -- I think that's probably
6  correct, yes.
7      Q   So when you finally saw Exhibit 36, did you
8  think it's okay to ignore this because of what Loral
9  told me at the table?
10     A   So, again, that's not exactly right.
11     Q   Okay.
12     A   And so when she -- when she made the -- it's
13 not that you ignore things, and so she -- she had
14 these -- these -- you know, their -- they had these
15 risks that they wrote down and she explained all of
16 that. So it's not ignoring at all.
17     It's -- there's -- there's a -- what she --
18 what she said was there's -- they have a good plan in
19 place, they have a good team in place, it's -- it's
20 already been an established business, they would just
21 be building on that.
22     So it's not -- it's not ignoring risk.
23 It's -- it's using -- it's -- in my mind, it's showing
24 that this is a good team, they -- they've anticipated
25 what's going to -- you know, what are potential things

---

168

1  that could happen and they've made a plan. And they
2  have a plan to deal with each of those and they know
3  how they're going to do it and they've written it out
4  very well.
5      And Loral, this is what she does, I mean,
6  she -- she is the millionaire maker and she's, you
7  know, done that for herself and she's done it for other
8  people. And she -- you know, Debbie is the poster --
9  her poster child. So, how -- I mean, you have the
10 poster child as the person who's doing this.
11     And so this is not ignoring things. It's
12 showing me that there's somebody who's very competent
13 who -- who did a -- you know, had plans for how to deal
14 with all this and make it a very good investment and --
15 and that we would have a good return on this
16 investment.
17     Q   Did Loral Langemeier's statement negate any
18 concerns you had about these risk factors?
19     A   So her statements, you know, I -- I was
20 confident in her. And so, really, we focused on, you
21 know, a good return and -- and so she answered -- she
22 answered all of those.
23     Q   Turn to Exhibit 37, please. Did you read
24 Exhibit 37 prior to making your investment?
25     MR. BRADLEY: For the record, I'd like to

---

169

1  point out that Exhibit 37 seems to consist of
2  multiple documents. So is your -- your question
3  with respect to all of them?
4      MR. LITTLE: Yes.
5      A   (Continuing) So I -- well, sorry. So I'm
6  sorry, if -- if you don't mind, I'll go through. So I
7  know I saw this -- this document (indicating). I think
8  you already have that one from a previous one. I --
9  I -- I remember seeing -- seeing that -- you know, the
10 Guemmer document. And the operating agreement, I -- I
11 just don't really recall. That's a very long document.
12 I don't --
13     Q   Did you read the private placement memorandum
14 before making your investment, sir?
15     A   So which one, that's -- which one is that?
16     Q   That's the top document.
17     A   This one (indicating)?
18     Q   Yes.
19     A   Yes, I think I said that.
20     Q   Okay. Turn to Exhibit 46, please.
21     A   Okay.
22     Q   This appears to be an email from David Zebny
23 to you and your wife in June of 2006, says, "Prom
24 Note" -- or actually, "Note 1, 250." Do you see that?
25     A   Okay.

---

STEVEN LENES - MAY 11, 2012

---

### 170

1  Q  The subject?
2  A  Uh-huh (affirmative).
3  Q  At this point, did you begin investing with Z
4  Restaurant -- or with -- in Prom Notes with Mr. Zebny?
5      MR. BRADLEY:  I'm sorry, can I -- can I get
6  that question back?
7      MR. LITTLE:  Yeah.
8  BY MR. LITTLE:
9  Q  At this point, did you begin investing in
10  Prom Notes with Mr. Zebny?
11  A  I believe that's correct.
12  Q  Did you do any kind of research into the
13  creditworthiness of Mr. Zebny prior to loaning him that
14  money?
15  A  So when we -- when we went to the table,
16  Loral presented David Zebny, the Z Restaurant, as a --
17  as an investment opportunity and she talked about that
18  he was -- owned a restaurant in California that was
19  successful, that he was an M.B.A., he worked with
20  Fidelity, he had a guy that helped make Fields
21  nationwide, involved a good location, knew the area,
22  knew the market.
23      And -- and so when we -- and she also told us
24  how to get ahold of our lazy assets, and so we -- we
25  had -- we had gotten a second mortgage on our home and

### 171

1  we had that money available.  And we were going to be
2  gone on vacation -- not really vacation, that's -- I
3  mean, we did a -- we did a trip, a missions trip with
4  our family.
5      And so Elisabeth talked to Loral's office and
6  asked, you know, what -- what could we put this money
7  in to invest it to get started with.  And so she gave
8  us, I think, three choices and we invested in David
9  Zebny in the -- in the -- in the restaurant group here.
10      So we -- we trusted that Loral, who knew our
11  finances and knew what our goals and aspirations were,
12  knew what our -- was best for us, would give us choices
13  that were good choices to invest in.
14  Q  Did she tell you which choice -- which one to
15  choose?
16  A  She gave us a set of three and we chose David
17  Zebny.
18  Q  Why did you choose David Zebny?
19  A  You know, I -- I don't quite recall, you
20  know, what prompted us to make -- I can't remember what
21  the other two choices were at the time and when I --
22  Q  But she didn't tell you to choose David
23  Zebny, did she?
24  A  She gave us three choices.
25  Q  Who were the other two choices?

### 172

1  A  Tell me again.
2  Q  Who were the other two choices?
3  A  So I -- I just said, you know, that I -- I'm
4  not sure I can even remember who the other two choices
5  were right now.  And -- and so we chose David Zebny out
6  of the three choices that -- that she gave us.
7  Q  And David Zebny paid off some of your
8  promissory notes, correct?
9  A  He paid some interest and he paid off some of
10  the promissory notes.
11  Q  When was the last time that Loral Langemeier
12  gave you any kind of financial advice or investment
13  advice?
14  A  The last time Loral gave us investment advice
15  was probably -- you know, we were involved with --
16      MR. BRADLEY:  And -- and hold on, I'm -- I'm
17  going to object to that as calling for a legal
18  conclusion.
19  A  (Continuing)  So we were involved with --
20  with Loral, you know, for a couple of years, and so
21  I -- she's -- she's had times when, I mean, we were on
22  the phone, we were at tables, we were at alumni
23  meeting, so I -- I don't know that I -- I really recall
24  the last time that she gave us advice.  I mean, we
25  were -- she did laser calls.  She talked to us, and so I

### 173

1  -- I'm sorry, I just --
2  Q  Thank you.
3  A  -- don't recall the last time.
4  Q  Turn to Exhibit 53, please.
5  A  (Witness complied with request of counsel.)
6  Q  Is this a letter that you wrote?
7  A  Yes.
8  Q  Did Loral Langemeier tell to you invest this
9  money in IRR-Residential?
10  A  So what -- what Loral -- one of the things
11  that she told was different ways that you could do
12  investments.  And so the -- one way, if you had an IRA,
13  there was the park and pray, where you had mutual funds
14  and you just had those in -- in your retirement account
15  and you would trust somebody, you know, who you didn't
16  know, that you didn't have access to -- to do -- to
17  take care of running that company and doing those
18  things well.  And so she called those park and pray
19  assets.
20      And so she presented IRR as an opportunity
21  where you could -- one of the teachings they had was
22  how you can do less -- you know, nontraditional, I
23  think that's what they called them, investments
24  where -- so in a -- like a Fidelity account, where we
25  had our retirement account, that's stocks and bonds,

---

STEVEN LENES - MAY 11, 2012

---

### 174

1  those kind of things, and mutual funds. And -- and so
2  they wouldn't hold property in an account like that,
3  for example, or they wouldn't have a business holding
4  in an account like that.
5          And so in order to do that, there's --
6  there's a legal, appropriate way to do that, and you
7  had -- Entrust was a company that knew -- knew how to
8  do that. And so they presented to us that you could
9  work with Entrust and they -- and you could take money
10  from your retirement account and put it in that
11  account, and then they could buy the business or buy
12  the property or do any of those kind of things.
13         And so -- so she said, "You need to move --
14  you need to move money into a trust," and then they
15  could purchase the IRR-Residential -- and -- and hold that
16  in the retirement account for you and it would be
17  like -- it would be like a retirement account, but
18  you'd have a business instead of a stock. And the
19  business would return more money than a stock would,
20  you'd have a better -- a better return.
21     Q   Did she tell you to invest in
22  IRR-Residential?
23     A   She --
24     Q   Loral Langemeier.
25     A   So that was -- so she had her choices, you

### 175

1  know, all the -- all the things that she recommended,
2  you know, they're put on the wall, and she -- and she
3  talked about why Entrust would be a good investment for
4  a retirement account, because it -- I don't actually
5  remember the details of why said it was good. But
6  she said that kind of a company would be good to put in
7  a retirement account. And so she recommended that we
8  put that in the retirement account.
9      Q   IRR-Residential or Entrust? I don't
10  understand.
11     A   Sorry. IRR is the company and the retirement
12  account is Entrust.
13     Q   And she recommended that you put
14  IRR-Residential inside of your self-managed IRA or
15  self-directed IRA?
16     A   So -- well, I don't exactly understand what
17  you're saying. What she -- so it's not -- I don't
18  understand the nomenclature.
19     Q   Did she -- did Loral Langemeier recommend
20  that you use your self-directed, self-managed IRA money
21  to invest in IRR-Residential?
22     A   That was one of the choices that she gave us
23  and it was the one that fit in that kind of a setting.
24  And so we felt that was -- you know, that was the right
25  choice and she recommended that that was a good thing

### 176

1  to use in a -- in a retirement account where it's an
2  atypical kind of investment.
3      Q   What were the other choices?
4      A   For what?
5      Q   You -- you said that she gave you a set of
6  choices. What choices?
7      A   I mean, so the whole -- the whole broad
8  spectrum, but the only one that -- that I recall that
9  fit into the retirement account was the
10  IRR-Residential, so that was like the choice for that
11  that -- you know, that it would fit into that well.
12  And so to the best of my recollection, that was the
13  best choice to go into a self -- into an atypical
14  self-directed retirement account.
15     Q   I see. Turn to Exhibit 54, please.
16     A   All right.
17     Q   On the 4th of July, 2006, this is the same
18  day as your -- as your message to Entrust, your family
19  put up $600,000 with Z Restaurant Group, is that right?
20     A   Yes.
21     Q   Did you tell Loral Langemeier you were going
22  to give David Zebny $600,000?
23     A   We -- what -- what we told was that we had --
24  excuse me, that we had done as she suggested we do,
25  that we get a second mortgage on our home and we had

### 177

1  $600,000, and that -- and that part of what we needed
2  to do was to invest, get that money working so it
3  wasn't a lazy asset.
4          And so she gave us a choice of three
5  investments, and so David Zebny was one of them and so
6  we told him we had -- we've got, you know, close to
7  700,000 or we've got a little over 700 from -- from --
8  from our home and so we put that 600 in. That's what
9  we told her, how much we had, and that's what she gave
10  us and so that's what we did.
11     Q   What do you mean, "that's what she gave us"?
12  I don't understand.
13     A   She gave us those choices, you know, for Prom
14  Notes, David Zebny and the other two, whatever they
15  were.
16     Q   And you told her you were going to --
17     A   That we had --
18     Q   -- loan that $600,000 to David Zebny?
19     A   And that we had this much money to invest,
20  that's what we told her.
21     Q   Okay. Turn to Exhibit 58, please.
22     A   (Witness complied with request of counsel.)
23     Q   Does your signature appear on Exhibit 58?
24     A   Yes.
25     Q   Why -- do you understand why you were filling

STEVEN LENES - MAY 11, 2012

---

178

1  this out?
2      A   We -- we understood that this was some of the
3  paper that you needed to do to get information on
4  the -- on the -- on each of the investments that Loral
5  recommended to us.
6      Q   And to whom did you send this investor
7  questionnaire?
8      A   And, again, you know, I really don't recall
9  who -- who I sent it back to, who was responsible for
10 this.
11     Q   I see.  Turn to Exhibit 59, please.
12         MR. BRADLEY:  And for the record, I would
13 point out that the document speaks for itself and
14 on the -- page 3 of that document instructs where
15 to send that document.
16         MR. LITTLE:  Jim, you don't need to testify,
17 really.  I mean, if he doesn't remember where he
18 sent it, that's fine.
19 BY MR. LITTLE:
20     Q   Have you seen Exhibit 59 before?
21     A   I've signed it.
22     Q   What is Refined Properties, LP?
23     A   I -- I don't recall what Refined Properties,
24 LP is.  I'm assuming that we -- there was something
25 else that she presented that we looked at and didn't

---

179

1  choose to invest in.
2      Q   You asked for the information based on what?
3  Did Loral tell you you needed to look at Refined
4  Properties, LP?
5      A   So, I mean, I don't really recall exactly
6  what Refined Properties is.  I know that when we were
7  at the table, Loral told -- told us how to allocate our
8  assets, and some of them were in real estate.  And she
9  had different real estate opportunities that she
10 presented and they were in Missouri and Ohio and New
11 Mexico and Georgia and Florida and maybe some others,
12 you know, that I just don't recall off the top of my
13 head.
14         And so we -- we were doing, you know, what
15 she asked us to do, to look at things and to -- to see
16 if that was a good opportunity for us.
17     Q   She asked you to look at -- look at it and
18 see if it was a good opportunity for you --
19     A   She --
20     Q   -- correct?
21     A   She -- she asked -- I mean, she -- she
22 looked -- she had us look at all the investments, I
23 mean, so she presented the investments and we had, you
24 know, different ones to choose.  And we do oil, that we do
25 that we do real estate, that we do oil, that we do

---

180

1  that.  And so she -- you know, these were just some of
2  the other investments that she presented through the
3  Big Table.
4      Q   Okay.  So she recommended that you select
5  investments within certain categories of allocation, is
6  that correct?
7      A   She recommended that we have oil, that we
8  have real estate, that we have Prom Notes, that we have
9  businesses.
10     Q   And you had choices to make inside each of
11 those categories, correct?
12     A   Some -- I mean, some things only had one
13 choice, it was Oil2, you know, oil and gas, you know,
14 so they're just one -- one choice there.
15     Q   Could you have gone out and found other oil
16 and -- oil and gas investments on your own?
17     A   You know, I -- I have no idea how to do that.
18     Q   Okay.  Turn to Exhibit 60, please.
19     A   All right.
20     Q   Was Exhibit 60 true when you signed it?
21     A   So, again, you know, to -- in the -- in the
22 framework of coming to Loral's Big Table and having her
23 make recommendations of companies to invest in, we --
24 we understood this, that this was what we needed to do
25 to get the paperwork, and that to the extent that I

---

181

1  understood this, I -- I understood it that this was --
2  this was correct, that this was true.
3         So she -- she explained the investments and
4  asked us to fill out this paperwork and -- and that's
5  what we did to go to the next step to get the next set
6  of paperwork.
7      Q   Was Exhibit 62 true when you signed it?
8      A   So Vetrazzo is the same thing, she --
9         MR. BRADLEY:  I'm sorry.  Did we skip an
10 exhibit?
11         MR. LITTLE:  Yes.
12         MR. BRADLEY:  Okay.
13     A   (Continuing)  So Vetrazzo -- so when we went
14 to the table, she explained to us that Vetrazzo was a
15 green company in California that was going to do very
16 well and that we would have a very good return on
17 our -- on our investment with Vetrazzo and that we
18 needed to fill out the paperwork to be able to -- this
19 paperwork to get the next set of paperwork and that --
20 that she -- she -- she presented a company that would
21 fit what we needed to invest in, and so we filled out
22 the paperwork.
23     Q   Was it true when you signed it?
24     A   So we -- we understood that all this
25 information was correct when we signed it.

---

STEVEN LENES - MAY 11, 2012

---

182

1  Q  Okay. Turn to Exhibit 63. You certified by
2  your signature in Exhibit 63 that the Vetrazzo
3  investment was also consistent with your overall
4  investment strategy, correct?
5      MR. BRADLEY: Objection, calls for a legal
6  conclusion.
7      A  (Continuing) So when we -- when we said
8  that, we said that we have been to the Big Table and
9  that we had revealed -- showed Loral all of the assets
10  that we had, she helped us figure out how to mobilize
11  them. She -- she understood what our goals and
12  aspirations were, and she had helped us, you know, with
13  an investment strategy and recommended to us things
14  that we felt -- she felt would fit into -- into our --
15  our goals and what would be good for us.
16      And so -- so it was consistent with the
17  investment strategy that we felt she was helping us
18  with.
19      Q  Take just a look -- quick look at Exhibits
20  64, 65, 66, 67, there're a variety of declarations of
21  non-solicitation that you signed. Do you see that?
22      A  Uh-huh (affirmative).
23      Q  You signed those and the declarations of
24  solicitation --- non-solicitation for Vetrazzo and
25  BioCare Direct all on the same day, August 10, 2006.

---

183

1      A  Uh-huh (affirmative)
2      Q  Do you see that?
3      A  Uh-huh (affirmative).
4      Q  What was the need to review six different
5  investment vehicles on the same day? What drove that?
6      A  So when -- when Loral presented these,
7  they're -- they're always presented, you know, with a
8  sense of urgency. And so the -- we'd already
9  experienced in one of the previous investments where
10  the investment took a limited number of investors and
11  you -- if you didn't make it in time, then, you know,
12  you didn't get to invest. And that -- that investment
13  was doing very well.
14      Q  What investment was that? I'm sorry.
15      A  That was the -- the nutrition one, it's
16  just -- it's before the Supplements To Go, the -- it
17  will -- it will eventually come back to me, but it's
18  the -- it's the -- the other nutraceutical nutrition
19  company that they developed before -- before
20  Supplements To Go.
21      And so that -- that had closed up just as our
22  table got there. They'd already invested, gotten all
23  the investors. And so that was already doing very
24  well.
25      And so when -- when Loral presented these

---

184

1  things, she presented them with the sense of urgency,
2  if you don't get in this, you might not be able to get
3  in. And they would talk about them and then they'd
4  say, okay, you know, as soon as we're ready, you ask --
5  they had something called DPP online, which is kind of
6  her clearinghouse to request all this information.
7      And so you had to go online and request it
8  and -- and that -- and then you get the information to
9  be able to make the investment or at least -- not make
10  the investment, but that gave you to the next step, you
11  know, of getting the information so you could see what
12  the -- get the private placement memorandum or whatever
13  it was that they would send with that.
14      And -- and so you -- you felt like, oh, we
15  just have to hurry up and get -- get in the queue in
16  order to have an opportunity if that was something that
17  would be a good fit for our particular needs. And so
18  you would -- you know, it's the buzz -- it was the buzz
19  around the table, you know, the tables you needed to
20  hurry up and, you know, get -- kind of get in line.
21  And if, you know, it might be really good, it would go
22  fast.
23      And so you would ask -- if several things
24  became available at one time, you -- you know, you
25  would ask for the information on those things. And so,

---

185

1  most likely -- and we had been gone for part of the
2  summer, and so when we got back, we -- I think probably
3  we felt like we were behind the eight ball, and so we
4  sent -- we sent -- we sent in a number of requests to
5  figure out, you know, what the -- what these
6  investments were. Since we were -- we'd been out of
7  the country, we hadn't been able to -- we weren't on
8  laser calls and those sorts of things for that month,
9  and so we needed to kind of catch up. So I imagine we
10  sent those in to -- to get further information on the
11  investments.
12      Now, some of these were -- were real estate
13  investments and -- and which -- you know, which one
14  went with which, I know that Cerritos Beach was in
15  Mexico. And I don't -- Renew -- where -- the locations
16  of these, I -- I no longer remember where they were,
17  you know, Advantage, Cerritos Beach, Renew, Tequila
18  Ranch, I know that was in Mexico.
19      And so those -- those property -- those
20  investments, we -- we didn't -- we didn't think, you
21  know, investing in Mexico was such a good choice for us
22  just because, you know, it's a different currency and
23  not very close to where we lived, and so we didn't --
24  we just didn't really want to do that.
25      Q  That didn't stop you from --

---

STEVEN LENES - MAY 11, 2012

---

186

1    A    And --
2    Q    -- investing in condo towers in San Jose,
3    California, did it?
4    A    Did what stop us from investing in condo --
5    Q    The fact that they were across the country
6    from you.
7    A    So I -- I don't think that's exactly what I
8    said.  So we didn't invest in Mexico because it's
9    another country, it was a long way from us, and it was
10   a different currency.  And so it's -- you know, we
11   wouldn't -- we wouldn't -- and these -- if I remember
12   correctly, these were single units, and so it's a whole
13   different kind of an investment.
14        And so then you're -- some of it was land,
15   you know, that you would contract and have somebody
16   build something on.  And so then we would have had to
17   manage a -- contract across -- in Mexico with a
18   language that we didn't know, with a currency that we
19   didn't know and all those sorts of things.  So we felt
20   that -- and my wife is French, you know, we're -- if
21   we're going to do something, we'd rather do it in
22   France --
23   Q    I see.
24   A    -- you know.  And so it's -- it just -- you
25   know, for those reasons, we felt we just didn't, you

---

187

1    know, want to do those investments.  They had
2    investments in other places, I'm not sure which ones
3    got with what, you know, which was in Louisiana, which
4    was in Ohio, which -- you know, wherever they --
5    wherever they all were, and it was the -- it was the
6    same sort of thing.
7        Those -- at least the ones I know in Missouri
8    were single-family homes, and so there are a lot of
9    single units and we -- we just wanted to, you know,
10   move away from that.  We didn't feel like we wanted to
11   be responsible for maintaining a building, you know, a
12   home long distance and trying to manage renters and all
13   those sorts of things.  You have a company that does
14   that, but you're still responsible.  So I -- I just --
15   you know, so we -- we just didn't do any of those
16   investment.
17   Q    I see.
18        MR. LITTLE:  He needs to change the tape.
19        VIDEOGRAPHER:  Off the record at 2:42, Tape
20   No. 4.
21   (Brief recess taken.)
22        VIDEOGRAPHER:  This is Tape No. 5 in the
23   deposition of Dr. Steven Lenes.  We're on the
24   record at 2:52.
25   BY MR. LITTLE:

---

188

1    Q    Dr. Lenes, if you would, please, take a look
2    at Exhibit 118.  Exhibit 118, for lack of a better
3    word, is kind of an amalgam of subscription agreements
4    that were produced in this order.  Do you see that?
5    A    I'm sorry.  The -- I mean, the --
6    Q    118.
7    A    Got the wrong -- I'm sorry.  Okay.  Sorry.
8    Sorry.
9    Q    Did you fill out multiple subscription
10   agreements for Renaissance Laser?
11   A    So there's two, two, and you're asking if we
12   went two in, or what are you asking me?
13   Q    Yes.  I'm -- I'm asking you if there were
14   multiple iterations that you sent in, because one of
15   them appears to be sent earlier than another.  I'm
16   asking if you recall how it was that you invested in
17   Renaissance Laser, were there multiple subscription
18   agreements?
19   A    You know, is it -- I'm trying to -- do you
20   think one is -- one is a copy of a fax that we sent in,
21   or is it different dates or --
22   Q    I don't know.  I'm asking you if you
23   remember.
24   A    I -- I really don't remember, you know,
25   what -- why we'd had --

---

189

1    Q    You just made one investment of $100,000?
2    A    That's correct, we just made one investment,
3    so I don't understand why there are multiple pages.
4    I'm looking to see if --
5    Q    If you'll take a look at page Lenes Hard Copy
6    001879.
7    A    Seven nine, okay.
8    Q    There's a Section 3(g) at the top.  It reads,
9    "The subscriber and its/his/her purchaser
10   representative" -- do you see that?
11   A    Yes.
12   Q    -- "if any, may only rely on the information
13   furnished" or made available to -- "or to be made
14   available to the subscriber in its/his/her purchaser
15   representative, if any, by the company as described
16   above."  Do you see that?
17   A    Yes.
18   Q    Did you rely on any information other than
19   what was provided by Renaissance Laser in making your
20   investment decision?
21   A    So when we made the reservation -- excuse me,
22   the represent -- the -- sorry.  When we made the
23   investment in Renaissance Laser, we -- we -- we
24   depended on -- on Loral.  She had us to the Big Table,
25   we presented our information to her, the -- the

---

CAROLINA REPORTING (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

### 190

1  investments, money that we had available, the -- and
2  what our goals and concerns were and our hopes were and
3  what would be -- she helped determine what would be
4  good investments for us.
5       And so when we invested in Renaissance Laser,
6  she told us that this would be a good investment for
7  us. It's a -- it -- it would have a good return, we
8  would make a good return on our -- our investment with
9  them.
10      Q   And that information was provided by Loral
11  Langemeier, not Renaissance Laser, correct?
12      MR. BRADLEY:  Objection.  There's an imbedded
13  legal conclusion there.
14      A   (Continuing)  So what -- excuse me.  What --
15  what -- so I don't -- I don't exactly understand what
16  all this means in this number (sic) G.  And so Loral
17  was involved with all of these investments and so, you
18  know, from what I understood, I mean, she -- this --
19  she was the person providing the information, that this
20  was consistent with how I understood things.
21      Q   Okay.
22      A   So she -- she is -- she knew us, she knew
23  what we needed to do, she made recommendations to us
24  that were -- you know, would be appropriate for us.
25  And -- and so that's all part of what she did.

### 191

1      Q   Did you understand Loral to be working on
2  behalf of Renaissance Laser?
3      A   We understood that Renaissance -- Renaissance
4  Laser is part of the spectrum of offerings that Loral
5  had to us, that she was involved and that she was
6  involved in -- you know, in making -- in the -- in the
7  company in some way, either -- I mean, I don't know, I
8  mean, I don't know how she was involved, but she
9  presented this, she's -- she's the -- she was the
10  person who -- who told us that she was -- you know, she
11  was involved, she was keeping an eye on things, that
12  this is appropriate for us.
13      And so I felt that that's what this kind of
14  thing told us, you know, that she was included in that
15  statement.
16      Q   Turn to Exhibit 121, if you would.
17      A   All right.
18      Q   Have you seen this document before?
19      A   I signed it.
20      Q   So you've seen it before?
21      A   Yes.
22      Q   Under the section marked F, "Consistent
23  investment strategy," the question is, "Is this
24  investment consistent with your overall investment
25  strategy?"  And you marked "No."  Do you see that?

### 192

1      A   The -- yeah.  So I -- actually, you know, I
2  think probably Elisabeth filled that out, and I'm not
3  sure if she understood that.  I do know that when we --
4  so that -- this says, "fax to Steve," so the guy who
5  did Fast Fitness Centers was a guy that was at our
6  table, Steven, I don't remember his last name now, and
7  so we -- we got -- we wanted to get the information
8  from him.
9       And eventually that -- I mean, he -- he
10  withdrew that investment, and so I'm not sure how all
11  of this worked out relative to that or -- I just don't
12  really remember.  You know, this was a different -- a
13  different investment in that it was just being
14  developed during the course of the table and --
15      Q   Was Loral Langemeier promoting it?
16      A   Loral Langemeier promoted it and -- and --
17  but then it was withdrawn.  I mean, they didn't
18  actually do the -- the investment, the thing.  So -- so
19  that made me think, you know, she's keeping an eye on
20  things and this was something that wasn't ready to be
21  offered at the table.  And so we -- we didn't -- you
22  know, actually, it turned out to not even be something
23  we could invest in.  So I'm not sure what happened
24  there.
25      You know, Loral made recommendations to us

### 193

1  that we felt were consistent with our investment
2  strategy.  You know, this is -- this form --
3      Q   This was one of them?
4      A   This was a form that Elisabeth filled out
5  and, you know, I don't know if she completely knew what
6  we were doing when we filled it out.
7      Q   Did you know what you were doing when you
8  filled out the subscription agreement for it that's
9  Exhibit 128?
10      MR. BRADLEY:  And I'm going to object, lack
11  of foundation.
12      A   (Continuing)  So, again, that -- the
13  investment, this investment was one that didn't
14  actually get going.  And so when we filled that out, we
15  wanted to support Steve at our table and Loral had been
16  working with him to develop it.  And I don't exactly
17  know why it was -- it was withdrawn from -- from --
18  from the -- the things that were offered.  And so --
19      Q   So is it your understanding that this
20  investment was consistent with your overall investment
21  strategy, that was just a mistake on the prior form?
22      A   That's my understanding.
23      Q   Okay.  Turn to Exhibit 151, if you would,
24  please.
25      A   (Witness complied with request of counsel.)

STEVEN LENES - MAY 11, 2012

194

1    Q   These are your notes, aren't they?
2    A   Let's see.  Yes.  That's my writing.
3    Q   All right.  Take a look at the first page,
4  you'll see that you highlight five points at the very
5  top of your notes, do you see that?
6    A   Uh-huh (affirmative).
7    Q   The first one is -- well, what are you taking
8  notes of here, can you tell me?
9    A   So these -- you know, I don't -- I don't
10  recall the actual meetings, but what occurred was there
11  were -- there were lectures, you know, during the
12  course of the -- the events, you know, to teach us more
13  of what was going on, how to -- how to implement
14  Loral's system and -- and how to be, you know,
15  investors.
16    Q   And the first point here is non-solicitation,
17  the second point is nondisclosure.  What does that
18  mean, what were you taking notes about?
19    A   You know, I wish I had written a little more
20  to explain this.  I -- that was a long time ago and
21  it's from a lecture and I didn't actually title the
22  lecture.  So I don't -- I don't really recall what that
23  was relative to.
24    Q   Under the third point, it says, "Suitability
25  form, don't take too much of someone's percentage of

195

1  investment."  At this point in time when you were
2  taking these notes, you knew what suitability meant,
3  didn't you?
4    A   The -- so I think those forms are the
5  suitability forms, right, isn't that what this is?
6    Q   Yes.
7    A   So at that time, then, the -- I mean, I'm
8  taking notes on it, trying to understand, I don't know
9  it necessarily means that --
10    Q   Dr. Lenes, by the time you took these notes
11  at the Cabo Alumni 7, you had already filled out at
12  least a dozen of those --
13    A   Correct.
14    Q   -- suitability forms, right?
15    A   So that -- that doesn't necessarily indicate,
16  you know, a complete understanding of things.
17    Q   I see.  So --
18    A   So --
19    Q   -- did you understand it or didn't you?
20    A   So I -- there -- we understood -- I thought I
21  understood, you know, to the extent that I've
22  explained, you know, previously, that this was part of
23  what you did to get the paperwork.
24    Q   And if your net worth was three million
25  dollars back in April of 2006, you loaned 20 percent of

196

1  that to David Zebny in one day, right?
2    A   I'm assuming that you've done the math and
3  that's correct.  I mean, so --
4    Q   Do you think that was a good thing to do?
5    A   At the time that we did that, we had
6  contacted Loral and asked her, that we had this much
7  money available to invest, and she gave us, you know,
8  some different investments to do, and so --
9    Q   How did you contact her?
10    A   You know, I -- I didn't contact her.
11  Elisabeth contacted her.  And so I don't -- I don't
12  know how that actually occurred except that we got -- I
13  don't know if she called her, I don't know if she -- I
14  don't know what she did.  And so we got back these
15  choices.  Elisabeth did a lot of legwork.  And -- and
16  so we got back these choices.  And so I'm -- she gave
17  us choices to make -- you know, to invest in and she --
18  we told her how much money we had.  And so, I mean, I'm
19  assuming that those were good choices.
20    Q   Were you privy to that conversation with
21  Loral Langemeier?
22    A   To -- to invest in -- in Z Restaurant, or
23  what -- what are you asking me?
24    Q   Were you privy to a conversation in which
25  Loral Langemeier was contacted for the purpose of

197

1  asking what to do with $600,000?
2    A   So --
3    Q   Were you privy to that conversation?
4    A   So "privy," I'm sorry, do you mean did I hear
5  that conversation?
6    Q   Yes.
7    A   So I did not hear that conversation.
8  That's -- you know, we divided up tasks, and so --
9  Elisabeth and I, and we -- she did some things, I did
10  other things.  And so she -- she was working on that.
11  I -- I mean, I had -- had and have a full-time job that
12  consumes a lot of time.  And so it's -- really, one
13  person can't do everything.  And so you have legal
14  assistants and, you know, I had -- and we work
15  together.  I mean, it's a -- we didn't hide anything
16  from each other.  Our -- our -- you know, we -- we look
17  out for each other, and so she was involved in doing
18  some of the legwork and so I didn't --
19    Q   Did you have a conversation with Elisabeth
20  where she told you, "I had a conversation with Loral
21  Langemeier and she said we should give David Zebny
22  $600,000"?
23    A   So --
24        MR. BRADLEY:  Objection.  Mischaracterizes
25  prior testimony.

CAROLINA REPORTING  (843) 832-0801
www.carolina-reporting.com

STEVEN LENES - MAY 11, 2012

---

198

1    A    (Continuing) Again, what -- what we did was
2    we contacted Loral and we had this much money available
3    to invest and we felt that Prom Notes would be good.
4    And we asked her which Prom Notes would be good for us
5    and she gave us a choice of three that she felt would
6    be good for us.  And so out of those three, you know,
7    we -- we gave the money to Loral (sic).
8        Q    You mean Dave?
9        A    Excuse me, yeah, sorry, Dave, to -- to the Z
10   Restaurant Group.  And so -- and so we -- we felt that
11   was -- you know, she -- she suggested those, she gave
12   us three good choices, we figured any one of those
13   choices would be good.
14       Q    And what I want to be clear about was, you
15   weren't -- you weren't privy to that conversation,
16   though, so did you and Elisabeth have a follow-up
17   conversation about it after she contacted Loral?
18       A    To decide what to do about it or --
19       Q    Yes.
20       A    Well, I think I sort of implied that, I
21   mean --
22       Q    No.  I -- I want to be clear.  Did -- after
23   she had the conversation with Loral, did you-all have a
24   follow-up conversation, and if so, what did you talk
25   about?

---

199

1        A    So we talked about that there are three
2    choices and that this is what Loral recommended and
3    that we -- we put it in the -- in the Z Restaurant
4    Group.
5        Q    Okay.  And then you did that, is that
6    correct?
7        A    Right.  You -- you have the checks that we
8    sent to them.
9        Q    All right.
10       A    So we did -- Loral would make recommendations
11   and she -- she said, "Look, if you're not going to, you
12   know, do what I say, then, I mean, it's -- I'm the one
13   who knows."  She's the expert.  We gave her our
14   information, she -- we felt she was looking out for our
15   best interests.
16           And so we -- we did -- really, I think when
17   you look at the email that we looked at earlier, we
18   tried very hard to do all the things that she told us
19   to do, because why would you -- why would you go to
20   a -- to a -- an advisor and not -- not do what
21   you're -- what they ask you to do?  I mean, if you --
22   there's a proven system to make -- you know, to make
23   people millionaires, and so why would we not do that?
24       Q    Did you get ahold of her on that 4th of July
25   weekend, "her" being Loral, to ask her about that?

---

200

1        A    So --
2            MR. BRADLEY:  Objection.  Lack of foundation.
3    Mischaracterizes prior testimony.
4        A    (Continuing) So I think -- are you saying
5    the checks were written on the 4th of July?
6        Q    Yeah, the 4th -- checks were written on the
7    4th of July, so did Elisabeth talk to her the day
8    before, night before, when did that happen?
9        A    So -- obviously I don't remember that,
10   because there's -- you know, you write a check, you've
11   already -- you don't write a check until everything is
12   lined up.  And so it takes time to get all the
13   paperwork and get the money available and all that kind
14   of stuff.  So -- so it seems silly to suggest that we
15   did -- called her on July 4th, on a holiday, to write
16   her -- if we should write a check, you know, when we
17   asked for the information, we did it at an appropriate
18   time, you know, and --
19       Q    Did it happen at some point between the first
20   Big Table in April and July 4th --
21       A    I mean, it took time to --
22       Q    -- 2006?
23       A    -- to -- so we -- she told us we needed to
24   get a second mortgage on our home and get -- mobilize
25   those lazy assets.  So when we came back, we started

---

201

1    working on that, and it takes time to get -- you know,
2    to get different -- different people to say what kind
3    of a loan they can give you and it takes time to, you
4    know, fill out all that paperwork and get -- do a
5    closing.  And -- and so, I mean, it just takes time.
6            And then they give you a check and you've got
7    to deposit it and, you know, it's -- so sometime, you
8    know, between then, we -- that's what we did.
9        Q    Okay.  About in the middle of this page on
10   Exhibit 151, you -- you write, "How much new money can
11   I get this year?"  And under that, you write, "Cash
12   machine, not cash flow.  Your skillset can create new
13   money, your cash can create new money."  Did you and
14   Elisabeth make any endeavor to use your skillsets among
15   the two of you to create new money that year?
16       A    Yes.  So that -- that's -- I mean, she --
17   she -- she told us that, you know, the more money we
18   have, the more we can invest.  And -- and so we needed
19   to get some kind of a cash machine to make money.
20           And so then you try and think of what your
21   skillsets are, you know, what can you do to -- to
22   generate some additional cash flow.  And -- and so
23   somewhere -- somewhere in all of this is a -- you know,
24   what our -- what we thought our skillsets were and --
25   and then trying to figure out how we could use that.

STEVEN LENES - MAY 11, 2012

## 202

1    And it -- it seems to me that that was even
2    part of the table, you know, of making suggestions, you
3    know, Loral said, "Okay, what do you do?"  And so she
4    would say, "Okay, these are possibilities for cash
5    machines for you."  And so a lot of this was, you know,
6    information that was presented at the table and then
7    gone over again at -- at Cabo.
8    And so we -- we tried to figure out a way
9    that we could have more -- you know, bigger cash flow
10   coming in.
11   Q    So what was your and Elisabeth's cash
12   machine?
13   A    So we -- we didn't really -- we didn't really
14   figure out a new cash machine.  The -- I tried to
15   figure out if there's a way, you know, I could do -- so
16   I -- I not only worked for the State of South Carolina,
17   but I also contract with a couple of disability boards
18   in Charleston and Dorchester County.
19   And so I was trying to figure out if there's
20   some way that I could see more people doing that and
21   then make more income, or if I could expand to another
22   county or, you know, if I could use, you know,
23   telemedicine or hire a nurse practitioner, figure out
24   some way that I could, you know, make that into a
25   bigger business that would generate more income.

## 203

1    And so it -- we just -- I mean, we tried to
2    figure out how to do that, we weren't really successful
3    with that, but --
4    Q    Didn't ever come up with a cash machine?
5    A    So we never -- we didn't -- we weren't able
6    to figure out an exact cash machine that we could do.
7    Q    Have you heard the term "money rules" at
8    these conferences?
9    A    We did.
10   Q    What were the Leneses' money rules?
11   A    You know, I -- I don't know if they're
12   written down in here somewhere.  We have them.
13   Actually, I haven't -- haven't really looked at them
14   since then.  And I'm not even sure where they are.  We
15   had them.
16   Q    Do you remember any of them?
17   A    It seems to me that we -- I can -- I can
18   remember maybe one, that we wanted to have an
19   investment that yielded at least 12 percent or better,
20   because Loral said that you shouldn't -- you shouldn't
21   take less than 12 percent return on any investment.  So
22   really, that's -- that's the one I remember.  I -- I
23   really don't remember the rest of them.
24   Q    I see.
25   A    They may -- if we find them, I'll be happy to

## 204

1    share them, but I haven't looked at them in a long
2    time.
3    Q    Can we find any of Loral Langemeier's
4    investment advice to you in your copious notes that are
5    found in Exhibit 151?
6    A    A lot of that -- let me just look through and
7    make sure it's not here.
8    Okay, would you repeat your question now?
9    Q    Yeah.  Where in your copious notes that we
10   see in Exhibit 151 can we find Loral Langemeier's
11   investment advice to you?
12   A    So there's a couple of things.  One is that
13   when -- when we went to these, you know, they -- they
14   divided out the teaching sessions from the investor
15   sessions, and so investor sessions were separate from
16   these.  And so when I -- when I took notes, I was
17   taking notes in the teaching sessions.
18   When -- when we -- when we -- when we did
19   these, the things that she taught us, you know, were
20   relative to the -- to the -- to the investments that
21   she recommended to us.  And so when -- so she's
22   teaching us how -- you know, the things to look out
23   for, what to do.
24   And then at the investment sessions, she's
25   presenting the investments and recommending those.  And

## 205

1    we have -- she -- so the -- you know, in my mind, what
2    I'm seeing is here she knows -- she knows all these
3    things.  And -- and so when she makes a recommendation,
4    she already knows all of this information.  She's the
5    one, you know, who has done it and taught us and taught
6    us how to do it and -- and made recommendations.
7    And so -- so in a sense, the -- these
8    sessions that I've taken notes on are, you know, what
9    she uses to shore up her investment advice.  And so she
10   has said, you know, "These investments are ones that I
11   have skin in the game, these investments are ones that
12   I've checked out, that I'm following up on, these are
13   the poster child investments, these are the M.B.A.
14   investments, these are the real estate guru
15   investments," you know, all those things.
16   And so here she's -- I'm -- I'm thinking
17   she's done all these principles when she's made these
18   investments.  And so when she makes a recommendation,
19   I'm going, okay, this -- this is a good thing.  And
20   she -- she -- you know, she's done -- she's done the
21   work and she knows what's good for us and it's a good
22   investment.
23   Q    My question was different.  Is her investment
24   advice to you anywhere in these notes?  Do you see it?
25   A    So -- so in these notes, these are notes that

STEVEN LENES - MAY 11, 2012

206

1   back up the investment advice that she gave us.
2       Q   I see.
3       A   And so --
4       Q   And you paid for that teaching, correct?
5       A   And so these notes are notes that back up the
6   investment advice that she gave us.  And she -- and she
7   gave the investment advice at another part of the
8   conference when she had Vetrazzo come speak and she had
9   Zebny come speak and she had Renaissance Laser and she
10  had Loudsoft come speak.  And so each of -- each of
11  those, you know, that was a separate part of the -- of
12  the alumni conference.
13      Q   But you paid --
14      A   And --
15      Q   -- for that teaching, correct?
16      A   And we -- we paid for her to help us develop
17  a whole wealth plan.  We paid for essentially, as -- as
18  Robert told us at the very beginning, that when we --
19  when he advised us not to make, you know, an investment
20  we were going to make before we came to Loral's Big
21  Table, that we were coming and that we would have
22  opportunities for investments that would return a much
23  higher rate of return at the Big Table and she
24  would make recommendations for us that would be
25  appropriate for us.

207

1           We lived out loud.  We laid out all our
2   finances in front of everybody.  She saw those.  She
3   knew what we wanted to do, what our freedom day was.
4   She, you know, knew how much we knew and what we knew
5   about things.  And so she made recommendations.
6           And this -- all this information, you know,
7   to me, confirmed that she knew what she was talking
8   about and that she was qualified to make investment
9   recommendations and that she took into account all
10  these things and that she took into account who we were
11  and that she made recommendations that were good for
12  us.
13      Q   Take a look at page Lenes Hard Copy 000186,
14  please.
15      A   All right.
16      Q   In the middle of the page, you see the --
17  your note that says, "find true diversification"
18      A   Yes.
19      Q   Did Loral Langemeier tell you to do that?
20      A   The -- I didn't really mark down who was
21  teaching us at the time, so -- so as far as where these
22  notes are from, I don't -- I don't recall who -- who
23  made that statement.
24      Q   Is find true diversification consistent with
25  Loral Langemeier's teaching to you, sir?

208

1       A   And so what she taught us about
2   diversification was she gave us a sheet on asset
3   allocation and she described that we needed real
4   estate, we needed Prom Notes, we needed oil and gas, we
5   needed businesses, and that as we -- as we got those in
6   place and we -- and we got those different companies,
7   you know, those are companies that were in different
8   industries, that that was -- that was diversification.
9       Q   Underneath there, you write, "Don't invest
10  all your money at one time."  Is that what Loral
11  Langemeier told you to do?
12      A   So, again, I don't recall who gave this
13  lecture and -- and so, you know -- and that's what
14  we -- we did, I mean, what we understood to do.  So we
15  took --
16      Q   What you did --
17      A   -- for example --
18      Q   Hold on a second.  What you did was you
19  invested all your money at one time?
20          MR. BRADLEY:  That mischaracterizes the
21  record.
22  BY MR. LITTLE:
23      Q   Isn't that true?
24      A   So what -- if -- if you would let me finish,
25  what we did was, for example, in oil and gas, we took

209

1   and we invested in the April fund and we invested in
2   the May fund and we invested in the -- you know, as --
3   as they changed the way they invested it, so we spread
4   that out over time.
5           We took -- Loral was telling us, you know,
6   why are we still sitting on our lazy assets, you know,
7   to get -- to get going.  And she gave Elisabeth a hard
8   time that we hadn't liquidated all of our lazy assets
9   and got those invested.
10          And so we were -- we were trying very hard to
11  do exactly what Loral told us to do and to get moving
12  and really were -- Elisabeth is especially good, I
13  mean, if she's given a task, you know, she works very
14  hard at it.  And she grew up the same way, you know,
15  they -- she grew up in a blue collar family, you know,
16  her father was a -- was a janitor at a local school.
17  And so anything that they -- they had as a family they
18  worked for.  And so she knows how to work.
19          And so when she's given a task -- Loral said,
20  "Get your assets -- your lazy assets together," so we
21  did that.  And then these investment opportunities came
22  along, and so -- so I -- I mean, I don't understand
23  that as investing all your money at one time.  We -- we
24  got an asset, an investment came along, Loral said this
25  would be a good investment for us, we invested in it.

STEVEN LENES - MAY 11, 2012

### 210

1    We had -- we -- part of the reason we did
2  the -- the Prom Notes, you know, there's a 250, a 250,
3  and 100,000 Prom Note with David Zebny, we divided
4  those up so that as investments came along, we could
5  pull money out of that and put it into other things
6  that Loral recommended to us.
7    Q   And you think --
8    A   And so --
9    Q   -- that created diversification for you?
10   A   And so that's what we understood from Loral's
11 teaching, was we -- we had oil, we had, you know, some
12 Prom Notes, we made the money available so that as
13 new -- new opportunities became available, we could
14 move the money into that.  We felt that this was, you
15 know, a way to -- that we were not sitting on lazy
16 assets.  You know, we had the money out, it was earning
17 interest.
18     So the money was working as Loral presented
19 new recommendations to us for -- for -- for
20 investments.  And so, I mean, to me, that -- I mean, it
21 seemed to make sense from the -- all the things that
22 she taught us.
23   Q   Underneath that, you write, "Barriers to"
24 successful -- "successful investing," and there's
25 something there that says, "GOT-U."  Is that an acronym

### 211

1  for something?
2    A   You know, I -- I no longer remember what that
3  means.
4    Q   Okay.  First thing you write there is
5  "greed"?
6    A   Right.
7    Q   Do you think greed played a part in your and
8  your wife's investment losses?
9    A   You know, I -- I was, you know, upset when
10 you said that under her deposition.  And we -- we have
11 tried very hard to never be greedy and we -- one of the
12 ways that we're very careful about that is that when we
13 get money, we want to -- I mean, the -- we give away
14 the very first part of it so that we'll never hang on
15 to it too tightly.
16     And we have different charitable causes that
17 we support.  And the first bit of that money off the
18 very top goes to the Lord and to the -- and to
19 different things, you know, that we feel are important
20 for caring for people around the world.
21     And so we -- you know, greed, you know, the
22 human heart.  And we are -- we are all -- none of us
23 are perfect.  And -- and yet, we have worked very hard
24 to not be greedy, to teach our children that you give
25 to others first and you don't hang on -- you don't -- I

### 212

1  mean, right now we're having to teach our one son, who
2  is just -- he just gives away everything and, you know,
3  he doesn't think it full, you know, that he should not
4  give -- I mean, he needs to keep a little bit for the
5  things that he needs, too, but then he'll give
6  everything away and then he'll come home.
7    Over his Spring Break last year, for Spring
8  Break, instead of going and messing around, he worked
9  at Chick-fil-A.  Over Spring Break this year, you know,
10 he's in the same spot, he had given away so much money,
11 you know, taking care of his friends and all that kind
12 of stuff, that he was broke again.  And so this -- this
13 Spring Break, he worked at one of the carriage
14 companies downtown, you know, to earn money to make it
15 through the rest of school.  So that -- I mean, that's
16 what you teach them, that's not what we do.
17   Q   Do you think that greed played a role in your
18 investment losses?
19     MR. BRADLEY:  Objection, asked and answered.
20   A   (Continuing)  So I think that if greed played
21 part in it, I don't -- you know, I don't know how to --
22 how to say that.  I mean, I think -- I wonder -- I
23 wonder if Miss Langemeier was greedy, I wonder if
24 that's what played a part in our investment.  You know,
25 I don't know the answer to that.

### 213

1    Q   What do you mean?
2    A   I can say that, you know -- I don't know, you
3  know, if -- if -- if she's doing all these investments
4  and encouraging us to do things that, you know, would
5  go on to not do well, and if she was getting money from
6  them, I mean, was she greedy?  I don't know the answer
7  to that.  But what I do know is that we -- we did not
8  do these investments out of greed.
9    Q   I see.  Which investment was it again where
10 you expected a 12 times return of your money for zero
11 risk?
12     MR. BRADLEY:  Objection, mischaracterizes the
13 testimony.
14   A   (Continuing)  So that -- that's really not
15 what we said.
16   Q   That's not what happened?
17   A   That's not what we said.  And so when we --
18 when we talked about investing in -- I think that was
19 BioNovix.
20   Q   Uh-huh (affirmative).
21   A   And so we talked about what the returns would
22 be and we never really talked about -- so much about
23 risk and those sorts of things.  The -- the concerns,
24 you know, we had a good team, we had a good product, we
25 had a good plan, you know, all that was in place.

STEVEN LENES - MAY 11, 2012

214

1    And so really, the returns that -- all -- all
2  these returns, I mean, Loral was saying, you know, we
3  get 20, 25, 30 percent returns.  I mean, that -- I'm
4  going, well, I mean, that seems to be -- that must be
5  what people make in businesses and things like those
6  kind of things.
7    And so -- so to me, that -- she said that
8  matter of fact like that's the way it is.  And so I'm
9  thinking that's a good thing, you know, that you can
10 make that kind of -- that kind of return on the money.
11 So when money works, it works better than when we work.
12   And -- and so then, if that was the case,
13 then I'm -- you know, I'm going to be able to go work
14 in Africa and relieve somebody to go to a conference,
15 you know, I'll -- I'll be able to do those things.
16   Q   When you took your equity out of your home,
17 some of that equity accrued as a result of just
18 appreciation in the market, correct?
19   A   So I think -- I mean, isn't that -- isn't
20 that what -- where all equity comes from?  I don't -- I
21 mean --
22   Q   No.
23   A   -- I don't know.
24   Q   No.  And the reason I would say that is, for
25 example, when you worked on your rent houses, you put

215

1  in some sweat equity, you --
2    A   Right.
3    Q   -- you physically improved the homes,
4  correct?
5    A   Right.
6    Q   But with respect to your house, how much of
7  that was pure market appreciation, do you think?
8    A   Well, I -- I don't -- I know that -- I don't
9  actually know how to determine that.
10   Q   All right.  Let me ask you a different
11 question.  What was your basis in the home on Ponsbury?
12   MR. BRADLEY:  You do keep interrupting him.
13 I'm going to ask you to stop doing that.
14 BY MR. LITTLE:
15   Q   What was your basis in the home on Ponsbury?
16   A   So let me just finish, I don't -- I don't
17 know how to determine that.
18   Q   What did you pay for it?
19   A   Wait, I wanted to finish --
20   MR. BRADLEY:  Would you mind, Mitch?  You
21 keep asking him a question.  He starts answering
22 it, and then you switch to another question.  It's
23 completely rude and unprofessional.
24   MR. LITTLE:  He said he didn't understand my
25 question.  Calm down.  Lower your voice.

216

1    A   (Continuing)  What -- what I said is I -- I
2  didn't actually -- I don't know how you -- how you
3  determine that.  And so what I was going to say is
4  that, I mean, there are general trends in the
5  marketplace in Charleston, you know, for -- they show
6  you graphs about how house -- house prices increase
7  over time in general and in different markets, sub
8  markets in Charleston.
9    Q   Uh-huh (affirmative).
10   A   And so, I mean, you could probably figure out
11 a percentage based on that, but we -- we also -- I
12 mean, we -- every house we've had we've put sweat
13 equity in, as well.  So Elisabeth is just really good
14 at making houses look nice, and so we -- we paint,
15 we -- you know, we do trim and moulding and all those
16 things.
17   Q   What was your basis in the house on Ponsbury?
18   A   So it was, I think, somewhere around 500,
19 550,000, somewhere around there.
20   Q   Did you get an appraisal that supported your
21 home equity loan on the second mortgage?
22   A   No, I don't -- it seems to me they always do
23 that, and so I -- I imagine we did.  But I don't -- I
24 don't actually recall.
25   Q   When you took out that money, did you tithe

217

1  on it?
2    A   When we took out the money on the -- for the
3  home?
4    Q   Yeah.
5    A   We -- we took out money, so everything we
6  earned on that -- we did not tithe on the money that we
7  took out of the home.  We -- everything that we earned
8  on that money, we tithed on.  And so -- so the interest
9  payments, anything -- anything that came in, we -- we
10 tithed on that and actually a little bit more than a
11 tithe.
12   Q   Okay.  So when you took out equity in the
13 home, you invested that with various businesses,
14 including Z Restaurant?
15   A   Uh-huh (affirmative).
16   Q   You didn't tithe on the money that you took
17 out, but if you got money back from Dave, you tithed on
18 that money, right?
19   A   So -- so actually more than a tithe, but
20 that's all the money that we got back, so on the gross,
21 yeah.
22   Q   I see.  When you borrowed money against the
23 other real estate, the sheer -- the sheer appreciation
24 in value, you took that equity out, did you tithe on
25 that?

STEVEN LENES - MAY 11, 2012

---

218

1    A   So I don't think we did.  You know, that --
2    that money out was -- I felt that, you know, that --
3    you know, that was money that was a loan, and so, you
4    know, that's money that we owed the bank that we would
5    pay them back.  And so if -- if we had sold the home,
6    so when we had a house that we sold that we renovated
7    downtown, then all -- that money, we gave the Lord --
8    we gave the Lord that money first, the -- the -- the
9    percentage that we determined beforehand.
10        And so I guess I looked at the -- the -- the
11   loans on the house, not really so much as a -- like an
12   income, but as a -- that was borrowed and that it had
13   to be paid back.
14    Q   Below there on Exhibit 151, page Lenes Hard
15   Copy 000186, there's a category that says
16   "Overreaching," do you see that?
17    A   Uh-huh (affirmative).
18    Q   Underneath that, it says, "Florida condo
19   speculation, if it hits the news, get out."  What did
20   that mean?
21    A   You know, I -- I don't -- I don't recall what
22   that meant.
23    Q   How about the category below that, says,
24   "Unrealistic expectations, if the return is too high,
25   it probably isn't a good investment."  Did a 12 times

---

219

1    your money return in BioNovix sound like a reasonable
2    return on your money in exchange for risk?
3    A   So Loral talked the -- through all of her
4    things about what returns would be.  And -- and so I'm
5    thinking I lived in a different world, you know, prior
6    to this and that these are the kind of returns that you
7    get when you -- when you have a company that you sell
8    and it goes -- I mean, a 600 million dollar company, if
9    you do that, I mean, that's a 12 -- a 12 times returns,
10   I guess.  I mean, that's what -- what she said.
11        And so -- so she acted like that's a regular
12   kind of a thing and so I'm thinking this must be a
13   regular kind of a thing.
14    Q   That's what it sounded like to you?
15    A   Yes.
16    Q   Take a look at the next page.
17    A   All right.
18    Q   Do you see at the bottom, there's a category
19   here that says, "Suitability," and some notes that you
20   made there?
21    A   All right.
22    Q   Do you see that?
23    A   Uh-huh (affirmative).
24    Q   You write, "Meet your goals, must meet
25   investment objective, don't invest if it's not what you

---

220

1    want, follow money rules."
2    A   Okay.
3    Q   Did you adhere to this?
4    A   So that's what we felt Loral was providing,
5    that's what she helped us figure out in our goal, we
6    had our goals, she -- she helped us figure out goals
7    for investments, she helped us figure out what
8    investment objectives would be, you know.  So she
9    talked about something that appreciated versus
10   something that would produce cash and so how you divide
11   up with that.
12        And really, I think probably "don't invest if
13   it's not what you want" kind of speaks for itself.  And
14   then following the money rules, you know, whatever was
15   greater than 12 percent or whatever our other money
16   rules were.
17        So that -- that seems like that's what --
18   what we understood from -- from the things that Loral
19   presented and that she recommended and that -- that she
20   had done.
21    Q   What was your responsibility with respect to
22   evaluating potential investments?
23    A   So my -- you know, we -- we had the -- you
24   know, we obviously have provided money and -- and so we
25   needed to make sure that, you know, we -- we would do

---

221

1    what we said we did -- would do.  Our responsibility
2    was to -- you know, to make the investment, to learn
3    about them.
4        We had -- you know, when we looked at the
5    things that were involved in -- in evaluating a -- an
6    investment, we had, you know, is this -- essentially
7    the things that she provided, so, you know, is this an
8    investment -- was it a -- was it an already existing
9    business, was it already successful, was there a good
10   team in place, you know.  So that's -- I mean, that's,
11   you know, how you -- that's how you evaluated an
12   investment, has it got a good plan, is it -- you know,
13   just -- just those things.
14    Q   The person providing this talk was a woman
15   named Melinda Newton, a certified financial planner
16   from Dallas, correct?
17    A   I'm assuming that that's correct just from
18   the top note there, but I don't -- I don't actually
19   know if that's somebody who talked on this or if she
20   talked about direct investments.  I just -- I don't --
21   I can't quite sort out on my -- on my notes to remember
22   how that occurred.
23    Q   What did she tell you about risk?
24        MR. BRADLEY:  Objection, lack of foundation.
25   BY MR. LITTLE:

---

STEVEN LENES - MAY 11, 2012

### 222

1    Q   Do you see your note there that says, "risk,"
2  two lines above "suitability"?  What did she tell you
3  about risk?
4    A   I'm looking.  I don't -- oh, risk.  You know,
5  I don't have anything written there, so I don't -- I
6  don't really recall.
7    Q   Don't remember.
8    A   That's true.
9    Q   I want you to turn with me, if you would, to
10  Tab B in the back again.
11    A   Okay.
12    Q   Okay.  We're going to look at your
13  investments that you made here.
14    A   This page (indicating).
15    Q   Page 2, yes.
16    A   All right.
17    Q   I want you to rank for me on a scale of zero
18  to 10, zero being not risky at all, 10 being the
19  highest possible risk you could have, what Z Restaurant
20  Group was to you at the time you made your investment.
21        MR. BRADLEY:  Objection.  We went through all
22    this before.
23    A   (Continuing)  So you're asking me how risky I
24  thought the investment was?
25    Q   At the time you made it, yes, sir.

### 223

1    A   At the time I made it, and so what -- what I
2  understood was that we were presented with the --
3  excuse me, these investments that were going to provide
4  a very good return and that they were investments that
5  were suitable for us and that were investments that had
6  a good team in place, that had, you know, good product,
7  that had a proven track record, you know, Z Restaurant
8  was already successful in California, that -- the
9  restaurant in California.
10        And so we -- we didn't -- you know, at the
11  time, we -- we understood that this was going to be a
12  great investment that we'd have a good return on and --
13  and we -- we never really talked so much about risk.
14    Q   I understand.  I asked you to kind of rank
15  this one.  If you can't do it, just tell me, "I can't
16  do it."  Can you rank it somewhere between zero and 10
17  in terms of risk, as you understood it?
18    A   To be honest with you, I don't -- I don't
19  think I can really rank them --
20    Q   Okay.
21    A   -- you know, at the time because I -- you
22  know, we didn't -- we didn't -- we just didn't really
23  talk so much about that.
24    Q   Is that the same for all the investments on
25  this document, your fourth supplemental discovery

### 224

1  responses?
2        MR. BRADLEY:  Objection, asked and answered.
3  BY MR. LITTLE:
4    Q   That you can't rank them?
5    A   I -- I know, you know, I'd have to -- I'd
6  have to say that, you know, she presented -- she
7  presented investment opportunities to us that were, we
8  felt, appropriate for us.  She knew who we were, she
9  knew what we had, she knew -- she knew that we -- that
10  we -- what our goals and aspirations were, she knew
11  what we could endure.  And -- and so she gave us
12  choices of -- of -- of investments that were
13  appropriate for us, so we -- we didn't --
14    Q   Uh-huh (affirmative).
15    A   -- we didn't think so much of the risk.
16    Q   You understand that returns are a function of
17  risk?
18    A   I -- I understand that now.
19    Q   You didn't understand that back then?
20    A   The -- we -- we didn't think so much about it
21  back then.  She -- she was telling us that these are
22  really -- these are great investments.
23    Q   I'm not -- I'm not --
24    A   And --
25    Q   -- asking you whether you thought about it.

### 225

1  I'm asking you whether you understood it back then.
2  Did you understand that?
3    A   So, you know, if we -- if we had really
4  understood it, we -- I don't know if we would have
5  asked about it or more or -- you know, she -- we -- we
6  worked hard, we had rental properties, we did these
7  things, we -- they said that they, you know, would be
8  able to give us a 20 to 25 percent return.
9        And the economy was booming and things were
10  going well.  We thought this is what happens in -- in
11  businesses that -- you know, that -- where you're
12  actually involved in the business and everything.
13    Q   Sir, listen to my question.  My question was
14  different.  In 2006, did you understand that rewards
15  were a function of risk?  If you did, just say yes, if
16  you didn't, just say no.
17    A   So at that point in time, I don't know that
18  we knew to -- you know, how to even answer that
19  question.  I mean, we -- we had been working and Loral
20  said that we could come, you know, there, we had an
21  opportunity to invest in businesses that had a much
22  better rate of return.  I don't -- you know, it's not
23  something I really thought about.
24    Q   Dr. Lenes, turn to Exhibit 152.  Is this your
25  handwriting?

STEVEN LENES - MAY 11, 2012

---

226

1    A   Uh-huh (affirmative).
2    Q   In the right category, it says, "startup has
3  a higher level of risk."  Who talked about that with
4  you?
5    A   You know, I don't -- I don't have a note to
6  know who did.  I don't know where that came from.  I
7  mean, I wrote that.  I don't know when.  I mean, I just
8  don't know what -- what that was.
9    Q   What does it say throughout the right column
10 of this initial due diligence checklist?
11   A   So it talks about level of risk and the --
12 and the thing that is not so straight forward about
13 this in the context is that you -- you have a team in
14 place, you know, an opportunity, a team.  I'm not sure
15 what all this is.  And so when you -- when you look at
16 all these things, then, you know, the risk is not --
17 it's just not as great.
18       And so you have a team, you have an
19 opportunity, it's an existing business, there's an
20 industry trend up or down, you know, do you understand
21 the concept.  So if -- if those -- if you have those
22 kind of things, then the business should do well.
23       And so Loral would answer those kind of
24 questions.  She'd say, "We have a great team.  They
25 have direct experience in the team and they're -- they

---

227

1  have a good background."  I mean, David Zebny was an
2  M.B.A. and he had -- and he had corporate background.
3       So she -- she told us these things and then
4  said she would answer them.  This is an existing
5  business, the restaurant was in California, it was
6  doing well, people -- more and more people are eating
7  in restaurants, you know, our culture is busier and
8  busier and people are going to restaurants to eat and
9  not eating at home as much.
10      David Zebny was an M.B.A.  They had a -- he
11 was entrepreneurial, they had a guy who helped -- who
12 helped Mrs. Fields get her cookies around the country.
13 And so all these things are saying this is a good
14 investment.
15      And so if you -- you know, if you didn't know
16 what you were doing, you know, that would be different,
17 but Loral is the expert, she's the one who knows how
18 these things work.  And so I counted on her expertise
19 and then I would go through, oh, yes, David Zebny is --
20 has corporate experience, he's already run the
21 business, you know, it's those kind of things.
22      So it's not -- you know, when you talk about
23 risk, it was, you know, this is a great opportunity,
24 you know, they're -- the sales in -- in -- in Boston, there's
25 going -- you know, people -- this is an area where a

---

228

1  lot of people go out to eat, Harvard Square.  Harvard
2  college is there, there's all these businesses there,
3  there's hospitals there.  You know, there's all this
4  stuff going on, and for this niche of restaurant, it's
5  a great opportunity.
6       So it's a mod -- moderately priced restaurant
7  that people can go back to, enough variety in the menu.
8  And then they had opportunities in the evening with the
9  liquor and they could -- they had parties and functions
10 there.  And so it's a -- I mean, they -- they answered
11 all the concerns, you know, as far as any level of risk
12 goes.
13   Q   When did you write these notes?
14   A   Well, I -- I don't know.  I mean, it's not --
15 it's not dated.
16   Q   Do you recall signing a representation that
17 you understood that Z Harvard Square had no operational
18 or financial history whatsoever?
19   A   And so, again, what Loral told us was that Z
20 Cafe in California, that David owned and operated, was
21 a successful venture and that -- and that that's, you
22 know -- that -- sorry, just lost my thought.  Can you
23 ask me your question again?
24   Q   Do you understand that you represented that
25 you understood that Z Harvard Square had no operational

---

229

1  or financial history whatsoever?
2    A   Okay.  So we -- we understood that -- that it
3  had operational interests -- history because it was a
4  successful venture in California and that essentially
5  they were going to do the same -- the same thing in
6  Boston.  So it's -- it's part of the same group.  It
7  would be -- it would be a successful venture.
8       MR. LITTLE:  We're going to change the tape
9  real quick.
10      VIDEOGRAPHER:  Off the record at 3:55, Tape
11 No. 5.
12 (Brief recess taken.)
13      VIDEOGRAPHER:  This is Tape No. 6 in the
14 deposition of Dr. Steven Lenes.  We're on the
15 record at 4:01.
16 BY MR. LITTLE:
17   Q   Dr. Lenes, turn to Exhibit 161, if you would,
18 please.
19   A   All right.
20   Q   Did you read this statement regarding
21 securities prior to making your Vetrazzo investment?
22   A   I -- at this point, I don't remember.
23   Q   Okay.  Turn to Exhibit 175, if you would.
24   A   (Witness complied with request of counsel.)
25   Q   Do you recall having seen Exhibit 175 before?

---

STEVEN LENES - MAY 11, 2012

---

230

1    A   Sorry.  Ask me again.
2    Q   Yeah.  Have you seen Exhibit 175 before?
3    A   Yes.
4    Q   Does your handwriting appear on page Lenes
5  Hard Copy 001521?
6    A   1521, that looks like it's probably my
7  writing.
8    Q   Under "investor suitability information," you
9  write your occupation as M.D. and business, residential
10  and commercial real estate, investor in businesses,
11  stock investing.  And the question below that asks, "Do
12  you have sufficient knowledge and experience in
13  financial and business matters so as to be capable of
14  evaluating the merits and risks associated with
15  investing in the company?"  And you marked "Yes,"
16  correct?
17    A   Yes.
18    Q   That was true, correct?
19    A   Well, that's a good question.  We --
20    Q   Is it?
21    A   Yeah.  So we -- we went to -- to Loral, we
22  went to Loral's Big Tables and Loral taught us how --
23  you know, the things involved in different investments.
24  And so we -- felt that we had an understanding of
25  what it took to involve -- to be involved in

---

231

1  investments and -- and evaluating businesses.  And so
2  at the time, that was true.
3    Q   And you write below that -- well, it asks
4  you, "Please briefly describe the basis of your
5  knowledge and experience," and you write, "As above
6  times 20 years."  Do you see that?
7    A   Yes.
8    Q   Was that true?
9    A   So we had been involved in real estate in our
10  business and in stock investing for 20 years.
11    Q   Do you intend to tell the ladies and
12  gentlemen of the jury at trial that after 20 years of
13  investing in businesses, real estate, and stocks, that
14  you did not understand that returns are a function of
15  risk?
16    MR. BRADLEY:  Objection, asked and answered.
17    A   (Continuing)  The -- what I intend to tell
18  the jury is that when we did the business and real
19  estate investments and those sorts of things over the
20  course of time, we invested in our home, we invested in
21  rental properties, we had a -- you know, around
22  property where you had a piece of -- a piece of
23  tangible, you know, concrete things that you could sell
24  if you needed to and cover that -- cover the loan if
25  something happened and that we worked with sweat equity

---

232

1  to make those things worth more value.
2    And we had stocks that we invested in that we
3  felt, you know, those are reasonable companies and so,
4  you know, General Electric grew over time.  It's -- you
5  know, that's what we understood.
6    Q   And was -- did you take risks when you bought
7  the rental homes?
8    A   So the -- you know, if -- the way we were
9  careful with that was, you know, we had -- we had a
10  property that we borrowed money on that was -- it was
11  worth a little bit more than we borrowed.  I had life
12  insurance if anything ever happened to me.  We saved,
13  you know, we had a -- we had renters in the -- in the
14  property.
15    And so we felt, you know, that that, you
16  know, was not very risky.  We had insurance, you know,
17  if a hurricane came through and we didn't have rent,
18  you know, we had a -- a clause in the insurance that
19  said they would pay the rent, you know, until you get
20  the house repaired.  So we thought those were
21  reasonable things, you know, we did that.
22    When we went to Loral, she -- she said that
23  you have a good team, you have a good opportunity, you
24  have a good product, you have things that are good.  I
25  mean, this is a business.  We hadn't -- we hadn't done

---

233

1  those kind of businesses before.  The -- the business
2  that we had was my -- my side business and Elisabeth
3  working for Pourquoi Pas when she did interior design
4  businesses.
5    And so that was -- you know, we are careful
6  with -- with how we -- how we managed those and so --
7  but it was -- that was a part-time business that she
8  did out of the home because she -- she cared for our
9  children at home, she home schooled them.  She operated
10  a business out of the home.  She did real estate out of
11  the home.  And so those businesses, you know, we -- we
12  were careful with them.
13    And so we went to Loral and we didn't know
14  about these other businesses, so she -- she told us we
15  had a good team, we had all these things.  And so we
16  felt that was a good thing.  And she offered us
17  investments and they were good investments because we
18  would have a good return on them.
19    Q   Doctor --
20    MR. LITTLE:  I object, nonresponsive.
21  BY MR. LITTLE:
22    Q   Dr. Lenes, that was a huge answer, I asked a
23  little question.  My question was, when you did the
24  rental houses, was there risk?
25    A   So -- well, I guess I answered that there was

---

STEVEN LENES - MAY 11, 2012

234

1  risk that we appropriately managed.
2      Q   What were the risks?
3      A   The risks are -- I mean, I think I sort of
4  answered that when we --
5          MR. BRADLEY:  Yeah, I'm sorry, hold on.
6  Objection, asked and answered.
7      A   (Continuing)  So the risks were if a
8  hurricane comes through --
9      Q   Okay.
10     A   -- then you have -- and the house is damaged
11  and you can't have a renter in it, then you have damage
12  to the house, you know, but we had insurance to cover
13  that.
14     Q   What else?
15     A   And so the risk is if I were killed and
16  couldn't, you know, be -- have my salary as a backup in
17  case something else happened, then I had life insurance
18  to help cover that and to provide for my family.
19     Q   What else?
20     A   And so the risk if we had -- if it took us a
21  little bit of time to get a renter in, then I had my
22  job and we could cover the rent, we could cover the
23  payments for however long it took us to get a renter
24  into the house.  And if -- the other risk if somebody
25  were injured or something at the house and they -- you

235

1  know, there was insurance that would cover that.
2      Q   What about one that I'm having a lot of fun
3  with right now, you have a renter who doesn't pay --
4      A   So --
5      Q   -- is that risk?
6      A   So that's a risk and so we had -- and we'd
7  had -- we've had a renter that didn't pay.  I mean, we
8  had that.  So we had -- we had my salary, you know,
9  that we could make the payment while that renter didn't
10  pay and while we went through all the process of, you
11  know, getting them out and going to court and all those
12  kind of things about all of that.
13     Q   Is there any other risks that you can think
14  of vis-a-vis have having rental houses?
15     A   Not right now off the top of my head.
16     Q   Okay.  But all of those risks are subsumed
17  within the price that you ask someone to pay to live
18  there for a month, aren't they?
19     A   So tell me what that means.
20     Q   Did you not understand?
21     A   The -- I don't think I did.
22     Q   Okay.  You are willing to accept all of those
23  risks for a certain price per month, aren't you?
24     A   I mean, I don't know that I thought through
25  it that way, but --

236

1      Q   Fair enough.
2      A   Yeah.
3      Q   Was there some safety in the fact that you
4  could drive by the house and see there and touch it and
5  stand on the lawn and say this is mine?
6      A   I think most of the time that I drove by the
7  house and looked at it, I was looking to see if they
8  watered the grass and if I needed to come mow it --
9      Q   Right.
10     A   -- and if the shrubs needed to be trimmed or
11  if the dog had chewed up the fence.  I think that's
12  mainly what I thought about when I saw the houses, and
13  did they need to be, you know, washed and those kind of
14  things, so...
15     Q   But you knew at the end of the day that you
16  owned it, you had a hard asset that you could go by?
17     A   We had -- we had a hard asset that we would
18  work to pay off the loan and that that would -- we
19  would have renters and there would be a source of
20  income from that.
21     Q   I see.
22     A   Are you -- are you a rental owner, too?
23     Q   I'll talk to you about it afterward, how
24  about that?
25     A   Okay, sorry.

237

1      Q   Deal.
2      A   Yeah.
3      Q   Let's take look at Exhibit 186, if you would,
4  please.
5      A   All right.
6      Q   I believe this is a complete version of the
7  subscription agreement that you signed for Vetrazzo.
8  Is that what it looks like to you?
9      A   Yes, I think so.  Making sure that all the
10  pages are there.  Okay.
11     Q   And that's the subscription agreement that
12  you signed in order to invest in Vetrazzo, correct?
13     A   It is.  We had -- I'm assuming that
14  there's -- I don't know if there's another -- I don't
15  quite know how we did it, because we -- we invested in
16  Vetrazzo as just like a regular investment.  And then
17  we invested -- they needed -- they needed -- they had
18  another capital call where they needed to raise more --
19  more money, and so we invested a second time in a
20  retirement account.
21         And so I -- I can't quite remember the timing
22  of all of these.  So there -- this is -- this is an
23  investment in them, but I think there's another --
24  another part of this.
25     Q   There was a second traunch of financing that

STEVEN LENES - MAY 11, 2012

---

238

1  they needed?
2      A   Yes.
3      Q   And you participated in that, as well?
4      A   That's correct.
5      Q   What was the alternative if you didn't?
6      A   Well --
7      Q   Have you thought about that?
8      A   -- the -- they gave us another opportunity,
9  and so we -- we had been -- we saw, you know, how the
10 company was doing and they -- we felt, you know, we'd
11 invest some more money.
12     Q   And they warned you about that in Exhibit
13 187, didn't they?
14     A   About what?
15     Q   That the company may require additional
16 capital, if you'll take a look at the second page of
17 Exhibit 187.
18     A   Uh-huh (affirmative), okay.
19     Q   And you knew that that was something that
20 you could -- that could happen when you made this
21 investment, correct?
22     A   The -- so what -- you know, when they talked
23 about raising -- having an additional fund-raising,
24 they were raising money so that they could essentially
25 get more equipment.  They -- they needed to -- they

---

239

1  needed a bigger capacity to be able to provide for
2  the -- for the growth of the company.
3          And so there -- there was not a sense that
4  there was a risk to the company.  There was -- if I
5  remember right, there was a -- a sense that we can --
6  we can produce more product, if we have some more
7  capital, we can get this piece of equipment that will
8  make -- make us be able to produce more of the
9  countertop and be able to go into more markets and
10 be -- and would be able to account -- we'd be able to
11 attract bigger -- the people who sell your products, I
12 forget what they're called, but --
13     Q   Distributors?
14     A   Distributors, yeah.  So we'd be able to make
15 a -- deal with a bigger distributor and expand the
16 distribution of the product around the country.  So it
17 was -- you know, an opportunity to grow the company
18 further, so it seemed like it was a reasonable thing to
19 do.
20     Q   It didn't seem like a high risk investment at
21 the time?
22     A   It's -- it's a company, I mean, people --
23 General Electric, in their -- in their -- one of their
24 catalogs used Vetrazzo's -- Vetrazzo countertops to
25 display their -- their -- their appliances, you know,

---

240

1  toasters and different things that they put.  And
2  Vetrazzo was in -- oh, one of the business, Forbes or,
3  I forget those, Fortune or -- I can't remember which
4  company, but where they -- where you get -- they have
5  votes on who -- who are the top new companies, and
6  Vetrazzo was one of the companies that they chose to be
7  in the competition for that.
8      Q   Wow.
9      A   So there -- I mean, these are really -- this
10 appears to be a really great company, Loral was right.
11     Q   So my question was, you didn't consider it to
12 be a high risk investment at the time?
13     A   Oh, sorry.  So -- so we felt that this is a
14 company that's up and moving and that, you know, we'll
15 make some more product and it will be good, we'll be
16 starting to generate some returns.
17     Q   Please answer my question.  You didn't
18 consider it to be a high risk investment at the time
19 you made it?
20     A   So, again, we -- we didn't consider so much
21 about risk.  This is a company that was doing well, and
22 so, you know, it -- it's not that we did or didn't
23 consider it.  You know, we thought this is a company
24 that's going to be producing a good return, it's a
25 great company, and -- and so we wanted to help it

---

241

1  continue on.
2      Q   How do you dovetail that with the fact that
3  Vetrazzo told you on page Lenes Hard Copy 002206 that
4  you should consider the investment to be highly risky?
5      A   The -- so the -- the thing that's, you
6  know -- about that is, is that when we -- when we
7  talked to Loral when -- when we went to the Big Table,
8  and she presented these opportunities, she -- she
9  talks, you know, there are some things that we just
10 have to do for the paperwork.
11         And so, you know, it's those kind of comments
12 and we just, you know, okay, well, that's what they do.
13 You know, this is something that, you know, lawyers
14 have people do or SEC or somebody has them do this kind
15 of paperwork.
16         And, again, the things that she taught us,
17 she's -- she's answered.  So this company, you know,
18 you write that -- you -- this company has people who
19 have been trained by Loral managing it, they have a
20 green product in a state that focuses on green, that
21 gives grants to companies to do green.  They have --
22 it's a company that is in Fortune or -- magazine.  It's
23 a company that GE notices, it's a company that people
24 are -- Loral -- Loral even said she used the countertop
25 in her office or home or somewhere, you know, when she

---

STEVEN LENES - MAY 11, 2012

## 242

1  was doing some work up there.
2       And so all these people are using Vetrazzo
3  countertop, you know, you see it in magazines, and
4  people are talking about it, it's a -- it's a great
5  product.  And so, you know, there's -- they wrote that,
6  but, I mean, that -- you know, that really didn't have
7  any relevance.  It was a company that was on the move,
8  that was doing well, that had a lot of focus and a lot
9  of exposure, and that companies -- you know, some of
10 the big countertop companies were -- were -- were
11 anxious, you know, in seeing how they did because
12 they -- none of them had a green countertop that they
13 could offer.  So Corian or some of those kind of
14 companies didn't have -- didn't have that kind of a
15 product to offer.
16      Q  Sure.  So I don't want to misstate anything
17 that you've said.  It sounds to me like despite the
18 fact that you read these materials, the subscription
19 agreements, the private placement memorandum, that
20 Loral's endorsement essentially overrode those things,
21 overrode those documents --
22      A  So when --
23      Q  -- for you.
24      A  -- when Loral made those recommendations, she
25 also answered those kind of concerns in the way that

## 243

1  she taught people to do things.  And so it -- it's not
2  so much that you -- that they -- that you -- they
3  overrode them, I don't think that that's an accurate
4  representation.
5       Q  Okay.
6       A  She -- it's not like, oh, you know, Loral,
7  it's -- it's this is a good company, it's got good
8  leadership, it's got a good product, it's got a good
9  assembly plant, you know, it's got support from
10 California and General Electric and Fortune.  So
11 it's -- it's not even her endorsement, I mean, it's,
12 you know, the whole thing that she presented, it's
13 really the whole picture of here's -- here's a great
14 company and Loral recommended it and that's just,
15 that's another bit of it.
16      Q  I want to turn with me to Tab D in that
17 book in front of you.
18      A  Okay.
19      Q  If you would, turn to page 5.  Actually, turn
20 to page 6, if you would.  We asked you and your wife to
21 come up with a list of misrepresentations that you
22 contend Loral Langemeier made, okay?  Let's look at the
23 ones under Z Restaurant Group.
24      A  Okay.
25      Q  Do you see that?

## 244

1       A  Uh-huh (affirmative).
2          MR. BRADLEY:  Hold on.  I think you're
3       misstating what this document is at page 6.
4          MR. LITTLE:  That's fair.  All right.
5  BY MR. LITTLE:
6       Q  Well, let me -- let me reframe this, Doctor.
7  On Interrogatory No. 2, I asked you and your wife to
8  identify all statements made by Loral Langemeier or her
9  affiliates which you relied upon in making each such
10 investment.  Do you see that?
11      A  Yes.
12      Q  Okay.  So let's turn to page 6 and you list
13 some statements that you relied upon with respect to Z
14 Restaurant Group.  Do you see that?
15      A  Yes.
16      Q  The first one was that David Zebny was a
17 successful restaurant owner and expert in the
18 restaurant business.  Do you see that paragraph?
19      A  Yes.
20      Q  Was any of that false?
21         MR. BRADLEY:  And I'm going to object.  I
22      think this exact thing was covered earlier.
23         MR. LITTLE:  It wasn't.
24 BY MR. LITTLE:
25      Q  Go ahead.

## 245

1       A  So what are you asking me?
2       Q  Are any of these statements that you relied
3  upon in making your decision to invest in Z Restaurant
4  Group false?
5          MR. BRADLEY:  And, again, to the extent that
6       you know of stuff now based on conversations with
7       your counsel, that's privileged and you don't need
8       to reveal that, but if you have an independent
9       knowledge...
10      A  (Continuing)  Okay.  So what we understood
11 from when we made this -- investment, this is what
12 Loral Langemeier told us about David Zebny, that he was
13 a successful restaurant owner, he was an expert, he
14 was, he had a successful business, he also had an
15 expert with him, that he was a Harvard M.B.A. graduate,
16 he did manage commercial investment real estate with
17 Fidelity, he managed their money, and that he had a
18 very large portfolio of money that he managed and that
19 he was a person of highest integrity.  So we -- that's
20 what we understood when -- when Loral presented it.
21 That's how she presented it.
22      Q  Okay, listen to -- listen to my question.
23 Okay?  My question is, which of these five bullet
24 points, these five statements, the five categories of
25 statements that are identified here by bullet points do

STEVEN LENES - MAY 11, 2012

---

**246**

1  you understand, as you sit here today, to be false?
2      MR. BRADLEY: Again, I'm going to object --
3  or instruct the witness that to the extent it's
4  based on conversations with counsel, not to reveal
5  that.
6      A   (Continuing) So you're -- you're asking in
7  the paper, which -- what things we relied on in making
8  our investments?
9      Q   No, sir.
10     A   Is that --
11     Q   Take a -- are you on page 6 with me?
12     A   Well, I was looking at Interrogatory No. 2.
13     Q   No. Turn to page 6, if you would.
14     A   Oh, then I'm sorry. Okay.
15     Q   Do you see these five bullet points
16  underneath the Z Restaurant Group investment?
17     A   Right. And so --
18     Q   Which of those do you understand to be false?
19     A   And so when you asked the question, I thought
20  you were asking identify all statements made by
21  Langemeier or her affiliates which you relied upon in
22  making each such investment.
23     Q   Yeah.
24     A   That's it, right?
25     Q   Yes.

**247**

1      A   That's what you're asking?
2      Q   That's not what I'm asking now. That's what
3  I asked originally in the interrogatory. Now I want
4  you to tell me which of these five bullet points are
5  false.
6      A   And so I guess I -- I don't know exactly how
7  to answer that because, I mean, there's information
8  that I -- I know now because we talked, and so I don't
9  -- I don't know how to answer that.
10     MR. BRADLEY: To the extent --
11  BY MR. LITTLE:
12     Q   You don't know how to answer the question?
13     MR. BRADLEY: You -- without revealing
14     specific stuff that we talked, you can -- you can
15     answer which ones you now believe to be false.
16     A   (Continuing) Oh, okay. I see. I'm sorry.
17  So I think that, first of all, I don't -- I don't know
18  that he was a person of the highest integrity, and I'm
19  not sure about him being a successful restaurant owner.
20     Q   Okay. Anything else?
21     A   I don't -- I don't know of other things.
22     Q   Okay.
23     MR. BRADLEY: Are you looking at all five
24     bullet points?
25     A   (Continuing) Oh, no. I'm sorry. I was

**248**

1  looking -- sorry. I messed up again. Thank you. I
2  was looking at the first bullet point. Okay. So
3  sorry. Okay. Now I see. So I -- I'm -- I don't know
4  that Loral Langemeier monitored the business.
5      Q   Okay.
6      A   And you're asking me which things I know to
7  not be true, is that correct?
8      Q   Yes.
9      A   Okay. So the business model was a proven
10  success, you know, it didn't actually return 22 to 25
11  percent --
12     Q   Okay.
13     A   -- in two to three years, so that's not true.
14  And you're asking me what I know now, is that correct?
15     Q   Correct.
16     A   And I know that it was not -- I don't know
17  how it started out, but when -- after a while, it was
18  not exclusive to the defendant's community. And I am
19  unsure how Loral invested in it.
20     Q   Okay. Let's go down to the next one,
21  Renaissance Laser.
22     A   So what are you asking me?
23     Q   Which of these five bullet points are false?
24     A   As I now understand?
25     Q   Correct.

**249**

1      A   Okay. Are you making fun of me?
2      Q   No, I'm not. I'm trying to make sure we're
3  on the same page.
4      A   Okay. So what I -- I'm not -- I'm not
5  sure about that Madison Scott is a person of highest
6  integrity.
7      Q   Okay.
8      A   I -- I'm not sure that Loral continued to
9  monitor the business. I -- I don't know what she did
10  with Mike Beller and Madison Scott. Obviously it did
11  not return 28 percent.
12     Q   Was that supposed to be in a year, 28 percent
13  a year? Because if you put in $100,000 and you get
14  $28,000 back, that's not a good return. Are we talking
15  about return on investment or of investment or what?
16     A   So when -- there was a -- there was a time
17  frame involved in that, and right off the top of my
18  head, I don't -- so they -- there was always a time
19  frame involved in the --
20     Q   Fair enough.
21     A   -- investments. And so I -- I know that it's
22  not -- you know, it's -- it's over that period of time.
23     Q   Okay. Please continue.
24     A   And then, again, I'm -- I'm not sure that
25  defendant invested in a like manner --

STEVEN LENES - MAY 11, 2012

---

250

1     Q   Okay.
2     A  -- Miss Langemeier invested in a like manner.
3     Q   All right.  And with respect to Coastal
4 Serenade, there are five bullet points.  Which of
5 these, as you sit here today, do you understand to be
6 false?
7     A  So as we -- as we do some of these, some of
8 these I just -- you know, I don't -- I just don't know
9 the answer to.
10    Q   That's okay.  Tell me the ones you do know
11 the answer to.
12    A  So I don't believe Loral continued to monitor
13 the business.  It obviously did not return 23 to 32
14 percent.
15    Q   Okay.
16    A  And I don't -- I think that -- you know, I
17 just -- I can't remember the last -- the last point.
18    Q   Okay.  Let's move on to Supplements To Go.
19 Which of those do you understand to be false, which of
20 those statements?
21    A  So from one of our previous statements that I
22 can remember was World Class Nutrition, you know, just
23 to go back to -- you asked about that at some point in
24 time.
25    Q   That was the one you missed out on that did

---

251

1 well?
2    A  Correct.
3    Q   Okay.
4    A  World Class Nutrition, yup.
5      I think probably the first bullet point,
6 the -- I don't know that that's true, the Internet,
7 world class team of experts.
8    Q   Okay.  What else?
9    A  I don't know that Loral continued to monitor
10 the business.  The business has not been profitable and
11 grown and has -- you know, I think they've tried to
12 sell it, but there have been no buyers.
13    Q   Okay.
14    A  And I -- and, again, I don't know how Loral
15 has invested in this.
16    Q   So my question was, which of these do you
17 know to be false?
18    A  So I guess I need to answer a little more
19 clearly.  So the experts in Internet marketing and
20 sales and business optimization, monitoring the
21 business.
22    Q   Do you know those two things are false?
23    A  The -- you know, I -- I don't know for sure,
24 I'd have to say that I don't know that for sure.
25 That's what I think.

---

252

1     Q   Okay.  Tell me which of these five bullet
2 points you know for sure to be false.
3    A  So that it was -- that it wasn't grown and
4 sold for a substantial profit.
5    Q   Anything else?
6    A  No.
7    Q   Moving down to BioNovix, which of these five
8 bullet points do you know for sure to be false?
9    A  So Fred Auzenne being a person of highest
10 integrity.
11    Q   You know for sure that's false?
12    A  Well, from how -- you know, how I understand
13 integrity, I don't believe he's acted in that way.
14    Q   Okay.  Any of these other bullet points you
15 know for sure to be false?
16    A  So the business does not -- did not have a
17 positive cash flow at that point.
18    Q   Okay.  Anything else?
19    A  And...
20      Okay.
21    Q   Are you done with that one?
22    A  Yes.
23    Q   All right.  Let's move on to IRR, which of
24 these four bullet points do you know for sure to be
25 false?

---

253

1    A  That Loral would continue to monitor the
2 business.
3    Q   You know for sure she didn't do that?
4    A  There's no -- there's no indication, you
5 know, in the documents and things that they sent us as
6 we went along that she was ever involved with the
7 business.
8    Q   Okay.
9    A  Obviously it didn't triple our investment.
10    Q   Okay.
11    A  All right.
12    Q   Moving on to Oil2, which of these five bullet
13 points do you know to be false?
14    A  So it didn't obviously produce the return
15 that was promised and it is not a proprietary system of
16 investing in oil and gas.
17    Q   How do you know that?
18    A  The -- they have a -- they have oil -- they
19 have -- oil and gas, I mean, that's, I think, how
20 people have invested in oil and gas for a long time.
21    Q   Do you understand that they have a two-party
22 partnership patent pending?
23    A  I don't understand that.
24    Q   Okay.  Anything else in here that you knew to
25 be false about Oil2?

---

STEVEN LENES - MAY 11, 2012

254

1    A    I -- I don't think there's anything else.
2    Q    Okay.  Moving on to Vetrazzo, which of these
3    five -- we're going to skip Loudsoft.
4    A    Okay.
5    Q    Moving on to Vetrazzo, which of these five
6    bullet points do you know to be false?
7    A    It did not produce a 30 percent annual
8    return.
9    Q    Anything else?
10   A    And I don't know how Loral invested.
11   Q    So going back to the beginning, out of all of
12   these bullet points for all these investments, is there
13   anything that -- is there anything that you know to be
14   false other than statements about future returns or
15   individual personal integrity?
16   A    Well, I can't remember all the things that I
17   said as I went through.
18   Q    Take a look.  I just want to be sure.
19        MR. BRADLEY:  And to be clear, you're asking
20   about whether he has personal knowledge?
21        MR. LITTLE:  Asking whether, as he sits here
22   today, he knows any of these statements to be
23   false other than those dealing with future returns
24   on investment or personal integrity.
25        MR. BRADLEY:  Based on his own personal

255

1    knowledge?
2         MR. LITTLE:  Yup.
3    A    (Continuing)  So I think when you -- when you
4    ask this question, you're asking in the interrogatory,
5    what we relied on to make those decisions.
6    Q    That's right.
7    A    And so when I think about what's not true
8    right now, things that I talked about were, I believe,
9    the things that I can talk about.
10   Q    I don't understand what you just told me.  I
11   don't understand that at all.
12   A    I -- I would say that -- that things that
13   you -- you know, it's the -- the failure to survive to
14   produce the returns, that people were not honest in
15   their dealings, as we found out, you know, what was
16   happening to the companies when they were failing, and
17   I know that businesses -- you know, we -- we were never
18   notified about what happened to businesses when we
19   tried to find out.  So there's just things that were
20   hidden.
21        And so it's -- it's just -- you know, it's
22   hard to really know how to answer that question because
23   there's -- there's things that -- that are even outside
24   of that, you know, when we -- when we tried to save --
25   you know, help the business survive, when Elisabeth

256

1    went up to Massachusetts, I mean, it's things that --
2    you know, where, you know, there was not an effort that
3    appeared to help with survival.
4         And there's a lot of things outside the scope
5    of these bullet points that, you know, are concerning
6    to us and that make us wonder, you know, what exactly
7    happened in all of those events and why those
8    businesses failed and why it was so hard to actually
9    get information about when they failed and why they
10   failed and what all happened with the failures.
11   Q    Do you contend that Loral Langemeier knew
12   that these businesses were not going to generate the
13   returns that you expected?
14   A    So, I -- I don't -- I -- I think that we
15   don't -- I don't know the answers to those things.  And
16   so that's -- that's why you have the lawsuit, to find
17   out.
18   Q    Sure.
19   A    And so --
20   Q    As you sit here today, I'm just asking you,
21   do you think Loral Langemeier intentionally lied to you
22   about how businesses were going to succeed or fail?
23   A    So not knowing what is in Loral's mind --
24   Q    Uh-huh (affirmative).
25   A    -- and it's -- I don't know that -- you know,

257

1    I can't say that because I -- I don't know the answer
2    to that.
3    Q    Yes.
4    A    And so there's not a -- there's not a way I
5    would know, and if I were to just guess, then that
6    would be a guess, it wouldn't be something that I know.
7    And we've been, you know, badly damaged by all of this,
8    and so I would certainly hope that that's not the case.
9    But I think that that's part of what, you know, we try
10   and find out through the whole course of this, is what
11   actually happened.
12   Q    Do you think Loral Langemeier knew that Dave
13   Zebny was a liar?
14   A    Again, I don't know that I know what's going
15   on in Loral's mind.
16   Q    Okay.
17   A    And so, you know, if I were to say do I think
18   that, I mean, I have no way of knowing that.
19   Q    Okay.  Well, the reason I ask, Dr. Lenes, is
20   you've made claims against Miss Langemeier that she
21   intentionally misrepresented facts to you so that you
22   would rely upon those misstatements to your detriment.
23   You've sued her for that.
24   A    That's right.
25   Q    What do you -- hold on.  Here comes the

STEVEN LENES - MAY 11, 2012

258

1  question.
2      A   All right.
3      Q   What do you think she intentionally
4  misrepresented to you, sir?
5      A   And --
6      MR. BRADLEY:  Based on -- based on his own
7  personal knowledge?
8      MR. LITTLE:  Based on any evidence he has
9  here whatsoever, as he sits here today, to testify
10  about his claims.
11      A   (Continuing)  So when she -- when she told
12  us -- sorry.  Ask -- ask me the question again.
13      Q   What do you think Loral Langemeier
14  intentionally misrepresented to you, sir?
15      A   So the -- when she -- when she -- the things
16  that we used to make our decisions on, you know, we
17  feel that those were things that she lined up so that
18  we would -- so that we would make the investment.
19  Sorry.  I'm just getting a little tired.  You know, may
20  I just take one break just for a second because I'm
21  getting a little uncomfortable, too, from what I drank,
22  so...
23      Q   Yeah.  I'm going to have to scoot here in
24  just a minute.  Let's take a -- five minutes okay?
25      A   I just -- I just need to make a pit stop.

259

1      Q   Okay, all right.
2      VIDEOGRAPHER:  Off the record at 4:47.
3  (Brief recess taken.)
4      VIDEOGRAPHER:  On the record at 4:51.
5  BY MR. LITTLE:
6      Q   Dr. Lenes, back to my question, what do you
7  think Loral Langemeier intentionally misrepresented to
8  you?
9      A   The -- the thing is -- is that, you know, the
10  businesses, you know, all -- all did poorly.  They all
11  failed.  And so it -- it's hard to know.
12  There -- there were, you know, talks that -- in the
13  community, there are things that were a concern.  And
14  so -- I mean, I don't know how I will know all of those
15  things that happened.
16      And so the -- the lawsuit is to -- is to
17  figure out what all happened and did she tell the
18  truth, did she mislead, did she -- you know, she
19  created a lot urgency for these investments, you know,
20  we -- you know, we felt, you know, we needed to hurry
21  up and make them.  You know, there are just a lot of
22  things that happened that, you know, just now, looking
23  back, didn't make sense to us.  We don't know exactly
24  what all went on, but how -- how will you know --
25      Q   I know.

260

1      A   -- unless you do the --
2      Q   We've been in this lawsuit for a couple of
3  years now, Dr. Lenes.  What is it that you think she
4  intentionally lied to you about?
5      A   So -- so, again, the -- we need to find out,
6  you know, did she intentionally lie.
7      Q   Do you know anything?
8      A   And we need to find out, you know, exactly
9  what occurred, you know, during these -- during all
10  these -- these -- all the proceedings of the restaurant
11  failing and the Renaissance failing and the Vetrazzo
12  failing and Supplements To Go failing and BioNovix
13  failing and, you know --
14      Q   As you sit here today, are you aware of
15  anything that Loral Langemeier intentionally
16  misrepresented to you, sir?
17      A   So that -- that's why we have attorneys.
18  That's why we have the lawsuit.  You know, it's -- we
19  want to find out what the truth is, what's actually
20  going on, you know, did she -- did she misrepresent,
21  did she lie.
22      Q   Please answer my question.
23      A   And so -- so -- so the question is, did we --
24  do we know of something she intentionally lied about,
25  is that what you're asking?

261

1      Q   Yes.
2      A   And so what we're saying is -- is that that
3  is the purpose of the -- of the lawsuit, is to find
4  those things out.  And so I -- I mean, I don't -- I
5  don't know --
6      Q   As you sit here today and we take discovery
7  of your claims in this lawsuit, are you aware of
8  anything that she intentionally lied to you about --
9      A   And so --
10      Q   -- anything at all?
11      A   And so that's -- I mean, I -- I don't know
12  how else to answer that, we have a lawsuit that is
13  going to find out what she intentionally lied, if she
14  did intentionally lie about things, so -- or what she
15  misrepresented or, you know, did she give investment
16  advice that she shouldn't have given or, you know, how
17  did all -- how did all this come together.  So --
18      Q   Is your answer I don't know if she did or
19  didn't?
20      A   The answer is that that is --
21      Q   Yeah.
22      A   -- I mean, it's the purpose of the lawsuit.
23  It's not -- it -- it is to find out what the truth is
24  and -- and seek -- seek, you know, a resolution of all
25  of that.

STEVEN LENES - MAY 11, 2012

262

1    Q    What are you --
2    A    And so --
3    Q    -- what are you claiming in this law shoot --
4    lawsuit that Loral Langemeier intentionally
5    misrepresented to you, sir?
6         MR. BRADLEY:  You know, and here's the thing,
7    I'm going to object, because I --
8         MR. LITTLE:  I'm going to get an answer to my
9    question, Jim.
10        MR. BRADLEY:  Yeah, and I'm going to put an
11   objection, because I think you were asking him
12   for -- for legal opinions here.  I mean, he's got
13   a lawyer who's helped him craft his claims.  You
14   know, he -- he hasn't been privy to all the
15   discovery.
16        MR. LITTLE:  That's ludicrous.
17        MR. BRADLEY:  It's not ludicrous.
18        MR. LITTLE:  That's ludicrous, Jim.
19        MR. BRADLEY:  It's not ludicrous at all.  You
20   produced 28,000 pages of documents.  You want me
21   to testify.  I'll tell you.
22        MR. LITTLE:  I bet you wish you could,
23   because he can't think of anything that was
24   intentionally misrepresented to him, Jim.
25        MR. BRADLEY:  He may -- he's not privy to all

263

1    the information, so you --
2    BY MR. LITTLE:
3    Q    Are you privy to any information that
4    suggests that Loral Langemeier misrepresented
5    something to you, sir?
6    A    So the purp -- I mean, we have -- that's why
7    we have an attorney, is to help us figure out exactly
8    what all happened in the case.
9         MR. LITTLE:  Object, nonresponsive.
10   BY MR. LITTLE:
11   Q    We'll ask the court to instruct you to answer
12   that question.
13        Why would Miss Langemeier intentionally lie
14   to you about anything?  What could her motive possibly
15   be?
16        MR. BRADLEY:  Objection.  Speculation.
17   A    (Continuing)  So when -- when you're asking
18   me what she would -- why she would do that, I mean, she
19   is Loral Langemeier.  I don't know what she's thinking.
20   And she's a separate person than I am.  And so when
21   people do things, there's lots of motivations for why
22   they do them, and I -- I don't know what her motivation
23   is for the things that she does.
24        And so if you're asking me to -- to guess,
25   then I -- I don't know that, you know, I have enough

264

1    information that I could guess on why she would do
2    whatever it is that she did.  And so I -- I don't -- I
3    don't know how I can answer that question.
4    Q    Are you aware of anything that Loral
5    Langemeier gained by your losing, sir?
6    A    So, in a way, that's kind of -- if you'll
7    forgive me, it's sort of a silly question.  So the
8    question --
9    Q    Do you know what I'm asking?
10   A    Well --
11        MR. BRADLEY:  Let him finish.
12   A    (Continuing)  So from what I understand of
13   the question is that if you're asking what she would
14   gain by my losing, you know, I -- I don't know the
15   answer to that.  But the question seems to be better
16   asked that what she would gain by my investing.
17        And so that's why we want to find out what
18   exactly is going on in this case and what happened and
19   was -- did she fulfill her responsibilities properly,
20   did we -- did we -- were we taken advantage of or, you
21   know, how -- why all this happened.  And so there --
22   there's a lot of information that I don't know.
23        When you go to an attorney and have a
24   lawsuit, then you -- you don't know the answer to
25   everything.  And so you -- you guys know how to do

265

1    this, attorneys know how to do this, and so you ask for
2    help to do it.  And so then you decide -- I mean, she
3    hired you to defend her, so it's not like you have an
4    adequate -- you know, you have to defend her, but for
5    us, we're trying to find an attorney that says do we --
6    think we have a case, is this something we can do, and
7    then they -- you guys know how to do all of that.
8         I mean, I -- I know how to do medicine.  I
9    don't -- I don't know how to do law.  And I don't know
10   how to do all these investigations, and so I don't know
11   how to answer that question.
12   Q    In a typical securities fraud case, what
13   happens is an investor says that person lied to me in
14   order to get my money.  Why would Loral Langemeier lie
15   to you?
16        MR. BRADLEY:  Objection.  Calls for
17   speculation.
18   BY MR. LITTLE:
19   Q    Do you know?
20   A    So the -- again -- do you want me to say the
21   same thing again?
22   Q    No.
23   A    It's -- it's --
24        MR. BRADLEY:  Well, it has been asked and
25   answered.

STEVEN LENES - MAY 11, 2012

266

1    A   (Continuing) Yeah, and so she -- she has
2 motives for things that she does and I don't -- I'm not
3 privy to those motives. I mean, it's -- it's not a
4 question that I know how to answer.
5    Q   Okay. As you sit here today, are you aware
6 of any facts that suggest that Loral Langemeier
7 misrepresented something to you intentionally?
8    MR. BRADLEY: Objection, asked and answered.
9    A   (Continuing) And so, again, we've asked
10 attorneys to help us figure out what all exactly
11 happened.
12    Q   You can't answer --
13    A   And so --
14    Q   -- that question without them, right?
15    A   The -- the -- it's -- it's not so much a
16 question of answering with or without them. It's a
17 question of -- I mean, it seems like you want to -- you
18 want to have a proper investigation done and a proper
19 trial and that things are brought out in the open and
20 exposed to the light, and the truth of -- of whatever
21 occurred is then clear and a jury decides, you know, if
22 this is true or not.
23    And then you have -- and you have a proper --
24 a proper procedure that goes for deciding, you know,
25 what actually happened. You know, it's brought out

267

1 into the open.
2    So do -- I don't -- I don't know every detail
3 of Loral's life. I don't know what her motives are,
4 you know. I don't know what she would do, why -- you
5 know, why she would do a particular thing. You know, I
6 don't -- I don't know the answer to that. I think the
7 attorneys can figure a lot of those things out and that
8 they'll -- they'll help us with that.
9    Q   Okay.
10    MR. LITTLE: Thank you. I'll pass the
11 witness.
12    MR. BRADLEY: I've got no questions.
13    VIDEOGRAPHER: This deposition is concluded
14 at 5:00, Tape No. 6.
15    (Deposition concluded at 5:00 p.m.)
16
17
18
19
20
21
22
23
24
25

268

1    C E R T I F I C A T E
2 STATE OF SOUTH CAROLINA:
3 COUNTY OF BERKELEY:
4    I, TERI L. SAMPSON, Registered Professional
5 Reporter, Notary Public and Certified Live Note
6 Reporter, State of South Carolina at Large, certify
7 that I was authorized to and did stenographically
8 report the foregoing deposition; and that the
9 transcript is a true record of the testimony given by
10 the witness.
11    I further certify that I am not a relative,
12 employee, attorney or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action, nor am I
15 financially interested in the action.
16    WITNESS MY HAND AND OFFICIAL SEAL this 16th day of
17 May, 2012, in the Town of Hanahan, County of Berkeley,
18 State of South Carolina.
19
20    _____
      Teri L. Sampson, RPR,
21    Notary Public and Certified
      Live Note Reporter
22
      My commission expires:
23    May 15, 2015
24
25