Exhibit 9

Deposition Excerpts of Lynne Taylor
May 17, 2012

```
 1                UNITED STATES DISTRICT COURT
 2                DISTRICT OF SOUTH CAROLINA
 3                   CHARLESTON DIVISION
 4
    _____
 5                                     )
    ELISABETH LENES and STEVEN         )
 6  LENES,                             )
                                       )
 7          Plaintiffs,                )
                                       )
 8      vs.                            )   CASE NO. 2:10-cv-316-RMG
                                       )
 9  LORAL LANGEMEIER,                  )
                                       )
10          Defendant.                 )
    _____)
11
12
13
14
15
16         VIDEOTAPED DEPOSITION OF LYNNE TAYLOR
17                 San Diego, California
18                Thursday, May 17, 2012
19                      Volume I
20
21
22  Reported by:
    ELAINE SMITH
23  CSR No. 5421
24
25
```

## Page 26

1  that same -- well, first of all, did the metrics that    09:19:53
2  you reviewed seem to be pretty consistent in that,    09:19:56
3  for instance, the rent was always too high as a    09:20:00
4  percent of sales, the help was too high as a percent    09:20:04
5  of sales, et cetera?    09:20:07
6     A  Yes.    09:20:08
7     Q  So it hadn't been a recent phenomena. It    09:20:09
8  appears to have been consistent?    09:20:13
9     A  No. If you go through the memo itself, back    09:20:14
10 even to 2004, when David first opened Cafe Z in Marin    09:20:19
11 County, it had never been profitable, ever. So    09:20:24
12 everything was -- it was a pattern.    09:20:30
13    Q  All right. So would it be your -- is it    09:20:32
14 your conclusion, then, that the failure of these Z    09:20:35
15 Restaurants was inevitable, based on the way they    09:20:38
16 were operating?    09:20:42
17    A  Yeah. Probably.    09:20:45
18    Q  What position did Ms. Langemeier hold with    09:20:47
19 the Z Restaurants?    09:20:53
20    A  She was a prom note-holder in the Cafe Z    09:20:57
21 restaurant.    09:21:00
22    Q  "Prom note," you mean promissory note?    09:21:00
23    A  Promissory note, exactly.    09:21:06
24    Q  Did she -- was she ever on any board of    09:21:07
25 directors or management committee?    09:21:11

## Page 27

1     A  Not -- not until we -- myself, Mark, Frank    09:21:13
2  Mangliochetti and, you know, the group that came in    09:21:16
3  to take over from David, you know, not until that    09:21:19
4  happened. So she had never had any management role    09:21:22
5  before that.    09:21:25
6     Q  Okay. Did she have any ownership role --    09:21:26
7  any ownership interest in the management company that    09:21:30
8  oversaw the restaurant?    09:21:34
9     A  No. It was purely David, the ZRG. ZRG    09:21:36
10 Group you're talking about, right?    09:21:41
11    Q  Did you discover that the Z Restaurant --    09:21:47
12 investments in the Z Restaurants had been offered to    09:21:52
13 people who participated in Loral Langemeier's Big    09:21:55
14 Table?    09:21:59
15    A  Yes.    09:22:03
16    Q  Did you see any of the offering documents    09:22:03
17 that were given to those people?    09:22:06
18    A  Later on I did. I looked at them, yes.    09:22:08
19    Q  Did those offering documents do an adequate    09:22:12
20 or accurate job in explaining the financial situation    09:22:16
21 that you discovered when you went there in October of    09:22:19
22 '08?    09:22:21
23    A  They did not describe Cafe Z at all and the    09:22:22
24 performance of Cafe Z, which was the only historical    09:22:27
25 information, you know, regarding restaurant    09:22:33

## Page 28

1  operations, but as far as putting forth, you know,    09:22:34
2  the concept of the Z Restaurant Group and Harvard,    09:22:37
3  you know, the Z Harvard Square business entity that    09:22:45
4  was planned, they did, they represented it    09:22:51
5  adequately, I thought. It was prepared by attorneys,    09:22:54
6  and it looked like a PPM.    09:22:57
7     Q  Did you see any evidence that due diligence    09:23:01
8  had been performed into the financial metrics that    09:23:03
9  would have notified an investor that if the    09:23:08
10 restaurants were run as the California restaurants    09:23:11
11 had been run, that financial failure was inevitable?    09:23:14
12    A  I didn't see any due diligence done at all.    09:23:19
13 I didn't see any evidence of due diligence done at    09:23:21
14 all.    09:23:23
15    Q  Did you ever receive any information that    09:23:29
16 Ms. Langemeier herself touted the Z Restaurants as a    09:23:31
17 good investment?    09:23:36
18    A  I didn't. I wasn't -- I didn't participate    09:23:36
19 in Big Tables. I never attended a Big Table, so I    09:23:41
20 was completely out of that.    09:23:44
21    Q  So you don't know one way or the other?    09:23:45
22    A  No, I don't.    09:23:47
23       MR. BURNS: I don't know if these have been    09:24:03
24 shuffled in any order, so they may be coming in an    09:24:08
25 order that doesn't make much sense, but let's go to    09:24:12

## Page 29

1  this one next.    09:24:15
2       (Exhibit 4 was marked for identification by
3       the court reporter and is attached hereto.)
4  BY MR. BURNS:    09:24:21
5     Q  Let me show you what we're going to mark as    09:24:21
6  No. 4 to your deposition, which is a -- it's called    09:24:23
7  "Your Consumer Complaint" up at the top.    09:24:31
8     A  Right.    09:24:35
9     Q  And it's dated March 2nd, 2010.    09:24:36
10    A  Yes.    09:24:39
11    Q  Do you recognize this document?    09:24:41
12    A  Yes. I authored it.    09:24:43
13    Q  And what was the reason that you authored    09:24:50
14 this item?    09:24:54
15    A  You know, I can't recall exactly if Loral    09:24:55
16 texted me or Chris texted me, but somebody told me    09:25:02
17 that there was something on the web about Loral's    09:25:07
18 money expert, so I went and read the consumer    09:25:11
19 complaint that John Hood -- it was authored by John    09:25:15
20 Hood, and it just seemed erroneous to me.    09:25:18
21       So I wrote what I knew of the -- you know,    09:25:24
22 the investments, because I had done pretty much the    09:25:32
23 forensic accounting, gone in and looked at the books    09:25:39
24 for each one of the items that were named, each one    09:25:42
25 of the entities that were named.    09:25:45

## Page 74

1  Q  Did you ever see any evidence that Loral 10:21:18
2  Langemeier received either founder's stock, carried 10:21:19
3  interest or some equity or interest in a company for 10:21:25
4  which she didn't pay money in order to let them 10:21:30
5  present at the Big Table? 10:21:34
6  A  No, because I had no -- everything was tied 10:21:36
7  out to what, you know, cash that she actually paid 10:21:40
8  for her investment. So anything that was stock or, 10:21:44
9  you know, something that -- I mean, we had no 10:21:47
10  evidence for that. We had no way to book it or no 10:21:52
11  evidence for it. So nothing -- nothing went on her 10:21:56
12  balance sheet that was anything like that. So... 10:21:59
13  Q  So that means if she owned such a thing, it 10:22:01
14  wasn't on her balance sheet? 10:22:07
15  A  I don't know. 10:22:09
16  Q  Is that what you're saying? 10:22:09
17  MR. LITTLE: Objection. 10:22:10
18  THE WITNESS: I don't -- 10:22:12
19  MR. LITTLE: Hold on a second. Hold on a 10:22:13
20  second. Objection. Assumes facts not in evidence. 10:22:13
21  Lack of foundation. Mischaracterizes testimony. 10:22:15
22  You can answer. 10:22:19
23  THE WITNESS: I had -- I never saw anything 10:22:23
24  where she owned anything in anything that she didn't 10:22:24
25  actually pay for. 10:22:28

## Page 75

1  BY MR. BURNS: 10:22:29
2  Q  Okay. Let me ask you about the -- something 10:22:32
3  called Crysalis Business Systems, LLC, 10:22:37
4  C-R-Y-S-A-L-I-S. 10:22:39
5  A  Never even heard of that one. 10:22:43
6  Q  Did you have any financial or other 10:22:45
7  information about Clear Zone Nursery? 10:22:47
8  A  Clear Zone. Yes, that was a day care sort 10:22:49
9  of thing. Uh-huh, yes. 10:22:51
10  Q  And what do you know about Clear Zone? 10:22:54
11  A  Well, I wrote a memo about all of Jay -- and 10:22:58
12  actually went to Alexandria, Louisiana, where Clear 10:23:02
13  Zone is located, the business of Clear Zone. 10:23:07
14  Q  That's Jay Pearson? 10:23:10
15  A  Uh-huh. And actually Bill Luckey from Lee 10:23:11
16  Financial went with me on the first trip. And then 10:23:14
17  Richie Lee actually came with us on the second trip 10:23:18
18  because Jay was -- Jay was quite a -- Jay had quite a 10:23:22
19  lot going on. 10:23:28
20  So, you know, Clear Zone was one of his 10:23:29
21  entities. He had -- I believe he had the Crumbs ones 10:23:36
22  and Gray Walk and his IRA thing, whatever. That was 10:23:38
23  his -- kind of his cash cow. But I wrote a memo 10:23:45
24  about all of those and how they operated, and we did 10:23:49
25  a forensic accounting of those books as well, cash 10:23:52

## Page 76

1  flows in and out. So... 10:23:54
2  Q  Did you come to the conclusion that 10:23:57
3  Mr. Pearson was conducting some illegal activity? 10:23:58
4  A  It sure seemed like that to me. But, you 10:24:03
5  know, it's my -- I'm not a lawyer. 10:24:05
6  Q  All right. You were so concerned that you 10:24:09
7  contacted a criminal lawyer for your own behalf? 10:24:11
8  A  Yes, I did. 10:24:13
9  Q  Did you ever make any report to any law 10:24:15
10  enforcement agency that Mr. Pearson was operating 10:24:17
11  illegally? 10:24:20
12  A  No, I didn't. 10:24:21
13  Q  Did you report your concerns about the 10:24:21
14  illegalities to Ms. Langemeier? 10:24:24
15  A  Yes. Oh, yes. 10:24:27
16  Q  Do you know if she or anyone in her 10:24:29
17  organization ever reported Mr. Pearson to any law 10:24:30
18  enforcement agency? 10:24:33
19  A  I don't know. I don't -- I don't know. 10:24:34
20  Q  Did people who were introduced to 10:24:41
21  Mr. Pearson through Loral Langemeier's Big Table lose 10:24:43
22  money? 10:24:47
23  A  With Jay? 10:24:48
24  Q  Yes. 10:24:49
25  A  It -- he was continuing to be ongoing when I 10:24:51

## Page 77

1  ended, you know, so I'm not sure, but it sure seemed 10:24:55
2  like it. I mean, he didn't have -- he didn't have a 10:24:59
3  way to pay, and it sure seemed like that money was 10:25:04
4  gone. So... 10:25:07
5  Q  Did you conclude that he was diverting money 10:25:09
6  out of IRA accounts illegally? 10:25:12
7  A  It sure seemed like it. 10:25:17
8  Q  And were these IRA accounts accounts that 10:25:22
9  belonged to Ms. Langemeier's clients? 10:25:25
10  A  I'm sure some of them were. Yes, some of 10:25:27
11  them were. In fact, some of them were Loral's and 10:25:31
12  her children's. 10:25:35
13  Q  Did you see any evidence Ms. Langemeier 10:25:36
14  notified her clients that had been clients of 10:25:42
15  Mr. Pearson of this irregularity? 10:25:44
16  A  Well, we had calls with them about our 10:25:48
17  concerns so -- and were trying to do something about 10:25:51
18  it, but -- 10:25:58
19  Q  Was that with all of the clients? 10:25:59
20  A  Well, everybody that, you know, we knew, 10:26:00
21  everybody that was asking questions about what's 10:26:03
22  going on with our -- 10:26:06
23  Q  Mr. Pearson ran an outfit called Entrust, 10:26:08
24  E-N-T-R-U-S-T? 10:26:12
25  A  Yes, that's right. 10:26:13

Page 94

1 is the side letter agreement as referred to in the  11:05:03
2 note that is held by each of you as executed as of  11:05:07
3 this day."  11:05:10
4     Do you know what note is being referred to  11:05:11
5 by this letter?  11:05:18
6  A  Yes. Loral had -- Loral had invested -- not  11:05:21
7 invested. She had given David money to open Cafe Z.  11:05:25
8  Q  As of February 10, 2005, do you know what  11:05:31
9 the amount of any note she held was?  11:05:35
10  A  You know, I want to say it's in the 50- to  11:05:39
11 $100,000 range. I can't -- I can't remember exactly,  11:05:42
12 but I think it was in that range.  11:05:45
13  Q  Okay. Do you know if she actually turned  11:05:47
14 over cash in an equivalent amount of the note?  11:05:54
15  A  Did she give him cash?  11:06:01
16  Q  Right.  11:06:05
17  A  Yeah. Uh-huh, yeah. It's -- yeah.  11:06:05
18  Q  So whatever -- whatever note you saw, you  11:06:06
19 saw evidence that a cash payment was made --  11:06:08
20  A  Yes.  11:06:11
21  Q  -- in an --  11:06:11
22  A  Yes.  11:06:12
23  Q  -- in that amount?  11:06:13
24  A  Uh-huh, yes, that cleared her bank. Yes,  11:06:14
25 exactly.  11:06:17

Page 95

1  Q  Now, this says that, in paragraph 1, "In the  11:06:18
2 event that you each choose to convert your note  11:06:22
3 balance into equity into SGBD Restaurant I, LLC."  11:06:26
4     Do you know what SGBD Restaurant I, LLC, is?  11:06:34
5  A  Yeah. That was the legal -- that was the  11:06:40
6 legal entity that was the holder, you know, d/b/a  11:06:41
7 Cafe Z Restaurant, Cafe Z Epicerie.  11:06:44
8  Q  Okay.  11:06:50
9  A  In other words, the tax returns were  11:06:50
10 prepared under the name SGBD Restaurant I, LLC.  11:06:52
11  Q  Did you -- did you know that Ms. Langemeier  11:06:57
12 had the right to convert her note into equity in that  11:06:59
13 restaurant?  11:07:02
14  A  I did not. I didn't know -- yeah. I didn't  11:07:03
15 know any -- any of the investors did, and I never saw  11:07:05
16 this guy's name on the books.  11:07:08
17  Q  Do you know if Ms. Langemeier, therefore,  11:07:11
18 had some rights or privileges that were not extended  11:07:14
19 to other noteholders?  11:07:19
20  A  No, I don't know that. I don't know if  11:07:20
21 this -- you know, if this same letter was sent to  11:07:22
22 other people. There were other noteholders, though.  11:07:25
23  Q  Okay. And then it goes on to say, "If one  11:07:29
24 or both of you choose to convert your note balance  11:07:31
25 into equity," in paragraph 2, "such election shall be  11:07:35

Page 96

1 in accordance with and subsequent to your review and  11:07:39
2 acceptance of the Cafe Z" --  11:07:42
3     Is it Epicerie?  11:07:45
4  A  Epicerie.  11:07:47
5  Q  -- "Epicerie 2005 business plan."  11:07:49
6     Did you ever see such a business plan?  11:07:50
7  A  No. I would have loved to, though.  11:07:53
8  Q  It says, "Each of you will receive a ten  11:07:56
9 percent ownership share in SGBD Restaurant I, LLC,  11:07:58
10 and will be entitled to a pari passu sweep of all net  11:08:03
11 cash flow."  11:08:08
12     Do you know if that ever happened?  11:08:10
13  A  No way. They never made any money. Cafe Z  11:08:12
14 never made any money.  11:08:16
15  Q  Was it -- from what you saw -- you went  11:08:18
16 there in 2009 or '8?  11:08:20
17  A  Cafe Z. Cafe Z was -- Cafe Z was in Marin,  11:08:22
18 so it was close to -- I actually had my husband go in  11:08:26
19 there and take a look at it too.  11:08:30
20  Q  I mean, when you went to Boston --  11:08:33
21  A  Yes, that was in 2008.  11:08:35
22  Q  2008.  11:08:38
23  A  Yes. This is when we first came, really,  11:08:38
24 into the --  11:08:40
25  Q  Was this Marin restaurant that's being --  11:08:42

Page 97

1 was that the restaurant that was in existence in  11:08:45
2 2005?  11:08:48
3  A  Yes.  11:08:49
4  Q  Was there any other restaurant affiliated  11:08:51
5 with the Z entities --  11:08:53
6  A  No.  11:08:55
7  Q  -- in 2005?  11:08:55
8  A  No. In fact, this one -- 2004, 2005, 2006.  11:08:56
9 I think it was 2006 when David got the -- you know,  11:09:01
10 the hair to go back to Boston and do this, because he  11:09:05
11 went to school there or something.  11:09:08
12  Q  Did you -- did you see from your '08 review  11:09:11
13 that none of the restaurants had ever been  11:09:14
14 profitable, including this one in Marin?  11:09:17
15  A  Yes. That's what that executive memo points  11:09:19
16 out.  11:09:22
17  Q  So if somebody would have looked at the  11:09:22
18 books of the Marin restaurant back in 2005, they  11:09:25
19 could have told it was not profitable?  11:09:29
20  A  Absolutely, uh-huh.  11:09:32
21  Q  Okay.  11:09:41
22  A  And because -- here's the deal. They never  11:09:42
23 got any K-1s because -- so nobody ever had a clue how  11:09:44
24 it was really doing, because it was all notes.  11:09:52
25 Everything on the books of Cafe Z was notes.  11:09:55

## Page 158

1  A  Apparently. 12:32:22
2  Q  Did you ever receive any communication from 12:33:17
3  any Live Out Loud Big Table investors that they felt 12:33:19
4  that the investments that they were exposed to 12:33:24
5  through Loral Langemeier and her seminar programs and 12:33:28
6  telephone call-in programs, et cetera, were 12:33:36
7  essentially programs that were endorsed by Loral 12:33:40
8  Langemeier? 12:33:43
9  MR. LITTLE: Objection. Assumes facts not 12:33:44
10 in evidence. 12:33:46
11 You can answer. 12:33:46
12 THE WITNESS: Did I ever receive e-mails 12:33:49
13 from people? 12:33:50
14 BY MR. BURNS: 12:33:52
15 Q  Yeah. Any communications from anybody that 12:33:52
16 said, listen, I bought this stuff because Loral 12:33:53
17 Langemeier was part of presenting it? 12:33:56
18 A  Yeah. People said that all the time. 12:33:59
19 Q  Okay. So was that a pretty consistent sort 12:34:01
20 of observation that the participants in these Big 12:34:07
21 Tables were making to you? 12:34:10
22 A  Consistent? Well, that's what they 12:34:13
23 believed. 12:34:17
24 Q  Okay. So a lot of people came to the 12:34:18
25 conclusion that Loral Langemeier was giving these 12:34:19

## Page 159

1  investments her seal of approval? 12:34:22
2  MR. LITTLE: Objection. Lack of foundation. 12:34:25
3  Assumes facts not in evidence. 12:34:28
4  You can answer. 12:34:29
5  BY MR. BURNS: 12:34:30
6  Q  Is that a fair statement? 12:34:30
7  A  They felt like that. 12:34:31
8  MR. LITTLE: Same objection. 12:34:32
9  BY MR. BURNS: 12:34:34
10 Q  So the investors with whom you talked 12:34:35
11 expressed their opinion that whatever was said at 12:34:39
12 these seminars or on these phone calls was said in 12:34:46
13 such a way that they believed the investment carried 12:34:50
14 a Loral Langemeier recommendation; is that correct? 12:34:52
15 MR. LITTLE: Objection. Assumes facts not 12:34:57
16 in evidence. Lack of foundation. 12:34:58
17 THE WITNESS: That's what they thought. 12:35:01
18 BY MR. BURNS: 12:35:03
19 Q  Okay. And you weren't there -- 12:35:03
20 A  I wasn't there. 12:35:05
21 Q  -- to witness what was said and how it was 12:35:06
22 said; is that correct? 12:35:08
23 A  No. 12:35:10
24 Q  How many times did you hear, either 12:35:10
25 personally or through e-mails or any other 12:35:12

## Page 160

1  communications, these investors express their opinion 12:35:15
2  that the investments they had made came with a Loral 12:35:18
3  Langemeier recommendation? 12:35:22
4  A  Well, how many times? Whenever they -- they 12:35:26
5  certainly -- every time they would write -- because I 12:35:33
6  didn't really talk to them much on the phone, but 12:35:38
7  every time they would write, at least initially, the 12:35:41
8  first time, I always heard it. They never expressed 12:35:43
9  an opinion that maybe they shouldn't have been such a 12:35:48
10 lemming and followed somebody blindly down some path 12:35:53
11 without checking it out themselves. They never took 12:35:56
12 responsibility and accountability for their own 12:36:00
13 actions. So let's say that's always the case. 12:36:02
14 Q  Okay. So and these -- these lemmings were 12:36:05
15 ones that also paid Loral Langemeier 15- or $20,000 12:36:08
16 to attend the Big Table; is that correct? 12:36:10
17 A  Yeah. 12:36:14
18 Q  Okay. Did you think that was acting like a 12:36:14
19 lemming to begin with? 12:36:16
20 A  I thought it was crazy. 12:36:17
21 Q  Okay. 12:36:19
22 A  I wouldn't do it. 12:36:20
23 Q  All right. All right. 12:36:22
24 A  But people do. 12:36:23
25 Q  I think -- I might suggest we're going to 12:37:07

## Page 161

1  take a short lunch break. And that would give us a 12:37:10
2  chance also to go through these remaining documents 12:37:19
3  and organize them and maybe save us a little time 12:37:21
4  down the road. 12:37:24
5  A  Okay. 12:37:24
6  MR. LITTLE: Are we off the record? 12:37:25
7  THE VIDEOGRAPHER: This marks the end of 12:37:27
8  Media No. 2 of the deposition of Lynne Taylor. We're 12:37:28
9  off the record at 12:37 p.m. 12:37:31
10 (Recess.) 12:37:33
11 THE VIDEOGRAPHER: We're on the record at 01:43:54
12 1:44 p.m. And this marks the beginning of Media 01:43:56
13 No. 3 of the deposition of Lynne Taylor. 01:44:00
14 BY MR. BURNS: 01:44:02
15 Q  Did you discuss this case during lunch at 01:44:05
16 all? 01:44:09
17 A  Yes. 01:44:10
18 Q  And with whom? 01:44:10
19 A  With Mitch. 01:44:12
20 Q  And what did you and Mitch talk about? 01:44:13
21 A  The line of questioning, I guess. 01:44:18
22 Q  What was the line of questioning? 01:44:20
23 A  It was just my confusion about -- primarily 01:44:24
24 my confusion about the things that we're going over 01:44:27
25 that I don't know a lot about and not -- and not a 01:44:30

Page 170

1  into what company did that revenue flow?  01:53:41
2    A  Probably Live Out Loud. At the time, I  01:53:44
3  think had we had Choice Performance, so they may --  01:53:49
4  it may have come into Choice Performance.  01:53:51
5    Q  Did you see any evidence from any of those  01:53:54
6  entities that they had paid for a ghostwriter?  01:53:56
7    A  I may have.  01:54:05
8    Q  Did you ever see any disclosure made by  01:54:12
9  Ms. Langemeier to anybody that she had not, in fact,  01:54:14
10  herself written the books?  01:54:19
11    A  No. I mean, they were her books. They were  01:54:24
12  her ideas. She was -- you know, nobody was writing  01:54:26
13  them down for her.  01:54:30
14    Q  How do you know they were her ideas?  01:54:32
15    A  Well, she had sessions with them where she  01:54:35
16  told them, you know, what she wrote.  01:54:37
17    Q  How do you know that?  01:54:40
18    A  Because she told me.  01:54:41
19    Q  So she did tell you she had a ghostwriter?  01:54:42
20    A  Well, yeah. I mean, that's how she got the  01:54:46
21  books done.  01:54:48
22    Q  I thought -- I thought when we started this  01:54:49
23  I asked you if she had mentioned to you that she had  01:54:51
24  a ghostwriter and you said no?  01:54:53
25    A  She may have. I mean, that's how I would  01:54:58

Page 171

1  assume that she got the books done.  01:54:59
2    Q  So her sitting down and having a session  01:55:02
3  where she's telling the people what to write, you're  01:55:03
4  just assuming that happened?  01:55:08
5    A  Yeah.  01:55:09
6    Q  She never told you that?  01:55:10
7    A  She may have. I remember it -- not for this  01:55:11
8  one, but for the next series of books, that's exactly  01:55:13
9  the arrangement that she did for the next book that  01:55:16
10  she was doing when I was working with her.  01:55:19
11    Q  Okay. So my question was, to go back to  01:55:21
12  that, when you were working with her, did you see any  01:55:22
13  payments being made to ghostwriters?  01:55:27
14    A  She had a contract with somebody that does  01:55:29
15  that, yes.  01:55:34
16    Q  Do you know who that was?  01:55:35
17    A  No, I don't remember. No.  01:55:37
18    Q  Do you remember if the payment she was  01:55:39
19  making to the ghostwriter that was involved when you  01:55:40
20  were there was more or less than the $70,000  01:55:43
21  apparently she had paid to Ms. Sherman?  01:55:47
22    A  I don't know. I think it's standard,  01:55:50
23  though. I mean, you know, it's whatever you can  01:55:53
24  negotiate. I have a friend who writes books, and she  01:55:55
25  gets a $35,000 advance from, you know, whoever.  01:55:59

Page 172

1  McMillan or whoever. I mean, it -- it seems to be  01:56:01
2  kind of in the ballpark.  01:56:05
3    Q  Okay. But what you're telling me is at this  01:56:07
4  point your conjecture; is that correct?  01:56:13
5    A  Yeah. I mean, it would just be my  01:56:16
6  assumption that that's the way Loral got it done,  01:56:18
7  because -- did I ever see her sitting down and  01:56:22
8  penning something out or typing on the computer to do  01:56:25
9  a book? No.  01:56:28
10    Q  You want to help Loral in this case to the  01:56:40
11  extent you can, don't you?  01:56:43
12    A  I want to tell the truth.  01:56:44
13    Q  Do you feel like you have a loyalty to her?  01:56:47
14    A  Not now. I mean, I did when --  01:56:50
15    Q  Do you like her?  01:56:51
16    A  -- I was working for her.  01:56:51
17      Yeah, sure, I like her.  01:56:54
18    Q  Okay. Let me show you what we're going to  01:56:57
19  mark as No. 22.  01:57:04
20      (Exhibit 22 was marked for identification by
21      the court reporter and is attached hereto.)
22  BY MR. BURNS:  01:57:07
23    Q  These are a series of e-mails back in 2006,  01:57:39
24  and on the last page of this e-mail chain, which is  01:57:43
25  on Bates No. 14227, an e-mail from Loral Langemeier  01:57:49

Page 173

1  with a subject of "Urgent help Tina will be calling  01:58:00
2  you," and it says, "Hey team, We need your help. You  01:58:04
3  all know we are spending a ton of money on the book  01:58:08
4  launch, and so the way orders need to be placed  01:58:11
5  requires MC for MasterCard/Visa - not Amex. Given  01:58:15
6  that I'm an Amex girl, this is a problem. So Tina  01:58:21
7  will call to further explain we need CCRD as a credit  01:58:25
8  card to run book orders and we will certify or wire  01:58:29
9  the replacement money same day, Friday. Can you  01:58:33
10  help? We need 5 to 10K limits or more per card."  01:58:36
11      Did I read that correctly?  01:58:42
12    A  Yeah.  01:58:44
13    Q  Do you see from this that Ms. Langemeier is  01:58:46
14  asking people to send credit card information so that  01:58:50
15  they can buy her books and be reimbursed by her?  01:58:53
16    A  Yeah, absolutely. That's standard.  01:58:56
17    Q  And did that happen when you worked for  01:58:58
18  Ms. Langemeier?  01:59:00
19    A  Yes. Before you can get on the best seller  01:59:02
20  list, that's how everybody promotes their books.  01:59:04
21    Q  How many people do you know have actually  01:59:07
22  purchased the books themselves by reimbursing friends  01:59:10
23  in order to get on the best seller list?  01:59:14
24    A  Purchasing the books themselves and  01:59:17
25  reimbursing?  01:59:19

44 (Pages 170 to 173)

## Page 174

1  Q  You would agree that Ms. Langemeier
2  basically is buying these books herself? She's
3  having friends do it and then she's reimbursing them?
4  A  Yeah. That's how you get on the best
5  seller's list, yeah.
6  Q  And you say that's the way you do it. Who
7  else do you know has done that to get on the best
8  seller list?
9  A  Well, I have a friend, like I said, who
10 writes, who's written -- this is her third book, and
11 that's what she does. I mean, if she wants to get
12 out there, then --
13 Q  And who is this?
14 A  She's a woman in LA that writes books about
15 physical therapy in the water, water power workout
16 and that kind of thing.
17 Q  And what's her name?
18 A  Lynda Huey. And that's -- it's standard to
19 do that. There's nothing --
20 Q  And then you have heard from Ms. Huey that
21 it's standard in the business that you -- that
22 authors of books use friends to buy large amounts of
23 the books and then reimburse them in order to get on
24 the best seller list?
25 A  Yeah. That's -- I think it's a common thing

## Page 175

1  in the book industry, book world.
2  Q  Do you have any -- other than your
3  conversations with Ms. Huey, any other sources of
4  information about what is common in the book world?
5  A  No. She's like, you know, the most -- you
6  know, the author that I know, but she's worked with
7  lots of authors, and that's what they do. Is that an
8  unusual thing?
9  Q  When did Ms. Huey first tell you that that
10 was a common practice?
11 A  Oh, she and I have been friends for over 20
12 years now.
13 Q  And has she been writing books all that
14 time?
15 A  Yeah. She -- yeah.
16 Q  So when Ms. Langemeier was engaging in this
17 practice of buying her own books through friends, you
18 thought that was normal?
19 A  Yeah. I don't see anything wrong with it.
20 It's hard -- it's hard to -- you know, especially
21 nowadays, when you're, you know, competing with
22 Kindles and everything, it's hard to get, you know,
23 book sales, like millions and millions of book copies
24 sold, just like it is with record sales.
25 Q  You believe, don't you, that Kindle sales

## Page 176

1  count toward the best seller list?
2  A  Absolutely. Yeah.
3  Q  Okay. So you said it's difficult in these
4  days with Kindle. But whether it's sold on a Kindle
5  or whether it's sold in a hardbound is --
6  A  Right.
7  Q  -- the same --
8  A  But getting one person and this person and
9  this person and this person, you know, to do it, it's
10 hard.
11 Q  Okay. So rather than rely on a book
12 surviving under its own merits, people game the
13 system?
14 A  Well --
15    MR. LITTLE: Objection. Argumentative.
16 BY MR. BURNS:
17 Q  Is that --
18 A  I don't know. I don't know if I'd call it
19 gaming the system, but, you know, I would say that
20 the way the New York Times and the best seller lists
21 are set up almost like requires it.
22 Q  The New York Times requires people to buy
23 their own books?
24 A  Well, the way the whole system is set up and
25 to -- you know, to reach a certain number of sales

## Page 177

1  to -- and how they -- what kind of sales count is,
2  you know, it's --
3  Q  So you would expect people like, say, John
4  Grisham, to buy his own books to boost his sales?
5  A  Maybe he does. Maybe he does do some of
6  that.
7  Q  Let me show you what we're marking as
8  No. 22.
9     MR. LITTLE: 23, I believe.
10    MR. BURNS: 23. Excuse me.
11    (Exhibit 23 was marked for identification by
12    the court reporter and is attached hereto.)
13 BY MR. BURNS:
14 Q  This is an e-mail dated September 3rd, 2008,
15 from Jeff Richmond to David Zebny and Judy Millikin.
16    Who is Judy Millikin?
17 A  She was an investor in Z Restaurants.
18 Q  And Mr. Richmond is saying, "David, We would
19 like to get additional calls scheduled for you on DPP
20 as well as getting your company info posted to the
21 site. We need to receive your first 500 monthly
22 payment before we can do that, however. Please make
23 the check out to Live Out Loud and send to the
24 following address."
25    Did I read that correctly?